1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT FOR THE

7               EASTERN DISTRICT OF CALIFORNIA

8

9   DELANO FARMS COMPANY, a          )    No. CV-F-96-6053 OWW/DLB
    Washington corporation; THE      )
10  SUSAN NEILL COMPANY, a sole      )    MEMORANDUM DECISION GRANTING
    proprietorship of Susan          )    IN PART AND DENYING IN PART
11  Neill; and LUCAS BROS.           )    DEFENDANT'S MOTION FOR
    PARTNERSHIP, a California        )    SUMMARY JUDGMENT (Doc. 289)
12  Partnerships,                    )    AND GRANTING IN PART AND
                                     )    DENYING IN PART PLAINTIFFS'
13                                   )    MOTION FOR PARTIAL SUMMARY
                                     )    JUDGMENT (Docs. 311 & 312)
14                                   )
                                     )
15              Plaintiffs,          )
                                     )
16         vs.                       )
                                     )
17  THE CALIFORNIA TABLE GRAPE       )
    COMMISSION,                      )
18                                   )
                                     )
19              Defendant.           )
                                     )
20  _____ )

21      Plaintiffs Delano Farms Company, Susan Neill Company, and

22  Lucas Bros. Partnership (hereinafter referred to as Plaintiffs)

23  have filed a motion for partial summary judgment and/or summary

24  adjudication of issues: (1) regarding the "government speech"

25  defense; (2) whether *Glickman v. Wileman Brothers & Elliott, Inc.*

26  or *United Foods, Inc. v. United States* applies; and (3) whether

                                 1

1  *Central Hudson* intermediate scrutiny is not applicable."

2  Defendant California Table Grape Commission (hereinafter referred

3  to as the Commission) has filed a cross- motion for summary

4  judgment on the grounds that (1) requiring Plaintiffs to fund the

5  government speech of the Commission does not implicate the First

6  Amendment; (2) the Ketchum Act is constitutional under *Abood*'s

7  "germaneness" test; (3) the Ketchum Act is constitutional under

8  intermediate scrutiny; and (4) Plaintiff's First Amendment rights

9  are not implicated by compelled funding of most of the

10 Commission's activities.

11      A.   <u>PROCEDURAL BACKGROUND</u>.

12      Plaintiffs commenced this action in the fall of 1996 by

13 bringing two separate complaints against the Commission,

14 alleging, *inter alia*, that the Commission's regulation and the

15 statute establishing the Commission - the Ketchum Act, California

16 Food & Agric. Code §§ 65500 *et seq.* (the Act) - violate

17 Plaintiffs' rights under the First and Fourteenth Amendments to

18 the United States Constitution and their civil rights under 42

19 U.S.C. § 1983.[1]  Plaintiffs initially sought preliminary

20 injunctive relief to permit them to pay the disputed assessments

21 into escrow, and in November 1996 and March 1997, the Court

22 issued two preliminary injunctions granting that relief.

23      In June 1997, the United States Supreme Court decided

24 *Glickman v. Wileman Brothers & Elliott, Inc.*, 521 U.S. 457

25  _____

26      [1]The other case was No. CV-F-96-6198 OWW/DLB and was
   consolidated with this case.

2

(1997), reversing the Court of Appeal's decision that reversed the trial court's grant of summary judgment for defendant against the Plaintiff growers who were challenging a generic advertising program for tree fruit under the Agricultural Marketing Agreement Act (AMAA) on First Amendment grounds.  The Supreme Court held that because the generic advertising program was germane to a broader regulatory scheme and did not involve the funding of ideological activities, *id.* at 473, it should be reviewed "under the standard appropriate for the review of economic regulation" rather than "under a heightened standard appropriate for the review of First Amendment issues," *id.* at 469.

In light of *Glickman*, the Commission sought dismissal of Plaintiffs' complaints under Rule 12(b)(6), Federal Rules of Civil Procedure.  In September 1997, Plaintiffs' First Amendment claim was dismissed to the extent that it alleged that the Commission's program as a whole, as opposed to particular acts in administering the program, violated Plaintiffs' rights. (Doc. 96).  The preliminary injunctions were modified to require Plaintiffs pay 98% of the disputed assessments to the Commission and to pay only 2% into escrow.

In 1999, the Court of Appeals for the Sixth Circuit decided *United Foods, Inc. v. United States*, 197 F.3d 221 (6th Cir.1999), reversing a grant of summary judgment for the United States.  The Sixth Circuit distinguished *Glickman* and held that a generic mushroom advertising program was subject to First Amendment scrutiny.  *Id.* at 224-225.

3

1    In light of the Sixth Circuit's decision in *United Foods*,
2  and contemporaneous Ninth Circuit authority, Plaintiffs moved for
3  reconsideration of the dismissal order.  In June 2000, the Court
4  denied Plaintiffs' motion for reconsideration, relying on the
5  Ninth Circuit's recent decisions in *Gallo Cattle Co. v.*
6  *California Milk Advisory Board,* 185 F.3d 969 (9th Cir.1999), and
7  *Cal-Almond Inc. v. U.S. Department of Agriculture*, 192 F.3d 1272
8  (9th Cir.1999), *cert. denied,* 530 U.S. 1213 (2000),
9  distinguishing the Commission's table grape program from the
10 mushroom program at issue in *United Foods*.  (Doc. 125).  On
11 August 14, 2000, the parties stipulated to dismiss all remaining
12 causes of action with prejudice except Plaintiffs' cause of
13 action under the First and Fourteenth Amendments and 42 U.S.C. §
14 1983, which the parties and the Court agreed could proceed to
15 appeal.  Plaintiffs then appealed to the Ninth Circuit.

16    After briefing in the Ninth Circuit but before any oral
17 arguments or decision, the Supreme Court affirmed the Sixth
18 Circuit's decision in *United Foods*.  *United Foods, Inc. v. United*
19 *States*, 533 U.S. 405 (2001).  The Supreme Court held that the
20 challenged mushroom advertising program was distinguishable from
21 the tree fruit advertising program in *Glickman*.

22    On January 27, 2003, the Ninth Circuit reversed the
23 dismissal of Plaintiffs' claims in this case.  *Delano Farms Co.*
24 *v. California Table Grape Commission*, 318 F.3d 895 (9th
25 Cir.2003).

26    Thereafter, the Commission amended its Answer and Plaintiffs

4

filed a motion for judgment on the pleadings.  By Order filed on
December 11, 2003, Plaintiffs' motion for judgment on the
pleadings was denied.  (Doc. 260).

The Scheduling Conference Order summarizes the parties'
factual and legal contentions.  Only the First Cause of Action
remains.  It alleges that the Ketchum Act violates Plaintiffs'
free speech and association rights under the First and Fourteenth
Amendments and Section 1983.  Plaintiffs seek declaratory and
injunctive relief and a refund of their assessments.  They
further contend that the Ninth Circuit's decision in this case is
dispositive and that each of the Commission's affirmative
defenses lack legal and factual merit.  The Commission contends
that it has not violated Plaintiffs' constitutional rights; that
the advertisements at issue are government speech and therefore
not subject to First Amendment restrictions; or that the program
is part of a comprehensive regulatory scheme and therefore exempt
from First Amendment scrutiny; or, to the extent that its program
is or implicates speech, the program passes scrutiny under
*Central Hudson Gas & Electric Corp. v. Public Service Commission
of New York*, 447 U.S. 557 (1980) and/or *Abood v. Detroit Board of
Education*, 431 U.S. 209 (1977).  The Commission further maintains
that the Ketchum Act is severable, and that if any section,
clause, or part of the Act, or any part of the Commission's
activities, is held unconstitutional, such holding does not
affect the remaining portions of the Act or any part of the
Commission's activities.  The Commission raises a number of

affirmative defenses to defeat Plaintiffs' claims, in whole or in part, including that Plaintiffs are guilty of unclean hands; they have waived any rights regarding any alleged acts or omissions by the Commission; they are estopped from asserting any rights for alleged acts or omissions by the Commission; their claims are barred by the applicable statute of limitations; their claims are barred by the doctrine of laches; they have not been damaged; their assessments have not been spent for non-germane, ideological or political speech; and that Plaintiffs would be unjustly enriched if they are not assessed for the Commission's programs but continue to benefit from them.

> **B.   STANDARDS GOVERNING RESOLUTION OF SUMMARY JUDGMENT OR SUMMARY ADJUDICATION MOTIONS.**

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id.*  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id.*

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden

by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to defeat summary judgment. *T.W. Elec.*, 809 F.2d at 630. The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id*. The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id*. The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id*. The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id*. As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102-1103 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract. Because either a plaintiff or a defendant can move

for summary judgment, we customarily refer to
the moving and nonmoving party rather than to
plaintiff and defendant.  Further, because
either plaintiff or defendant can have the
ultimate burden of persuasion at trial, we
refer to the party with and without the
ultimate burden of persuasion at trial rather
than to plaintiff and defendant.  Finally, we
distinguish among the initial burden of
production and two kinds of ultimate burdens
of persuasion: The initial burden of
production refers to the burden of producing
evidence, or showing the absence of evidence,
on the motion for summary judgment; the
ultimate burden of persuasion can refer
either to the burden of persuasion on the
motion or to the burden of persuasion at
trial.

A moving party without the ultimate burden of
persuasion at trial - usually, but not
always, a defendant - has both the initial
burden of production and the ultimate burden
of persuasion on a motion for summary
judgment ... In order to carry its burden of
production, the moving party must either
produce evidence negating an essential
element of the nonmoving party's claim or
defense or show that the nonmoving party does
not have enough evidence of an essential
element to carry its ultimate burden of
persuasion at trial ... In order to carry its
ultimate burden of persuasion on the motion,
the moving party must persuade the court that
there is no genuine issue of material fact
....

If a moving party fails to carry its initial
burden of production, the nonmoving party has
no obligation to produce anything, even if
the nonmoving party would have the ultimate
burden of persuasion at trial ... In such a
case, the nonmoving party may defeat the
motion for summary judgment without producing
anything ... If, however, a moving party
carries its burden of production, the
nonmoving party must produce evidence to
support its claim or defense ... If the
nonmoving party fails to produce enough
evidence to create a genuine issue of
material fact, the moving party wins the

8

> motion for summary judgment ... But if the
> nonmoving party produces enough evidence to
> create a genuine issue of material fact, the
> nonmoving party defeats the motion.

    1.   <u>BURDEN OF PROOF</u>.

Plaintiffs assert the following contentions regarding the respective burdens of proof in connection with these motions:

> Since the [Supreme] Court made clear in
> *United Foods* and *Johanns*, that it is
> Defendant's burden of proof re 'government
> speech,' the Table Grape Commission must
> persuade this Court, through undisputed
> material facts that the Table Grape
> Commission law and its operations are
> government speech ... Further, Plaintiffs, as
> the moving party with respect to this motion,
> carry their initial burden of summary
> judgment by 'showing' that the Table Grape
> Commission lacks sufficient evidence to carry
> its ultimate burden of persuasion at trial
> with respect to not only the government
> speech affirmative defense, but that
> *Glickman*, not *United Foods* applies.  That is
> because those are affirmative defenses.

The Commission argues that Plaintiffs are wrong about which party has the burden of proving that the Commission's speech is government speech and that the table grape industry is collectivized:

> ... *Wileman Bros.* and *Livestock Marketing*
> make clear that the First Amendment is *not
> even implicated* if the table grape industry
> is collectivized or if the speech of the
> Commission is government speech.  In order to
> make a First Amendment claim, Plaintiffs must
> show that the First Amendment is at least
> implicated by the challenged speech, and it
> is therefore *Plaintiffs'* burden to
> demonstrate that the table grape industry is
> not collectivized and that the speech of the
> Commission is not government speech.

Noting that Rule 8(c), Federal Rules of Civil Procedure lists

specific affirmative defenses, including "any other matter constituting an avoidance or affirmative defense", the Commission cites *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir.2002):

> A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense. *See Flav-O-Rich v. Rawson Food Services, Inc. (In re Rawson Food Services, Inc.),* 846 F.2d 1343, 1349 (11th Cir.1988)(recognizing that a defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense).

The Commission correctly asserts the burden of proof is on Plaintiffs.  Plaintiffs have the burden to prove that the Commission's program pursuant to the Ketchum Act is subject to the First Amendment and that the program violates the First Amendment.

C.  <u>STATEMENTS OF UNDISPUTED FACTS</u>.

The parties' Undisputed Stipulated Facts are  63 pages long and include 170 separately numbered paragraphs containing a multitude of facts.

The Commission's Statement of Undisputed Facts is 83 pages long, is comprised of 235 facts (with numerous subparts) and has a table of contents.  Plaintiffs' Objections and Response to the Commission's Statement of Undisputed Facts is 137 pages long, and uses the following abbreviated keys: "'Stip.' stands for stipulated; 'Undis.' stands for undisputed; 'Disp. stands for disputed; 'Obj.' stands for objection; and 'Rel.' stands for <u>not</u> relevant."  In addition, Plaintiffs assert:

10

> **When Plaintiffs ... respond with an undisputed, it is only for the purposes of the instant cross-motions for summary judgment, and Plaintiffs reserve the right, at trial, or any further additional motions for summary judgment to dispute the same alleged fact, or to object, or object on other or additional grounds.  In addition, when Plaintiffs and Defendant stipulated to various facts, it was done on the condition that any fact 'stipulated' to could be explained, expounded upon, or state how things were different or have changed.**

**Also, to the greater extent, Plaintiffs' objections to or disputes with the Commission's Statement of Undisputed Facts are string-cite objections, i.e., not relevant, hearsay, lack of foundation, improper lay opinion, conclusory, violation of best evidence rule, with no supporting law or analysis.**

**Plaintiff's Statement of Undisputed Facts is 8 pages long and is comprised of 43 facts.**

**Because of the magnitude of the factual positions of the parties, in the interests of economy, a separate Statement of Undisputed Facts will not be provided, instead the relevant undisputed facts and certain disputed facts necessary to ruling on the motions will be included in this Memorandum Decision.**

**D.   UNDISPUTED STIPULATED FACTS.**

**1. California has the largest agricultural production of any state in the nation.**

**2. The California Department of Food and Agriculture ("CDFA") estimated that in 2004, California's growers produced almost $32 billion in agricultural commodities, valued at the farm-level.**

11

3. Of that figure, grape growers as a whole, including wine, raisin, and table type grapes, accounted for 8.6%.

4. The volume of California table grapes shipped has increased from the equivalent of approximately 37 million 19-pound boxes of grapes per year when the Commission was first created to approximately 94 million 19-pound boxes in 2005.

5. Approximately 97% - 99% of the table grapes grown in the United States are grown in California.

6. The total F.O.B. value (value at the point of shipping including picking, packing, and extra services such as cold storage and placing on pallets, as voluntarily reported to the United States Department of Agriculture ("USDA")) of the California table grapes shipped to buyers in 2004 was just over $1 billion.

7. Table grapes are grown in California in the Coachella and San Joaquin valleys on approximately 110,000 acres of land.

8. According to the United States Department of Agriculture, farm and farm-related employment accounted for 2.75 million jobs in California in 2002—over 13.8 % of the state's total employment.

9. In sum, agriculture and the table grape industry are important parts of the California economy.

10. At present, there are 35 active federal regional marketing orders in place and 17 national programs that cover blueberries, beef, cotton, dairy, eggs, milk, Hass avocados, honey, lamb, mangoes, mushrooms, peanuts, popcorn, pork,

12

potatoes, soybeans, and watermelons.

11. In addition to the federal marketing orders covering the state, California currently has 53 active commodity marketing programs. These programs cover about 65% of the value of California's agricultural production, and include programs for four of California's top five agricultural products (dairy products, greenhouse/nursery products, grapes, almonds, and cattle/calves).

12. The California Table Grape Commission was established in 1967 by an act of the California Legislature called the Ketchum Act.  Its purposes include expanding and maintaining demand for California table grapes worldwide and preventing economic waste of the agricultural wealth of the State of California.  The California Legislature has also declared that the Commission's activities (and those of other commissions) are essential to the goals and interests of the State of California in, among other things, marketing research and trend analysis, elimination of tariff and non-tariff barriers, consumer education relating to the health and other benefits of consuming agricultural products, and "[c]ooperative crisis resolution."

13. The Commission is comprised of 18 commissioners representing the six active table grape growing districts in the State of California and one "public member," all of whom are appointed and subject to removal by the Secretary of the California Department of Food and Agriculture ("CDFA").  Prior to appointment, the CDFA inquires into whether potential

13

commissioners are suitable for appointment.

14.   The Commission's work is funded primarily through assessments that are imposed on all shipments of California table grapes pursuant to the Ketchum Act. Those assessments are paid to the Commission by shippers who are authorized to collect the assessments from the grower of the fruit shipped.

15. The Commission office is located in Fresno, California, where it employs 17 people. It has one employee in Texas. In addition, the Commission contracts for the services of a number of consultants, including one domestic representative who works out of Canada and international representatives in Australia, New Zealand, the United Kingdom, Germany, Japan, South Korea, Hong Kong, Singapore, India, Venezuela, Costa Rica, Mexico, the Philippines, Taiwan, and the United Arab Emirates.

16. The Commission's fiscal year runs from May 1 to April 30. The 2004-2005 fiscal year therefore closed on April 30, 2005. The Commission's expenditures for the 2004-2005 fiscal year were $12,015,653. Its adjusted carryover and revenue was $12,497,031. Assessments paid to the Commission (and not into an escrow account) for California table grapes shipped in 2004-2005 accounted for $8,367,429 of that amount. The remaining revenues came principally from federal international marketing grants.

17. The season for California table grapes runs from May through January. In the early part of the season, retailers purchase grapes grown in the Coachella Valley of California.

During this early part of the California season, late season and storage table grapes from Chile and South Africa are still in the market and new crop grapes from Mexico have entered the market. As the season progresses, California table grapes from the Bakersfield area and then farther north are available. By the middle of July, usually only California table grapes are in the domestic market. By November, grapes from a number of southern hemisphere countries (including Brazil, Peru, and Chile) are back in the market.

18. There are at least four different principal paths for California table grapes to travel from the vineyard to the final end retail consumer in the domestic market.

19. All four principal paths start with a grower who harvests the table grapes and a shipper who packs the grapes and finds a first buyer for them. Sometimes growers act as their own shippers. Other times growers contract with a separate entity to act as the shipper.

20. All four principal paths end with a retailer making a sale to a customer. While there are different kinds of retailers (large supermarket chains, mom-and-pop grocery stores, fruit stands, farmers' markets etc.), the vast majority of grapes are sold by large retail chains such as Safeway, Albertson's, Kroger, or Wal-Mart.

21. The distinction between the four principal paths is in how the grapes go from the grower/shipper to the retailer.

a. The first path is directly from shipper to retailer.

15

For large retailers, such as Vons, this is the most common way to purchase grapes. Approximately 70% of all California grapes sold in the United States travel along this path.

b. The second path is from shipper to a broker and then to a retailer. The broker may or may not take ownership or physical custody of the grapes. Approximately 10% of all California grapes sold in the United States travel along this path.

c. The third path is from shipper to a distributor and then from the distributor to the retailer. The distributor may take physical possession of the grapes and generally takes ownership of the grapes. Approximately 10% of all California grapes sold in the United States travel along this path.

d. Finally, the fourth path is from shipper to "terminal market wholesalers." As the name suggests, these wholesalers operate in so-called "terminal markets"—generally large cities where a large volume of grapes is sold. Terminal market wholesalers take physical possession of the grapes and most often take ownership of them.  Approximately 10% of all California grapes sold in the United States travel along this path.

22. California grapes travel along similar paths to consumers in international markets.

23. Although there are four distinct paths along which California table grapes generally travel from vineyard to

16

consumer, there are ultimately two distinct markets for California table grapes. First, there is the market in which retailers and wholesalers purchase California table grapes from grower/shippers (the "wholesale market"). Second, there is the market in which consumers purchase California table grapes from retailers (the "retail market"). These markets operate very differently.

24. Produce retailers, such as supermarket chains like Vons, purchase table grapes in the wholesale market, either from grower/shippers, brokers, distributors, or wholesalers. Retailers make four principal decisions when participating in the wholesale market: (1) what quantity of table grapes to put on their shelves, (2) from which production area (Chile, Mexico, California) to buy table grapes, (3) from which specific shippers to buy table grapes, (4) and what price they will pay. Retailers also consider the color and level of fruit quality (*e.g.*, "A" box, "B" box, etc.) of the grapes they sell and whether grapes are seedless.

25. In deciding what quantity of table grapes to put on their shelves and where to put them, retailers must weigh the value of selling grapes versus the value of selling other products. Every square foot allocated to table grapes means one less square foot allocated to something else in the produce department. And every square foot allocated to produce is one square foot less available in the store for toothpaste, coffee, and everything else.

17

26. California table grapes compete with grapes from other countries (during certain parts of the year) and other fruits (like apples) for shelf space within the produce department. California table grapes and other "snack" produce also compete with "salty snacks," like potato chips and pretzels and with snacks like candy and ice cream, for overall snack shelf space.

27. Competition for shelf space between different types of produce and among different types of products (produce vs. dairy, for example) is fierce. There is competition across departments and within departments. Foods and non-foods compete for space. Moreover, there is competition for the best shelf space in a grocery store.

28. The goal of individual grower/shippers of table grapes is to obtain the highest price and maximize their own sales. That is, individual grower/shippers are interested only in expanding their slice of the overall table grape market.

29. Every year, each grower/shipper has different levels of fruit quality to sell to his/her customers. A common method of identifying quality is to designate a box of grapes as an "AA" box (highest quality), an "A" box, a "B" box, and a "C" box. Most grower/shippers offer all four levels. It is possible for different grower/shippers to have more—or less—of the highest quality fruit than their competitors. A particular grower/shipper may generally have a higher percentage of the highest quality fruit than another grower/shipper. But it is possible for that grower/shipper to suffer from adverse weather

18

patterns in a particular year and thus have less highest quality fruit than the grower/shipper whose fruit is generally not as good.

30. Consumers do not shop for grapes with brand names in mind. Rather, table grape consumers consider primarily the ripeness and freshness (*i.e.*, quality) of the grapes, the taste of the grapes, the variety and whether the grapes are seeded, and the price of the grapes.

31. Consumer survey evidence indicates that when shoppers buy produce generally, brand is typically not an important factor. While for some types of produce, such as bananas and oranges, brand is more important than it is for grapes, it is still subordinate to a host of other factors like ripeness and freshness (*i.e.*, quality), color, and price.

32. In large retail stores, grapes are typically not sold in their boxes, so customers never see the labels on those boxes. Store signage typically does not indicate the name of the grower/shipper of the table grapes being displayed. And most of the time grapes' packaging does not reveal the grower/shipper's name.

   a. In general, most retailers do not want the produce they sell to be branded. They find branding on packaging clutters their produce section and confuses consumers because of the different print sizes, colors, and logos fighting for the consumer's eye.  Retailers want the grapes themselves to be the focus of the consumer's eye. For a product like table

grapes—which are produced at different times of the year by different growers in different parts of the world and are shipped to market by multiple shippers who each have multiple labels—this problem of customer confusion is exacerbated. Retailers do not want to be tied to any one grower/shipper or any one label because throughout the year a retailer will buy its grapes from a number of different grower/shippers, both domestic and international.

33. In general, there is less consumer recognition of brands of produce than other food products.

34. Individual California table grape growers and shippers conduct virtually no direct advertising to consumers in the retail market.

35. To achieve its statutory objective of maintaining and expanding demand for California table grapes worldwide, preventing economic waste of the agricultural wealth of the State of California, and promoting the health of the people of California, the Commission conducts a variety of activities that fall into five general categories: (1) Research, (2) Trade Management, (3) Issues Management, (4) Advertising, and (5) Education/Outreach.

36. The Commission's research activities are broad ranging and include consumer, trade, viticulture, industry statistical, and nutrition research.

a. In 2004-2005, the Commission spent $1,776,950 in assessment dollars on research.

20

37. The Commission's trade management activities focus on working with the retail and wholesale produce trade, domestically and internationally, to create demand for the volume of fresh California grapes grown each season.

a. Using the results of its category management (discussed below) and consumer research, as well as analysis of retail chain activities (in the aggregate and individually) and using financial and/or media incentives, the Commission works around the year to attempt to create demand for California table grapes.

b. In 2004-2005, the Commission spent $1,987,783 in assessments on trade management.

38. The Commission's issue management work is varied, as the issues that might impact demand for the crop can vary week-to-week, month-to-month, and season-to-season.

a. Issue management is an important element of all demand-creation work.

b. Fundamentally, the focus of issue management is working with interested parties and decision makers to keep trade flowing both in the United States and internationally, and to respond to short-term incidents and long-term issues that could impair the economic strength of California's fresh grape industry.

c. Specifically, issue management typically involves working with other governmental agencies at the county, state, and federal levels and their counterparts in export markets—as

1  well as with industry groups, health authorities, and non-

2  industry organizations.

3         d. It involves using a variety of disciplines to ensure

4  the long-term continued movement of fresh California grapes from

5  field to market.

6         e. Categories of issue management on which the

7  Commission works on an ongoing basis include (but are not limited

8  to) food safety, market access, tariff reduction, standardization

9  of packaging, labeling, pesticide registration, pest

10  infestations, and all litigation involving the Commission. Within

11  each category numerous types of issues can, and do, arise.

12         f. In 2004-2005, the Commission spent $1,493,192 in

13  assessment dollars on issue management.

14  39. The Commission conducts advertising campaigns to reach

15  consumers with paid messages designed to increase overall demand

16  for fresh California grapes.

17         a. Paid media is used in an attempt to keep fresh

18  California grapes "top-of-mind" for consumers in a way that

19  motivates increased purchase.

20         b. The messages revolve around healthy snacking,

21  positioning grapes as a healthy alternative to products like

22  buttered popcorn, fries, and ice cream. This message is

23  intended to increase demand but also furthers the state interest

24  in public health.

25         c. In 2004-2005, the Commission spent $2,032,440 in

26  assessment dollars on paid advertising.

22

40. The Commission's education and outreach activities are designed to provide education, training, analysis, and general information to retailers, wholesalers, foodservice operators, grower/shippers, researchers, consumers, and others such as teachers, editors, authors, doctors, and nutritionists.

a. The Commission provides information about, among other things, nutrition, usage, storage, handling, availability, retail merchandising techniques, product characteristics, technological advances, and statistical analysis through a variety of outreach methods.

b. This work is intended to increase demand. Credible information is required by those who make decisions about what products to place on grocery shelves, what nutritional information to share with patients or clients, what foods to include in classroom lessons, what foods to include in restaurant menu items, what to advise readers about recipes or storing and handling of food, and what to advise viewers to watch for in terms of quality and safety.

c. In 2004-2005, the Commission spent $847,619 in assessment dollars on education and outreach.

41. The Commission operates five principal ongoing programs: Viticulture and Technical Issues, Advertising, Domestic Marketing, International Marketing, and Consumer Education. Each program involves activities that fall within one or more of the categories described above in paragraphs 36-40.

42. The viticulture and technical issues program has three

areas of focus: viticulture research, technical issues management, and patenting/licensing. The program includes activities falling within the following categories: research, issue management, and education and outreach.

43. The viticulture research program involves directing and overseeing the funding and implementation of viticulture research performed by scientists from a variety of research institutions including the University of California, USDA, and California State University. The research is designed to increase grower efficiency and improve table grape production and fruit quality.

a. The Commission has developed a process for receiving and evaluating research proposals.

b. The program includes the funding of cultural (horticultural farming) practices research that is intended to improve fruit maturity, storability, and overall quality. It includes work in areas such as pruning techniques, trellising/training methods, crop/cluster and canopy management, crop load regulation, and irrigation strategies.

c. The program also includes the funding of pest and disease management research. Research studies in this category attempt to develop biological and reduced-risk chemical control methods for destructive vineyard pests and diseases such as mealybugs, molds/mildews and grapevine measles. Biological control methods being examined include releasing beneficial insect predators or parasites to reduce the targeted pest

24

population and using pheromones or sex attractants to disrupt
mating cycles.  The Commission also funds research regarding the
application of reduced risk pesticides that target harmful pests
without eliminating beneficial insects.

       d. The program also funds post-harvest research.  The
research is intended to improve storing, handling/shipping
procedures, shelf life, and overall fruit quality.  It includes
research on modernizing storage room and phytosanitary
fumigations, temperature/humidity requirements, and new packaging
methods.

       e. Finally, the program funds new grape and grape
rootstock variety research.  The goal of this research is the
development and evaluation of new varieties of grapes and
grapes rootstocks with improved characteristics and pest/disease
resistance.

       i. The Commission has been funding efforts to
breed new, better varieties of table grapes since the inception
of the research program in 1972, first with the University of
California and then with USDA.  The Commission currently
supports the USDA's table grape variety breeding program run by
Dr. David Ramming, providing approximately one-third of the
program's funding.

       ii. Since the Commission began funding the USDA
program and advising its breeder in 1981, it has developed over
10 new varieties of grapes that are currently being marketed,
including the Crimson Seedless variety that constitutes over half

1   of Delano Farms' sales as well as the Princess variety

2   sold by Delano Farms.

3          f. The Commission makes the results of its viticulture

4   research available to grower/shippers in a number of ways that

5   include seminars, field tours, newsletters, and publications.

6   (The new varieties are made available through the patenting and

7   licensing program described below.)

8      44. Technical issues management encompasses the Commission's

9   work related to pesticides, pest exclusion, production,

10  packaging, distribution, and quarantines.  It includes technical

11  analysis related to the Commission efforts to expand

12  international market access by, among other things, developing

13  international shipping protocols and participating in trade

14  barrier negotiations.

15         a. The Commission monitors chemical Maximum Residue

16  Level ("MRL") restrictions proposed by other countries or the

17  international standard-setting body (the Codex Alimentarius

18  Commission) to determine whether the chemicals to be regulated

19  are registered for use on grapes in California and are in fact

20  used, whether the proposed MRL is lower than the U.S. or the

21  Codex MRLs, and if so whether the proposed MRL is likely to

22  disrupt shipments of California table grapes to the country in

23  question.  Depending on what is learned, the Commission works

24  with the U.S. government and the country involved to negotiate

25  the best possible solution for California's table grape

26  grower/shippers.

b. The Commission also conducts research to support its efforts to develop and streamline shipping protocols that allow California table grapes to access foreign markets.  The research can also support efforts to eliminate those protocols when they are no longer necessary.

45. The patenting and licensing program revolves around the Commission's efforts to develop new varieties of table grapes jointly with the USDA and to protect the intellectual property developed through U.S. patents, international plant protection, and domestic and international licenses.

a. In 2001, the Commission and USDA signed a Memorandum Of Understanding that outlined an agreement to patent future USDA-developed table grape varieties with the intent that the Commission will become the exclusive licensee of the varieties in domestic and international markets.

b.  In 2004 and 2005, at the recommendation of the Commission, the USDA sought patent protection for and then released three newly developed varieties of grapes: Sweet Scarlet, Scarlet Royal, and Autumn King.  The USDA has already obtained patents for the Sweet Scarlet and Scarlet Royal varieties, and patent is pending for the Autumn King variety.

c.  As the exclusive licensee, the Commission, in turn, has sublicensed the varieties to a number of nurseries that sell the varieties to any domestic grower that wishes to purchase them.  The amount of domestic production of the newly developed varieties is not limited.  Nurseries that wish to sell the new

27

varieties, however, must pay the Commission a yearly fee and a per-vine fee, a portion of which is remitted to the USDA.

d.   The Commission is also charged with applying for intellectual property protection abroad, setting the terms on which the new varieties are made available abroad, and enforcing foreign intellectual property rights obtained.

46.   In 2004-2005, the Commission's viticulture and technical issues program spent $807,377 in assessment dollars on the following categories of activities $548,711 on viticulture research, $12,370 on outreach, and $246,296 on issue management.

47.   Since the Commission began funding the USDA breeding program, USDA has developed 10 new varieties of grapes that are currently being marketed and two varieties that are not yet in production. Together, the 10 varieties being currently marketed account for approximately 30% of California grape shipments.

48.   The following varieties were developed under the joint USDA/Commission program: Autumn Seedless, Autumn Black, Crimson Seedless, Autumn Royal, Fantasy Seedless, Fresno Seedless, Black Emerald, Princess, Summer Royal, Sweet Scarlet, Scarlet Royal (not yet in production) and Autumn King (not yet in production).

49.   The Commission has also helped to fund the development of the Red Globe and Christmas Rose varieties.  In total, varieties funded by the Commission account for approximately 45% of the volume of California table grapes shipped to market, and California produces approximately 97% - 99% of the commercially grown table grapes in the United States.

28

50.   The Commission's initiative to obtain patent protection for newly developed varieties has the potential to be beneficial to the California table grape industry.

a.   As the exclusive licensee of varieties patented by the USDA, the Commission attempts to ensure that varieties developed by California growers are not misappropriated by foreign growers to unfairly compete with California grapes.  The Commission also attempts to ensure that the genetic quality of the new varieties is maintained.

51.   The California Legislature has directed the Commission to undertake advertising that "promote[s] the sale of fresh grapes" and the Commission has consistently followed that legislative directive.

52.   The consumer advertising undertaken by the Commission is known as "generic advertising" because it promotes the entire category of fresh grapes from California.  It does not specify any one type of fresh California grape or any one producer of fresh California grapes.  Instead, it speaks to the general characteristics of all fresh California grapes—that they are flavorful, convenient, and healthful.

53.   All of the Commission's radio, television, print media, and billboard advertisements are intended to "promote the sale of fresh grapes."  Commission advertisements have not promoted products other than grapes and have not disparaged other California agricultural products.  The Commission has not run political or ideological advertisements, and all of the

Commission's advertisements have been in good taste and have not been false or misleading.

54.   The development of the Commission's advertising campaign begins with consumer research.

a.   Initially, secondary research on consumer attitudes and buying habits is obtained from a variety of sources to determine the general consumer mindset about the foods they purchase and consume.

b.   Next, the Commission conducts primary research to determine how consumers view grapes, why they do and do not purchase them, where and when they purchase them, what they look for when purchasing grapes, how, when and where they consume them, their specific views of fresh grapes from California as opposed to grapes from other sources, what foods they might consume instead of fresh California grapes, and what qualities about fresh California grapes are most and least motivating for their purchase and consumption of fresh California grapes.

55.   The research is then analyzed by the Commission staff and its advertising agency—currently McCann Erickson, San Francisco—to develop potential advertising messages to "promote the sale of fresh grapes" and the most effective medium to transmit that message.  The potential messages are then taken to additional focus groups to determine their effectiveness in motivating consumers to purchase and consume more fresh California grapes.

56.   The current advertising campaign takes into account the

30

fact that fresh California grapes are consumed primarily as a snack and emphasizes that fresh California grapes are a more healthful alternative to other snack food such as ice cream, french fries, chips, and buttered popcorn.

57. The advertising is done primarily in outdoor billboards and in 10-second traffic radio commercials. The Commission also ran a limited amount of television advertising in the fall of 2005 on the Food Network.

58. The Commission's outdoor billboards use beautiful images of grapes contained in packaging typically associated with less healthful snack foods such as popcorn, potato chips, french fries, and ice cream to remind consumers that grapes are a healthy alternative to these other snack foods.

a. In 2005, the Commission ran 284 billboards for seven months. The billboards were placed in the following major markets: Baltimore, Boston, Chicago, Dallas-Ft. Worth, Denver-Boulder, Los Angeles, New York, Philadelphia, San Francisco, and Seattle-Tacoma. On average, there were 18 billboards in each market.

59. The Commission's radio advertisements are in the form of short radio messages that air during radio traffic reports when consumers are thought to be paying close attention to what they hear on the radio. The messages remind consumers where to go to get the fresh California grapes they enjoy and encourage consumers, while they are out on the road, to stop into the featured store and buy grapes. Like the billboards, these

advertisements emphasize that California table grapes are a
healthy alternative to other snack foods.

     a.  One script, for example, reads: "Hold the burger,
the fries, and the shake and drive up to (Name of Store) because
the fresh California grapes are in season now.  This is
your window to pick up the grapes everyone likes best—at your
local (Name of Store)."

     b.  Another reads: "Have a sweet tooth that won't let
go?  Forget the ice cream and head to (Name of Store).  Scoop up
a bunch of sweet, fresh California grapes from (Name of Store)
and in a few luscious bites you'll know why California grapes are
preferred over any other."

     c.  Other radio scripts emphasize the health benefits
of table grapes more generally.  One reads: "It's easy to get
your recommended five servings of fruits and vegetables a
day with fresh California grapes.  They come in three colors and
fresh California grapes from (Name of Store) are part of a smart,
healthy diet.  Pick up some sweet, delicious grapes from (Name of
Store) and live better."

60.  In 2004 and 2005, the Commission ran two 15-second
advertisements on the cable channel the Food Network during the
seven-day-a-week cooking program "Sara's Secrets" featuring
renowned chef Sara Moulton.

     a.  The television advertisements, like the billboards
and radio advertisements, emphasized that grapes are a healthy
alternative to traditional snack foods.

b.  One advertisement showed three colors of grapes in an ice cream cone and the other shows grapes in a popcorn bag.  A voiceover declared that "Good Things Come in Bunches."

61.  Past themes of the Commission's advertising include: (a) "Good things come in bunches."; (b) "Share some California grapes."; (c) "Life is complicated.  Grapes are simple."; and (d) "California grapes.  The Natural Snack."

62.  The Commission's advertising is designed to be as motivating to consumers as possible, but it is also used as an incentive for retailers.

63.  The Commission's advertising is meant to work in conjunction with the Commission's other efforts.

a.  The Commission's efforts with retailers are intended to "push" California table grapes into the stores, and the Commission's advertising is intended to "pull" consumers into the stores to buy the grapes.

b.  Similarly, the Commission's advertising is intended to build on the research efforts of the Commission. The current advertising campaigns emphasize the health benefits of table grapes and the Commission's research efforts are focused, in part, on discovering and documenting the health benefits of grapes.

64.  In 2004-2005, the Commission's advertising program spent $2,042,247 in assessment dollars on the following categories of activities: $229,003 on consumer research and $1,813,244 on direct advertising.

33

65.  Most of the advertising on television, in print, or on the radio is "branded product" advertising.  Advertising for "Pepsi" soda, "Tide" laundry detergent, and "Crest" toothpaste are familiar examples.  The goal of this type of advertising is almost entirely to increase sales of the particular product advertised, not to increase overall consumption of a category of product.

66.  Product differentiation can stem from actual differences between products—the Microsoft Windows operating system works differently from the operating systems of its competitors.  Or product differentiation can result from an extensive advertising campaign that creates perceived differences between products—some consumers prefer Coke while others prefer Pepsi, yet the actual differences between the products may be slight.

67.  The California table grape industry is estimated to have 550 growers currently, including grower-shippers.  Large growers have market shares only in the single digits.

68.  Unlike "branded product" advertising, which often seeks to create preferences in the minds of consumers even absent substantial differences in the products sold, generic advertising often promotes actual characteristics of a category of products. Table grapes, for example, are promoted for their health benefits, convenience of consumption, and good taste.

69.  Generic regional advertising is intended to promote all table grapes from a particular region, such as California.  This

advertising is still generic in that it does not distinguish between different California producers, but it does seek to distinguish California table grapes from grapes grown in other regions.

70. Generic regional advertising allows producers in a region who feel they are too small to run their own advertising to band together and fund efforts to run advertisements focusing on the general attributes of the category of products.

71. Economists have been modeling and measuring the impacts of commodity programs for at least 20 years.

72. The Commission's current advertising campaign ("Snacks") was designed to target women aged 25 to 54 and to convey the message that grapes are a healthy alternative to other snack foods based on market data that revealed that the primary shoppers in most households are women in that age range and these women were concerned with providing healthy, tasty, convenient foods to their families.

73. According to consumers in focus group studies, the Commission's generic "California" advertising campaign motivates consumers to want to purchase more California table grapes.

74. In a focus group study, the "Snacks" campaign was viewed favorably by participants. All participants readily discerned the message that grapes are a healthy alternative to other snack foods.

a. Participants described the campaign as "brilliant" and "clever." People selected the words, "happy," "pleased,"

"surprised," "playful," "joyful," "amused," "interested,"
and "delighted" to describe their feelings to this campaign.  The
campaign appeals to adults as individuals and as parents.  And
the campaign is intended to make consumers think about grapes in
a new way, establishing in their minds more occasions for using
grapes.

75.  Any additional revenue to farmers that might be
realized due to the Commission's advertising, trade management,
and education and outreach generally results in additional
jobs in the agricultural industry.

76.  Like other states, California and its citizens face a
number of significant health problems related to poor diets.

a.  For example, more than half of California adults
are overweight or obese. Physically inactive, obese, and
overweight individuals cost California billions of dollars every
years in medical care, workers' compensation, and lost
productivity.

b.  Heart disease is the leading cause of death in
California and the nation.  In 1999, there were almost 60,000
deaths due to heart disease in California.

c.  Stroke is the third leading cause of death in
California and the nation.  In 1999, there were approximately
18,000 deaths due to stroke in California.

d.  Cancer is the second leading cause of death in
California and the nation. Cancer accounted for approximately 25%
of all deaths in California in 2002.

1           e.   Diabetes is also as significant health problem

2   afflicting Californians and Americans generally.

3       77.   Eating more fruits and vegetables helps to reduce

4   diseases.   Eating five to nine servings of fruit and vegetables

5   each day helps protect against heart disease and cancer.   Eating

6   fruits and vegetables also has the potential to reduce the risk

7   of obesity and many other chronic diseases including stroke and

8   diabetes.

9       78.   California adults consume, on average, fewer than four

10  daily servings of fruits and vegetables, well below the five to

11  nine daily servings recommended for good health.   As a result,

12  efforts to encourage people to eat more fruits and vegetables are

13  important to the future of the state and to the country.

14      79.   Any increase in demand for California table grapes

15  benefits California table grape grower/shippers and the State of

16  California generally.

17      80.   The domestic marketing program is implemented by a

18  staff of 4 people, which includes Cindy Plummer, Jane Lytle,

19  Karen Hearn, and Brad Brownsey (a consultant).

20      81.   The domestic marketing program conducts domestic trade

21  management as well as research and education and outreach.

22      82.   The purpose of the program is to increase the movement

23  of fresh California grapes from field to market or professional

24  kitchen.   The program targets (1) retailers and wholesalers of

25  fresh grapes and (2) foodservice entities.

26      83.   The Commission works with retailers and wholesalers to

increase the quantity of California table grapes sold during a season, the square feet of display space that will be allocated to California table grapes, the number of varieties displayed, the effectiveness of the displays, and the number and effectiveness of table grape advertisements run by retailers.

84. Among other things, the Commission works to "educate and instruct the . . . retail trade with respect to proper methods of handling and selling fresh grapes," as contemplated by the California Legislature.

85. The portion of the Commission's trade management program directed toward domestic retailers can be divided into the following subcategories: (a) category management; (b) promotional agreements; (c) tagged advertising, and (d) training.

86. Conducting category management research is one way the Commission seeks to encourage retail grocery stores to sell a greater volume of table grapes. Category management involves the development of a comprehensive strategy for expanding sales of a category of product, in this case California table grapes. Category management research—on which the Commission spent nearly a quarter of a million dollars in both 2004 and 2005—allows the Commission to provide retailers information about the value of selling fresh California grapes and the tactics that research has indicated increase sales of fresh grapes.

    a. To conduct some of this research, the Commission contracts with a company called The Perishables Group, one of the country's top retail produce category management research firm.

b.   The results of the Commission's category management research are then conveyed to the top 75 retailers (which together constitute approximately 80% of the market) in the United States and Canada.   Commission staff meet with representatives from retailers at least twice during the growing season.   Additionally, every year retailers are provided the Commission's marketing materials, which summarize the Commission's category management findings.

c.   The Commission also conducts consumer research.   For this work, the Commission contracts with Fleishman-Hillard, a national public relations and advertising firm.

d.   In addition to the general category and consumer research data provided to retailers, the Commission also shares with retailers data related to that retailer's performance in the grape category.   This information is provided to encourage retailers to increase grape ad activity.

87.   Every year the Commission enters into promotional agreements with retailers and wholesalers.

a.   Retailers that earn an award are required to spend the award through a third party.   For example, retailers frequently use their promotion award funds to have the Commission book flights and hotel rooms for their employees attending the annual Produce Marketing Association ("PMA") Fresh Summit Conference.

b.   Under the promotion agreement, retailers also agree to share with the Commission information about their grape sales

39

and advertising.  This allows the Commission to evaluate effectiveness of the efforts overall and to ensure that the retailers have met all of their commitments.

88.  The domestic marketing program offers retailers tagged advertising to encourage them to run more advertisements for grapes.

a.  The three retailers with the highest volume of grape sales in a market are given the opportunity to have their store name featured in the billboard and radio ads if it agrees to conduct a certain level of advertising (running more grape ads, increasing size of grape ads) for grapes in the upcoming year.  Retailers also must use California logos showing the California origin of the grapes they sell.

b.  The retailer's logo, for example, might be placed on Commission billboard advertisements in the proximity of the retailer's stores.  Similarly, the names of retailers can be used in the Commission's radio advertisements.

89.  Because consumers prefer table grapes that are in good condition, the Commission also provides training or training materials to targeted retailers in the proper procedures for handling, storing, and displaying table grapes.

a.  Each year the Commission makes available to retailers (via its website, on CDROMs, and in its Marketing Training Guide) materials providing information about grape displays, storage temperatures, backroom handling, and grape delivery.

40

b.   Because there is constant turnover in produce departments, the Commission believes it must continually reach out to retailers.

c.   In addition to providing training materials, the Commission also encourages retailers to put the Commission's advice to use by creating attractive grape displays for entry in the Commission's seasonal display contests.  It is the Commission's goal to encourage retailers to use the techniques learned during the display contests throughout the California grape season.

90.   The Commission devotes significant efforts to encourage foodservice providers to increase the amount of fresh grapes they use.

a.   Because people today eat out in restaurants more frequently than ever before, the Commission's work targeting food service providers is thought to be important.

b.   One way the Commission attempts to increase the volume of grapes used by foodservice providers is by working with menu developers.  In order to encourage menu developers to use fresh grapes, the Commission has developed numerous recipes featuring fresh grapes that it sends to foodservice providers.

c.   Commission representatives also meet with menu developers as frequently as possible.  For example, in 2005, a Commission representative attended a leadership retreat for menu developers at the Culinary Institute of America in Napa.

d.   In addition to developing and distributing recipes

41

featuring grapes and contacting menu developers, the Commission
contacts editors and writers for foodservice publications.   For
example, every year a Commission representative attends an
international foodservice editors' council in order to meet with
editors and tell them about the many uses of grapes in recipes.

       e.  In aid of its efforts to increase the use of grapes
by foodservice providers, the Commission has retained a
registered dietician as a consultant.  The registered dietician
is able to answer nutrition questions from the foodservice
industry as well as to help create information useful in
foodservice education efforts.

       f.  The Commission uses the research it has funded on
the health benefits of grapes in its efforts to expand their
usage by foodservice providers.

     91.  In 2004-2005, the Commission's domestic marketing
program spent $ 1,445,242 in assessment dollars on the following
categories of activities: $1,066,748 trade management,
$328,554 research, and $49,940 education and outreach.

     92.  Just four years ago, the Commission conducted little
category management research, but now the Commission has
developed a category management research program.  In recognition
of the Commission's new category management research efforts, the
Commission recently won the "Category Captain" award for random
weight produce from Progressive Grocer magazine.

     93.  In 2004, the Commission had incentive agreements in
place with the retailers whose stores sell approximately 81.2% of

the table grapes sold in the United States and Canada.  Each year the Commission provides rewards to retailers under these contracts totaling approximately $450,000 to $500,000.

94.  Retailers participating in the Commission's September 2005 display contest reported average increases of grape sales of 217% over normal sales for that time period.  Research shows that just over 50% of the (1251) table grape purchasers surveyed decide to buy grapes once they are in the store and just over 60% of those who decide in the store to buy grapes do so because the grapes look good.

95.  The Commission undertakes an extensive amount of consumer preference research.

96.  McDonald's decided in May 2005 to start selling the new Fruit and Walnut Premium Salad, which features fresh grapes.  The appearance of fresh grapes on the McDonald's menu followed more than two years of work by the Commission with McDonald's menu developers.  McDonald's indicated that it planned to buy 6.5 million pounds of fresh grapes in 2005, but McDonald's has not made public the amount of California table grapes that actually were purchased that year.

97.  A 1993 consumer survey indicated that 82% of responding primary grocery shoppers agreed that "grapes are a healthy, nutritious snack."  A 2005 consumer survey indicated that 99% of U.S. and Canadian shoppers surveyed believe fresh grapes are "extremely good/good for you."

98.  The primary activities of the Commission's

international marketing program can be broken down into three areas: (1) market access (which falls within the issue management category), (2) international trade management, and (3) international research.

       a.   The market access work undertaken involves efforts to increase access by California grapes to foreign export markets by opening markets, keeping them open, and reducing tariffs.

       b.   The international marketing program also includes market research on a range of subjects including consumer and trade attitudes, export protocols, and foreign production.

    99.   In 2004-2005, the Commission's international marketing program spent a total of $4,666,522.  Of that amount, $1,288,853 came from assessments and was spent on the following categories of activities: $121,176 for education and outreach, $170,114 for research, $238,847 for issue management, and $758,717 for trade management.

    100.   The market access work undertaken by the international marketing program is principally financed with assessment dollars.

    101.   The Commission received $2,958,649 in MAP funds for 2004; to date for the 2005 fiscal year the figure is $2,501,538, as not all MAP funding has been received.

    102.   In order to obtain these funds, the Commission must agree to match a certain percentage of the MAP funds with its own funds.  For 2005, the Commission agreed to match 79% of the MAP funds with its own spending.

103.   USDA data indicate that between 1995 and 2004 the volume of fresh grape exports has increased 63% and the value of those exports has increased 78%.

104.   In addressing market access issues, the Commission works closely with USDA and the Office of the U.S. Trade Representative ("USTR") in attempts to enhance the position of the table industry in negotiations between the United States and other governments.  The Commission also retains a consultant, Bryant-Christie, Inc., that specializes in market access issues.

105.   Market access work is divided into three primary areas: opening markets, keeping markets open, and providing broader access through the elimination of tariff and nontariff trade barriers.

106.   First, the Commission works with USDA and USTR to attempt to open new markets to fresh California grapes.  For example:

     a.   In order to open the Australia market to California grapes, the Commission expended significant efforts from 1990 to 2002 conducting research and working with the USDA and the USTR to negotiate a shipping protocol that called for grapes to be fumigated with methyl bromide.  It also expends significant efforts helping to administer the shipping protocol put in place.

          i.   In order to facilitate compliance with the protocol and to fund operations under the protocol, the Commission created the California Table Grape Export Association. The Association works directly with shippers and Australian

45

government officials to manage and coordinate inspections by the Australian officials of California table grapes being shipped to Australia.

ii.   Each year, the Australian government also requires a list of all those entities that will be shipping to the Australian market, including their designated contact person, and their fumigation facility locations and operators.  The Commission compiles this list for the USDA so that it can provide the information to its Australian counterparts.

b.   The Commission also worked with USDA and the USTR to re-open the New Zealand market when its government closed the market to fresh California table grapes in 2001 because of fears that black widow spiders would enter New Zealand and threaten its consumers.

i.   To help to resolve the problem, the Commission briefed California shippers exporting to New Zealand on how to improve their handling and shipping of table grapes to eliminate the presence of black widow spiders.  The improvements in handling and shipping resulted from Commission sponsored studies of table grape box types and the use of carbon dioxide ("CO2") and sulfur dioxide ("SO2") to kill any black widow spiders that made their way into a shipment.  Ultimately, the Commission, USDA, and the USTR were able to convince the New Zealand government that a shipment protocol involving appropriate box types and treatment was adequate protection.

ii.   The Commission worked with county

46

agricultural inspectors in California and USDA to develop the protocol and assure the New Zealand government that it was being used uniformly.   Through this effort, the New Zealand market was re-opened before the end of the 2002 California marketing period.

c.   The Commission also worked closely with USDA Animal and Plant Health Inspection Service to convince the New Zealand government that cold treatment was unnecessary to prevent the introduction of glassy winged sharpshooters in California grape shipments.   New Zealand repealed its cold storage requirement in 2005.

d.   The Commission also worked with USDA and the USTR to open the India market to California table grapes in 2001. India had long been closed to imports or had extremely high tariffs or complex import permit requirements that sharply limited volumes.   The Commission began working with USDA, the Indian government, and the Indian table grape industry approximately four years in advance of the opening of the market. A Commission representative was sent to India twice to pave the way for opening the market.   When India started to liberalize its market to world trade in April 2001, the Commission immediately worked with the U.S. and Indian governments to help gain access and California table grape shipments were sent to India in that first season following the liberalization.

e.   The Commission also helped to open the China market to lawful imports of California table grapes in 1997 following years of negotiation between the US and Chinese governments.   The

US government worked to open the market at the urging of, and in conjunction with, the Commission.  The Commission's role in opening the market was two-fold: keeping the US government focused on getting the market open; and participating with the US government in the development of a work plan that outlined the rules under which the fruit could be shipped between the two countries.

      i.  The agreement was negotiated between and signed by the governments of China and the United States, but like most market access issues in which the Commission is involved, the Commission played an important role in the negotiations.  The Commission had a representative from Bryant Christie in attendance at most of the negotiation sessions, including the final session.

      ii.  To this day, China continues to require a list of approved shippers, and the Commission continues to be responsible for developing that list and maintaining it.  It is submitted annually to USDA which in turn submits it to the Chinese government.  The Mediterranean fruit fly trapping continues to be required, although in recent years the cost has been borne by the counties.

      f.  The Commission is also working to facilitate expanded shipments into China by California grower/shippers.

      i.  As noted above, China requires that all shippers of California grapes into China be registered.  The list of registered shippers is given to Chinese customs officials at

all of the ports of entry.  Any grapes from a shipper not on
the list are turned away.  At the request of China and the USDA,
the Commission compiles and maintains the list.  The list is
compiled after soliciting California grower/shippers to sign up.
After the list is compiled, it is given to USDA, which then gives
the list to the Chinese authorities.

        ii.   In addition to working under the China
protocol, the Commission is working to modify the protocol to
permit inspections to be made in the U.S. at the port of exit.
Under the current system, Chinese customs officials from time to
time turn away shipments of fruit from registered shippers based
on minor errors in the list or other mistakes.

        iii.   Additionally, the Commission is working with
the USDA and the USTR to eliminate the Mediterranean fruit fly
trapping program required by China and to open a new port in
China to shipments of California table grapes.

    107.   Second, the Commission works with USDA, the USTR,
foreign governments, and other interested parties to attempt to
keep foreign markets open to California grapes by responding
to incidents that arise that need a prompt resolution.

        a.   When exported California grapes are turned away by
foreign customs officials or other critical export problems
arise, the Commission responds by coordinating the efforts of the
U.S. government, U.S. embassy officials, foreign industry, and
foreign governments to attempt to resolve the problem.

        b.   Various impediments to exports periodically arise

requiring the Commission to work with others to attempt to avert two types of potential losses: immediate loss to the shippers whose fruit is sitting on a dock or at a border crossing awaiting approval to move, and loss to the industry as a whole from the closing of a market mid-season.

c.   For example, a black widow spider was found in the United Kingdom in 2002 and threatened to close that market to California grapes.  In 2004-2005, an European Union sulphur dioxide requirement almost closed the member countries' markets to California grapes.  Mexico and Panama briefly closed in 1999 due to misidentified pests.  California grape shipments that had already arrived in Australia were held up in 2003 due to missing box stamps.  Venezuelan shipments were disrupted due to the Venezuelan government reducing the number of, and volumes within, import permits they issue that allow fruit into that market. Concern about Mediterranean fruit flies in Taiwan almost closed that market to California grapes.  The Commission responded to each of these incidents by working with the relevant governmental and private parties to keep the markets open.

108.   Third, the Commission works with the USDA and the USTR to attempt to lower tariff and non-tariff barriers that impede the flow of California table grapes to foreign countries.

a.   The Commission tracks international standards for grapes—including packaging standards, maturity/quality standards, and especially pesticide maximum residue levels ("MRLs")—and works with USDA, the USTR, foreign governments, and international

bodies to ensure that these standards are reasonable and based on an informed judgment about the costs and benefits of setting standards at various levels.

i.  The Commission works with the Codex Alimentarius Commission (which was created in 1963 by the United Nations Food and Agriculture Organization and the World Health Organization) in its efforts to set international standards for grapes.

ii.  The Commission works with USDA, the USTR, and other countries that import grapes to attempt to implement workable MRL standards in countries that import grapes and to develop reasonable packaging and labeling standards.

b.  The Commission expends significant efforts working with USDA and the USTR to attempt to lower tariffs imposed by foreign countries.

i.  The Commission has worked with the Bryant-Christie firm to attempt to lower tariffs on California grapes since 2004.

ii.  The Commission has conducted a review of the tariffs applicable to California table grapes in numerous foreign countries and has outlined not only the tariffs that California grower/shippers must pay but also the tariffs that their competitors must pay.

iii.  For the California table grape industry, the effort to reduce tariffs involves meeting with the USTR, the federal government agency responsible for the United States'

51

participation in the WTO negotiations, and urging the agency to attempt to secure the lowest possible tariffs for California grapes.  The issue of lowering tariffs comes up frequently, both in the context of the WTO negotiations and regional negotiations, such as the Central America Free Trade Agreement.  In these negotiations, it is important to keep the importance of lower tariffs for California table grapes in the negotiators' minds, and provide data in support of these requests.  This can make the difference between having a reduced tariff take effect immediately versus having a high tariff maintained or phased out over an extended period, such as 12 years.

iv.  By working to keep the issue of tariffs before the USTR, the Commission has helped to obtain tariff reductions for California table grapes in markets such as the Central America Free Trade Agreement countries and the Dominican Republic.

109.  The Commission's international trade management activities, which are funded principally with MAP funds, target the trade: retailers, importers, and wholesalers. The goal of the program is to encourage retailers, importers, and wholesalers to buy more California grapes more often and during more of the California season (May-January).

110.  The core of the Commission's international trade management effort is the work of its 15 overseas representatives who work directly with overseas retailers, importers, and wholesalers.  They provide grape storage, handling, and display

information to retail stores.

111.   The representatives also monitor local markets in their countries or regions and provide information that is conveyed in "Global Market Reports" that are sent twice a month during the California season to California table grape grower/ shippers to help them, if they are interested, understand the dynamics at work in foreign markets.

112.   A portion of the Commission's international trade management consists of "joint promotions" with retailers.  These joint promotions include activities such as in-store demonstrations where the Commission employs people to provide information and grape tastings to consumers, competitions for consumers to enter at the point of sale of table grapes, cooking demonstrations at the point of sale, special displays including secondary display locations and center aisle locations, point of sale posters, banners and the like.

113.   The Commission also provides financial awards to retailers for certain grape promotional activities, like offering samples or otherwise featuring California grapes.

114.   In support of its market access and international trade management efforts, the Commission conducts research on various international topics.

a.   A portion of that research work consists of foreign production studies designed to provide California grower/ shippers, if they are interested, with specific information about competitive countries.  The Commission has recently conducted

production studies of a number of countries, including China, Peru, and Spain.  The studies examine grape production in foreign countries, and in China's case also the development of the infrastructure for the postharvest management and transportation of fresh grapes.

b.  The Commission has also funded two transshipment studies.  One tracked grapes that were exported to Malaysia but then transported across the border into Thailand.  The other tracked grapes that traveled from China to Vietnam across their shared land border.

115.  Exports of California table grapes have increased over the past decade.

a.  According to USDA data, total exports of California table grapes to offshore markets and Mexico increased from 122,451 metric tons in 1995 to 201,653 metric tons in 2004.  The total volume of California table grapes exported over the past five years is higher than the previous five years.

b.  Over the past five years (2000 versus 2004), exports to some of the industry's largest exports markets have increased.  For instance, exports to Malaysia have increased 98% (+11,510 metric tons), exports to the United Kingdom have increased 30% (+3,396 metric tons), and exports to Indonesia have increased 152% (+6,694 metric tons).

116.  Studies indicate that 94% of consumers surveyed in select markets in certain Central American countries are aware of U.S./California grapes, 78% of consumers surveyed in select

54

markets in China are aware of U.S./California grapes, 97% of consumers surveyed in select markets in Hong Kong are aware of U.S./California grapes, 57% of consumers surveyed in select markets in Japan are aware of U.S./California grapes, 85% of consumers surveyed in select markets in Indonesia are aware of U.S./California grapes, 65% of consumers surveyed in select markets in Malaysia are aware of U.S./California grapes, 87% of consumers surveyed in select markets in the Philippines are aware of U.S./California grapes, 65% of consumers surveyed in select markets in Singapore are aware of U.S./California grapes, and 95% of consumers surveyed in select markets in Taiwan are aware of U.S./California grapes.  Research has also shown that awareness of U.S./California as an origin for grapes in most export markets significantly increases the likelihood of trial by the consumer.

117.  To receive MAP and EMP funds, a party must provide a certain level of matching funds, which the Commission is able to do.

118.  The Commission has been able to increase the amount of federal funds it receives while the its contribution has remained fairly stable.  While federal funds allocated to the Commission increased 69% in the five years between 2000 and 2004, the Commission's contributions have increased only 20%.

119.  The Commission has had success working with USDA and the USTR to open new markets to California table grapes. For example, since 1997, the Commission has been actively involved in

efforts with USDA and the USTR to open China, India, and Australia.  It also worked with USDA and the USTR to re-open the New Zealand market.

120.  The Commission works with USDA, the USTR, foreign governments, and interested parties to keep existing markets open to California grapes.

a.  For example, the Commission's work with the U.K. government and U.K. retailers helped to keep the United Kingdom market open when U.K. retailers indicated they intended to stop importing California grapes in 2002 following the discovery of a black widow spider in a shipment of California table grapes.

i.  The U.K. is one of the California table grape industry's largest export markets.

ii.  The black widow discovery was noted in the press in London, and retailers indicated that they intended to stop buying California grapes.  A few retailers continued to sell the product they had on their shelves and a few accepted loads of fruit that were already on the water but most did not.  More important, major retailers indicated that California grapes would not be imported in the 2003 season.

iii.  In response to the incident, the Commission President traveled to the U.K. in early January of 2003 to meet with retailers and importers.  To address retailers concerns, the Commission put together a voluntary protocol for shipping to the U.K. that is designed to eliminate black widow spiders.

iv.  The shipping protocol, which remains in

existence, requires shippers to register with the Commission in order to ship to the U.K. and agree to take certain steps pre-harvest to eliminate black widow spiders in the field and to submit to post-harvest fumigations and inspections.  Shippers agree to have their names provided to buyers in the U.K. so that buyers know which shippers have agreed to abide by the shipping protocol.

v.  As a result of the protocol, shipments to the United Kingdom resumed in 2003 and have been uninterrupted.  The U.K. remains one of the industry's top markets.  There have been no more reported spider finds.

b.  In 2004, when different Member State interpretations of a European Union directive 95/2/EC were creating uncertainty about the tolerance level for sulfur dioxide on table grapes, the Commission, Bryant Christie, the USDA, and Freshfel (a European fresh produce importers association) entered into consultations with the European Commission to clarify the issue and press for a definitive SO2 tolerance of 10 ppm on fresh grapes.  This has led to a process currently underway to amend the E.U. legislation to clearly establish a 10 ppm SO2 tolerance on fresh grapes.  Approval of the amendment is expected by spring 2006.

c.  In late 2004, the Thai government suddenly released a Ministerial announcement effectively banning three chemicals by setting a zero tolerance on them, thereby preventing the importation of California table grapes.  The Commission worked

with various departments of the U.S. government, including the
U.S. Department of Agriculture Animal and Plant Health Inspection
Service, the Foreign Agricultural Service, and the U.S. Embassy
in Bangkok, Thailand to have the announcement reversed.  The Thai
government postponed the start date for implementation of this
requirement, and the requirement has not yet been implemented.

d.  The Commission tracks packaging, shipping, residue
levels, and phytosanitary requirements imposed by countries that
import California table grapes.  It summarizes this data (along
with marketing information) by country in a database that is
accessible only to California table grape grower/shippers on a
password-protected portion of the Commission's web site,
www.freshcaliforniagrapes.com/en-US/Growers/
InternationalTrade.htm>.  This information is not available
anywhere else.

121.  The Commission's consumer education program is
intended to provide consumers with information about the health
and nutrition benefits of fresh California grapes and with
information about the industry, with the goal of keeping
California table grapes "top-of-mind" for consumers and educating
them about grapes and California's fresh grape industry.

122.  For example, the Commission sends recipe ideas,
photography, and fresh California grape health information to
newspaper food editors.

123.  The Commission also regularly contacts writers and
editors of consumer magazines to learn what would prompt them to

write stories about fresh grapes and then responds by providing them with the latest research on grape phytonutrient, photography, recipe ideas, and news about the industry.

a.   For a current example, as a result of the Commission's outreach efforts, the October 2005 issue of the culinary magazine Gourmet contained a two-page story on grapes and the October 2005 issue of the culinary magazine Bon Apatite contained a four page article about cooking with table grapes and published a number of recipes using grapes.

124.   In 2004, the Commission contacted television stations and cable broadcast networks and made available to them a spokesperson (Food Network host, celebrity chef, and award-winning cookbook author Kathleen Daelemans) hired by the Commission to explain how fresh California grapes can be an important part of a healthy diet.   In response, 47 television stations decided to air footage of Ms. Daelemans talking about grapes.   She also appeared by tape on the Health and Home Report, a syndicated television show that airs on cable broadcast networks.

125.   The Commission produces educational brochures and publications that detail the history of the industry, the health benefits of eating fresh grapes, and usage ideas such as freezing grapes for a cool summertime treat or adding them to salads for a pleasing hint of sweetness, color, and a crisp texture.   This information is also included on the commission's website at www.freshCaliforniagrapes.com.

126.   The Commission sends materials to members of the American Dietetic Association and meets with dietitians, nutritionists, and family physicians, answering their questions about the health benefits of fresh California grapes and providing them with the information and resources the Commission thinks they need to confidently recommend to their clients, consumers, or patients that fresh California grapes should be a part of their diet.

a.   In 2005, the Commission went to the annual convention of the American Academy of Family Physicians and spoke with the doctors in attendance about the health benefits of fresh California grapes.  The Commission interviewed the doctors about healthy eating, and those interviews were then used in a video and an audio news release for television and radio stations about healthy eating and the benefits of fresh California grapes as part of a healthy diet.

127.   Each year the Commission sends out news releases announcing the start of the California table grape season and conducts outreach on television (e.g., sending grapes to television newscasters and conducting live interviews) to tell people that they are now able to purchase California grapes.

128.   In 2004-2005, the Commission's consumer education program spent $694,229 in assessment dollars on the following categories of activities: $56,084 on research and $638,145 on education and outreach.

129.   The Commission provides information about California

table grapes to newspapers to encourage them to run stories about California grapes.  The firm that tracks news coverage for the Commission (Burrelle's Information Services) found that in 2004 a significant number of stories about fresh grapes and the California industry were based on this information.

130.  The Commission also provides information about California grapes to magazine writers and editors.  The consumer research and public relations firm Fleishman-Hillard found that in 2004, more than 90 articles based on this information appeared in major consumer magazines like Better Homes and Gardens, Bon Appetit, Family Circle, Good Housekeeping, Martha Stewart Living, and Woman's Day.

131.  In addition to the Commission activities that fall generally within one of the five principal Commission programs, a number of Commission issue management activities fall outside of the established programs.  One such activity is the Commission's phytonutrient research program.  Another is its work with foundations that work to educate consumers about the value of a good diet.

132.  The Commission's phytonutrient research program funds research into the potential health benefits of table grapes.

133.  In 1997, a researcher from the University of Illinois, Chicago, published a study that found that a substance called resveratrol fought cancer at three different stages of its growth.  The predominant dietary source of resveratrol is grapes.

134.  The Commission, after speaking with the researcher,

Dr. John Pezzuto, held a symposium on grape phytonutrient among researchers exploring the human health potential of grape compounds and then created a scientific advisory panel, chaired by Dr. Pezzuto, to advance the science linking fresh grapes with the prevention of disease and improved human health.

a. The panel consists of Dr. Pezzuto, currently Dean of the College of Pharmacy, Nursing and Health Sciences at Purdue University, Dr. Richard Moon with the University of Illinois, Chicago, Dr. Le Creasy of Cornell University, Dr. Richard Van Breemen with the University of Illinois, Chicago, Dr. Myron Gross with the University of Minnesota, and one member of the Commission board, Fred Smeds.

135. One of the foundations of the Commission's research is a standardized preparation of fresh California grapes used for the research, which the Commission developed.

a. The grapes are collected from throughout California's growing region during the growing season which runs from May through December. The grapes are frozen, blended, and freeze-dried in a proprietary process that ensures that the compound contains all of the biologically active compounds found in fresh California grapes.

136. Since 1998, the Commission has funded or supported 29 research studies.

137. As research studies are completed and published and new information about the impact of grape consumption on human health is generated, this information is disseminated to the

media and others, such as dieticians, nutritionists, and family physicians.

138.  In 2004-2005, the Commission spent approximately $270,000 on its phytonutrient research efforts.

139.  The Commission has been and continues to be involved in the efforts to address obesity and improve the health of consumers by working with various foundations that educate consumers about the value of a good diet.

a.  The Commission assisted in the creation of and works with the California and national 5-A-Day programs, in conjunction with the California Department of Health Services, the National Cancer Institute, and the Center for Disease Control.  These efforts encourage all Americans to eat five or more servings of fruits and vegetables each day in order to prevent obesity and other disease.  The Commission was a founding partner of both organizations and remains actively involved.

b.  The Commission's Vice President serves on a committee of the Produce for Better Health Foundation ("PBH") and sits on the board of Spoons Across America, two organizations that are actively involved in improving the quality of Americans' diet.  PBH educates consumers about the importance of eating more fruits and vegetables, and Spoons Across American teaches children about good nutrition and provides them with the basic cooking skills they need to have control over their own diet.

c.  The Commission's Vice President of Domestic Marketing serves on the PBH board and Marketing Committee and as

the co-chair of the Joint Steering Committee for the California Nutrition Network and California 5 A Day program.

140.   The Commission's efforts to develop a standardized freeze-dried mixture of California grapes that can be used in research projects have helped improve research on the health benefits of grapes.

141.   Researchers funded by the Commission have found links between the compounds in fresh California grapes and fighting or preventing diseases such as cancer, heart disease, and degenerative nerve damage.

142.   The Commission's health research program and the work of its Scientific Advisory Panel has been helpful in generating research and awareness of the health potential for fresh grapes and fresh grape compounds in the scientific community.  For example, there are researchers exploring potential links between grapes and prevention of certain viruses as well as prevention of Alzheimer's disease.

143.   Consumer research by the Commission has shown that the existence of a health claim that eating grapes is beneficial to one's health would motivate some primary grocery shoppers to purchase and consume more fresh California grapes more often.

144.   Research by the Commission has shown that awareness of the health benefits of fresh California grapes can be a motivating purchase factor for a majority of primary grocery shoppers even without the health claim.

145.   The Commission's support of the California and

national 5 A Day programs and the Produce for Better Health Foundation, in conjunction with the efforts of other groups, has been important in those programs in encouraging Californians and Americans to eat more fruits and vegetables and thereby improve their health.

146.  If an individual promotion program would be profitable without a generic promotion program, it would also be profitable with a generic promotion program.

147.  The process of obtaining the federal funds used by the Commission is complex and cumbersome, but the Commission is willing and able to dedicate the resources necessary to obtain the funding.

148.  The Commission is able to provide the matching funds required to obtain federal export grant money.

149.  Individual grape grower/shippers do not have the incentive to conduct the consumer education activities undertaken by the Commission.

150.  The Plaintiffs conduct no significant direct advertising to consumers.

a.  When Plaintiffs Susan Neill Company and Lucas Brothers Partnership grew and shipped California table grapes, they advertised only in trade publications, and that advertising (which was for Lucas Brothers grapes) was relatively limited.

b.  Virtually all of Plaintiff Delano Farms' advertising is in trade publications.

151.  The Susan Neill Company and Lucas Brothers Partnership no longer grow or ship California table grapes and therefore no longer pay assessments to the Commission.

152.  Susan Neill Company has never itself borne the cost of the assessments paid on grapes it has shipped.  Susan Neill Company has always passed the cost of the assessment on to Lucas Brothers Partnership.

153.  The Commission was created by the California Legislature, and the Legislature has defined its duties.

154.  The CDFA oversees and conducts voting on five-year and special termination referenda under the Ketchum Act.

155.  The CDFA oversees the nomination and selection of producers eligible to be appointed to the Commission board by the Secretary.

156.  All of the Commissioners of the Commission are appointed and subject to removal by the Secretary.

    a.  Growers hold nominating meetings followed by elections to determine who they will recommend to the Secretary for appointment.

    b.  The Secretary then determines who to appoint to the Commission and appoints that person.

    c.  Prior to appointment, the CDFA inquires into whether potential commissioners are suitable for appointment.

    d.  The Secretary is authorized to remove a commissioner if necessary.

157.  The Commission, like other mandated commodity

organizations overseen by the CDFA, pays its share of the common expenses incurred by the marketing branch of the CDFA.

158.   California table grape growers have filed grievances with the Commission, as permitted under the Ketchum Act, on at least four occasions in the past.

159.   When a grievance is filed, the grower is given an opportunity to present his position to the Commission and then the Commission renders a decision, which can be appealed to the CDFA.

160.   In 2004, a grower appealed the Commission's denial of his request for disclosure of the salary of the Commission President under the Public Records Act.  After receiving the appeal, the Secretary asked the Commission to submit the video tape of the hearing at which the grievance was presented and to explain the rationale behind its decision.  After considering the Commission's submission, the Secretary rendered a decision reversing the Commission's determination and ordered disclosure of the salary.  The Secretary held that the Commission "is a government entity within the meaning of the Public Records Act." The Commission then disclosed the requested information as ordered.

161.   The CDFA has indicated that if a person complained to the CDFA about a Commission advertisement, the CDFA would review the matter internally and could act to block the ad or advise that it be changed.

162.   Each month the Commission receives the CDFA's

Marketing Memo, which contains information and instructions for marketing orders, agreements, councils, and commissions.

163.   The CDFA has provided guidance to the Commission regarding the level of reserves it maintains.

164.   The CDFA can, if it wants, request that the Commission provide it with information, including notices of meetings, meeting minutes, contracts, and copies of advertisements.

165.   The Commission responds to any requests for information from CDFA marketing branch staff.

166.   The CDFA conducts audits of grape shippers on behalf of the Commission.

167.   The Commission complies with certain legal requirements imposed on some state agencies.

a.   All of the Commission's meetings are conducted in accordance with the Bagley- Keene Open Meeting Act, as directed by the CDFA.   Accordingly, the Commission gives notice of all of its meetings and its meetings are generally open to the public.

b.   The Commission is required to comply with the Public Records Act.

c.   The Commission is required to and does submit a Statement of Facts Roster of Public Agencies Filing to the California Department of State every year.

d.   The Commission's Commissioners are required each year to submit disclosure statements to the Fair Political Practices Commission every year.

168.   Commission employees are eligible to participate in

1  the state's Savings Plus Program, a retirement saving program for

2  state employees, but are not required to.

3      169.   The CDFA provides Commission employees with a template

4  for creating identification cards that allow them to take

5  advantage of special rates for state employees, but said

6  employees are not required to do so.

7      170.   Commission employees may, and are encouraged by the

8  CDFA to, use State of California employee travel discounts.

9      E.   STANDING OF THE SUSAN NEILL COMPANY AND LUCAS BROTHERS

10 PARTNERSHIP.

11     A footnote to the Commission's opening memorandum supporting

12 its motion for summary judgment argues that Plaintiffs The Susan

13 Neill Company and Lucas Brothers Partnership lack standing to

14 seek any prospective relief because they stipulated that these

15 plaintiffs "no longer grow or ship California table grapes and

16 therefore no longer pay assessments to the Commission."

17     Plaintiffs respond that this stipulated fact is "irrelevant

18 to the extent that these two Plaintiffs are seeking refunds of

19 past paid assessments."  This is a concession that The Susan

20 Neill Company and Lucas Brothers Partnership no longer have

21 standing to obtain prospective relief.

22     The Commission also cites to the stipulated fact that the

23 "Susan Neill Company has never itself borne the cost of the

24 assessments paid on grapes it has shipped [and that] Susan Neill

25 Company has always passed the cost of the assessment on to Lucas

26 Brothers Partnership".  Plaintiffs respond by an objection on the

ground of relevance.   In a footnote to their opposition brief to the Commission's motion for summary judgment, Plaintiffs object to the contention that the Susan Neill Company has no standing: "First of all Susan Neill is married to George Lucas, general partner of Lucas Bros. partnership.   Secondly, the Susan Neill Company does have standing since the [Act] does require the shipper (Susan Neill) to actually pay the assessments to the Commission, regardless of whether she passes that on to Lucas Bros."

As the Commission correctly responds, Plaintiffs' contentions do not establish standing for The Susan Neill Company:

> Whether Ms. Neill is married to Mr. Lucas ... says nothing about whether The Susan Neill Company can recover assessments for which it was reimbursed and seek declaratory and injunctive relief with respect to a law that no longer affects it.   Moreover, because The Susan Neill Company seeks only a refund of past assessments, not recovery of any administrative costs it might have incurred in paying assessments on behalf of Lucas Bros. Partnership ..., that fact that it 'actually pa[id] the assessments' before getting reimbursed is irrelevant.

The Commission's motion for partial summary judgment on the grounds that The Susan Neill Company lacks standing to obtain relief as that entity never paid assessments and that the Lucas Brothers Partnership lacks standing to obtain prospective as opposed to past relief is GRANTED and Plaintiffs' motion for summary judgment on this issue is DENIED.

   F.   <u>GOVERNMENT SPEECH</u>.

70

The parties respectively move for summary judgment that the Commission's program is or is not "government speech," subject or not subject to First Amendment protections.

Relying on the Supreme Court's opinion in *Johanns v. Livestock Marketing Ass'n.*, 544 U.S. 550 (2005), Plaintiffs argue that the Act's provisions and the California Department of Food and Agriculture's involvement "in the Commission's speech, let alone [the Commission's] activities, [are] not even arguably in the same ball park compared to the control over the make-up and communications of the Beef Board."  Plaintiffs argue the Commission's program is not "government speech" as that term is defined in *Johanns* and summary adjudication in their favor on this issue is appropriate.

The Commission rejoins that the Commission's speech is "government speech" for three reasons: "(1) the messages Plaintiffs challenge were mandated by the California Legislature; (2) the Commission itself is a governmental entity; and (3) the CDFA retains effective control over the Commission's speech because it appoints and can remove Commission board members and is empowered to reverse any improper actions taken by the Commission."

1. *Johanns v. Livestock Marketing Ass'n*.

In *Johanns v. Livestock Marketing Ass'n.,*, the Supreme Court addressed "whether the generic advertising at issue is the Government's own speech and therefore is exempt from First Amendment scrutiny."  544 U.S. at 553.  The Beef Promotion and

Research Act of 1985, 7 U.S.C. § 2901(b), announces a federal policy of promoting the marketing and consumption of "beef and beef products."  The statute directs the Secretary of Agriculture to implement this policy by issuing a Beef Promotion and Research Order (Beef Order or Order) and specifies four key terms the Beef Order must contain: (1) The Secretary is to appoint a Cattlemen's Beef Promotion and Research Board (Beef Board or Board), whose members are to be a geographically representative group of beef producers and importers, nominated by trade associations; (2) the Beef Board is to convene an Operating Committee, composed of 10 Beef Board members and 10 representatives named by a federation of state beef councils; (3) the Secretary is to impose a $1-per-head assessment or checkoff on all sales or importation of cattle and a comparable assessment on imported beef products; and (4) the assessment is to be used to fund beef-related projects, including promotional campaigns, designed by the Operating Committee and approved by the Secretary.

The Secretary promulgated the Beef Order with the specified terms.  The assessment is collected primarily by state beef councils, which then forward the proceeds to the Beef Board.  The Operating Committee proposes projects to be funded by the checkoff, including promotion and research.  The Secretary or his designee approves each project and, in the case of promotional materials, the content of each communication.  Respondents sued the Secretary in federal court, arguing based on *United Foods* that the advertising promotes beef as a generic commodity which

72

impedes their efforts to promote the superiority of American beef, grain-feed beef, or certified Angus or Hereford beef. *Id.* at 554-555. After a bench trial, the district court ruled for respondents, declaring that the Beef Act and Beef Order unconstitutionally compel respondents to subsidize speech to which they object, and rejected the Government's contention that the checkoff survives First Amendment scrutiny because it funds only government speech. *Id.*, at 556.

The Eighth Circuit affirmed the district court, although the Eighth Circuit did not find that the challenged advertising was government speech. Instead, the Eighth Circuit found that government speech is relevant only to First Amendment challenges to the speech's content, not to challenges to compelled funding for the speech, and that compelled funding of speech may violate the First Amendment even if the speech in question is the government's. *Id.*, at 556-557.

The Supreme Court noted that it had sustained First Amendment challenges to compelled expression in two categories of cases: "true 'compelled speech' cases in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." *Id.*, at 557. The Supreme Court recognized that it had not previously considered "the First Amendment consequences of government-compelled subsidy of the government's own speech." *Id.*

Respondents there argued that the challenged promotional campaigns "differ dispositively from the type of government speech that, our cases suggest, is not susceptible to First Amendment challenge" by pointing to "the role of the Beef Board and its Operating Committee in designing the promotional campaigns, and to the use of a mandatory assessment on beef producers to fund the advertising." *Id.*, at 560.

As to the identity of the speaker, respondents argued that "speech whose content is effectively controlled by a nongovernmental entity - the Operating Committee - cannot be considered 'government speech.'" The Supreme Court ruled: "We need not address this contention, because we reject its premise. The message of the promotional campaigns is effectively controlled by the Federal Government itself." *Id.* From this conclusion, the Supreme Court reasoned:

> We therefore need not label the Operating Committee as 'governmental' or 'nongovernmental.' The entity to which assessments are remitted is the Beef Board, all of whose members are appointed by the Secretary pursuant to law. The Operating Committee's only relevant involvement is ancillary - it designs the promotional campaigns, which the Secretary supervises and approves - and its status as a state actor is not directly at issue.

*Id.,* at 560 n.4. In explaining this conclusion, the Supreme Court stated:

> The message set out in the beef promotions is from beginning to end the message established by the Federal Government. Congress has directed the implementation of a 'coordinated program' of promotion, 'including paid

74

advertising, to advance the image and desirability of beef and beef products.'  7 U.S.C. §§ 2901(b), 2902(13).  Congress and the Secretary have also specified, in general terms, what the promotional campaigns shall contain, see, *e.g.*, § 2904(4)(B)(i)(campaigns 'shall ... take into account' different types of beef products), and what they shall not, see, *e.g.,* 7 CFR § 1260.169(d) (2004)(campaigns shall not, without prior approval, refer 'to a brand or trade name of any beef product').  Thus, Congress and the Secretary have set out the overarching message and some of the elements, and they have left the development of the remaining details to an entity whose members are answerable to the Secretary (and in some cases appointed by him as well).

Moreover, the record demonstrates that the Secretary exercises final approval authority over every word used in every promotional campaign.  All proposed promotional messages are reviewed by Department officials both for substance and for wording, and some proposals are rejected or rewritten by the Department ... Nor is the Secretary's role limited to final approval or rejection; officials of the Department also attend and participate in the open meetings at which proposals are developed ....

This degree of governmental control over the message funded by the checkoff distinguishes these cases from *Keller*.  There the state bar's communicative activities to which the plaintiffs objected were not prescribed by law in their general outline and not developed under official government supervision.  Indeed, many of them consisted of lobbying the state legislature on various issues ... When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages.

*Id.*, at 560-562.

The Supreme Court rejected the argument that the beef program does not qualify as "government speech" because it is funded by a targeted assessment on beef producers, rather than by general revenues, thereby giving control to a narrow interest group that will not heed respondents' objections, as opposed to politically accountable legislators:

> ... The compelled-*subsidy* analysis is altogether unaffected by whether the funds for the promotions are raised by general taxes or through a targeted assessment. Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech. And that is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object ....

> Some of our cases have justified compelled funding of government speech by pointing out that government speech is subject to democratic accountability ... But our references to 'traditional political controls' ... do not signify that the First Amendment duplicates the Appropriations Clause ... or that every instance of government speech must be funded by a line item in an appropriations bill. Here, the beef advertisements are subject to political safeguards more than adequate to set them apart from private messages. The program is authorized and the basic message prescribed by federal statute, and specific requirements for the promotions' content are imposed by federal regulations promulgated after notice and comment. The Secretary of Agriculture, a politically accountable official, oversees the program, appoints and dismisses the key personnel, and retains absolute veto power over the advertisements' content, right down to the wording. And Congress, of course, retains oversight authority, not to mention the ability to reform the program at any time. No more is required.

*Id.*, at 562-564.

Finally, the Supreme Court refused to rule on the contention that crediting the advertising to "American Beef Producers" impermissibly uses not only their money but also their seeming endorsement to promote a message with which they do not agree. Respondents had argued to the Supreme Court that "[c]ommunications cannot be 'government speech' ... if they are attributed to someone other than the government; and the person to whom they are attributed, when he is, by compulsory funding, made the unwilling instrument of communication, may raise a First Amendment objection."  *Id.*, at 564.  The Supreme Court stated:

> We need not determine the validity of this argument - which relates to compelled *speech* rather than compelled *subsidy* - with regard to respondents' facial challenge.  Since neither the Beef Act nor the Beef Order requires attribution, neither can be the cause of any possible First Amendment harm. The District Court's order enjoining enforcement of the Act and the Order thus cannot be sustained on this theory.
>
> On some set of facts, this second theory might (again, we express no view on the point) form the basis for an as-applied challenge - if it were established, that is, that individual beef advertisements were attributed to respondents.  The record, however, includes only a stipulated sampling of these promotional materials ... and none of the exemplars provides any support for this attribution theory except for the tagline identifying the funding.  Respondents apparently presented no other evidence of attribution at trial and the District Court made no factual findings on the point. ... Whether the *individual* respondents who are beef producers would be associated with speech labeled as coming from "America's Beef Producers' is a question on which the trial

> record is altogether silent.  We have only
> the funding tagline itself, a trademarked
> term that, standing alone, is not
> sufficiently specific to convince a
> reasonable factfinder that any particular
> beef producer, or all beef producers, would
> be tarred with the content of each
> trademarked ad.

*Id.*, at 564-566.[2]

   2.   *Paramount Land Co., LP v. Cal. Pistachio Com'n*.

Since these motions for summary judgment were argued and submitted, the Ninth Circuit decided *Paramount Land Co., LP v. Cal. Pistachio Com'n*, 491 F.3d 1003 (9th Cir.2007).

In *Paramount*, a group of pistachio growers (collectively referred to as Paramount) challenged the marketing and promotional activities of the California Pistachio Commission under the First Amendment and on various state law grounds. Paramount moved the District Court for a preliminary injunction. The District Court granted the preliminary injunction on the ground that it was unlikely that the California state government exercised effective control over the Pistachio Commission for its expressive activity to qualify as "government speech" under *Johanns"* and that, under *Glickman v. Wileman Brothers & Elliott, Inc.*, 521 U.S. 457, 469-470 (1997) and *United States v. United Foods, Inc.*, 533 U.S. 405, 415 (2001), the assessments funded by the Pistachio Commission probably were not part of a larger economic regulatory scheme so as to make them constitutionally

---

[2]In this case, there is no attribution to Plaintiffs of any of the Commission's advertising and promotions.

permissible under *Glickman*.   491 F.3d at 1008.   On appeal, the Ninth Circuit addressed "whether this generic advertising is 'the Government's own speech and therefore is exempt from First Amendment scrutiny' under the Supreme Court's analysis in *Johanns v. Livestock Marketing Association*."   *Id.,* at 1005.   *Paramount* describes the state regulation of pistachios:

> The California state legislature created the Pistachio Commission 'to enhance and preserve the economic interests of the State of California,' by among other activities, '[i]mplement[ing] public policy through [its] expressive conduct.'   Cal. Food & Agric. Code § 63901.   The Pistachio Commission administers the Pistachio Act and supports the pistachio industry through advertising, marketing, research, and government relations campaigns.   *See* Pistachio Act § 69051.
>
> The Pistachio Commission is authorized to undertake a broad range of activity: (1) research into production, food safety, marketing, crop protection and production materials, (2) promotion of the elimination of trade barriers, (3) consumer education regarding the health benefits of pistachios, (4) demand-side regulation to stabilize the market, (5) analysis of relevant foreign, federal and state regulation, (6) cooperative crisis resolution, (7) cooperation with state and federal agencies in foreign negotiations, and (8) support of industry self-regulation. *See* Cal. Food & Agric. Code §§ 63901-63901.3. This regulatory scheme, which applies to all councils and commissions relating to agricultural or seafood markets in California, is designed to 'work subject to, and together with, the constraints placed on the agricultural industry by state and federal statutes and regulations and international restrictions.'   *Id.* § 69301.4.
>
> The Pistachio Commission has nine members, eight selected by California pistachio growers and one selected by the Secretary of the California Department of Food and

Agriculture ('CDFA').  Pistachio Act § 69031.
Acting through committees chaired by the
commissioners, the Commission meets three
times a year and employs a full-time staff to
handle daily operations.  In addition to
appointing one member of the committee [sic],
the Secretary of the CDFA (or a designee),
may attend and participate in the Pistachio
Commission or committee meetings as an *ex
officio* member.  *Id.*  Like other entities in
the state government, the Commission is
subject to transparency and ethics
regulations designed to promote public
accountability.

The Secretary retains broad statutory
authority to: (1) review and approve the
Pistachio Commission's annual budget and
planned activities, (2) conduct fiscal and
compliance audits, (3) approve nomination and
election procedures, (4) decide appeals from
grievance petitions filed by growers, and (5)
suspend or discharge the Commission's
president.  *See id.* §§ 69051, 69069, 69092.
The Secretary may also require the Pistachio
Commission to 'correct or cease any activity
or function that is determined by the
secretary not to be in the public interest or
to be in violation of [the Pistachio Act]."
*Id.* § 69032.  Although the Secretary has
ultimate authority over the Commission's
budget, operations, and planning, the
Secretary has declined to exercise many of
his more specific statutory powers.

Paramount and its various affiliated entities
are the largest producers of pistachios in
California, together paying between 25 and 30
percent of the Pistachio Commission's total
assessments in recent years.  The expressive
activity that has attracted Paramount's ire
centers around generic print and public
relations advertising campaigns for
California pistachios.  The most recent
campaign features the logo 'California
Pistachios' and the slogan 'Grab a Handful.'
The campaign included print advertising in
magazines, media mailings, a satellite tour,
talk-show appearances by spokesperson Jane
Seymour, and promotion at the retail level
(including point-of-sale promotional

materials, price recommendations, and advertising incentives).  Paramount maintains that these campaigns are 'ineffective in augmenting pistachio sales,' 'do not adequately feature the nuts themselves,' and are 'antithetical to Paramount's interests,' which are to 'increase sales by differentiating its product from competitor's products.'

Paramount also targets the Pistachio Commission's government relations activities, which are coordinated by a political consultant who hires lawyers to represent the industry before the International Trade Commission and the Commerce Department, and to lobby government entities on behalf of the pistachio industry.  Paramount complains that the Pistachio Commission has 'not done enough to protect the domestic pistachio industry from foreign pistachios.'

These offending activities [of the Pistachio Commission complained of by Paramount] are funded by mandatory assessments paid by pistachio producers and importers (via processors who deduct dues from the amount they pay the producers).  *See id.* §§ 69081 & 69085.  Failure to pay invites financial penalties and possible enforcement action by the Pistachio Commission.  *Id.* §§ 69088-93.  The majority of the Commission's annual budget, which has fluctuated between $6.6 million and almost $8 million in recent years, is dedicated to the challenged expressive activity.

491 F.3d at 1006-1007.  The Ninth Circuit then describes federal regulation of pistachios:

In 2004, the United States Secretary of Agriculture issued a marketing order for California pistachios under the Agricultural Marketing Agreement Act of 1937 ..., 7 U.S.C. § 601 *et seq.*  *See* 7 C.F.R. § 983 (the 'Marketing Order').  The Marketing Order regulates two broad areas of the pistachio industry: aflatoxin levels and minimum quality levels.  *Id.* § 938.38-39.  The Marketing Order makes no mention of

81

> promotion, marketing, advertising, research,
> government relations or other potential
> expressive activity to be carried out by the
> administrative committee established by the
> federal regulations.  The committee may
> 'deliberate, consult, cooperate and exchange
> information with the California Pistachio
> Commission.'  7 C.F.R. § 983.71.

*Id.*, at 1007.

Based on the Supreme Court's decision in *Johanns*, the Ninth

Circuit ruled that Paramount had not shown a likelihood of

success on the merits of the First Amendment claim:

> The framework of statutes and regulations
> governing the Pistachio Commission and its
> activities essentially mirrors the scheme
> addressed in *Johanns*.  Although the state of
> California may, in practice, exercise less
> oversight over the Pistachio Commission than
> the Secretary of Agriculture exercises over
> the Beef Board, on the record developed thus
> far, that distinction is not enough to
> differentiate the activities of the Pistachio
> Commission from those of the Beef Board.
>
> The structure of the Pistachio Commission and
> its relationship to the State of California
> is nearly identical in design to that of the
> Beef Board at issue in *Johanns*.  The
> Pistachio Commission consists of nine
> members, of which eight are elected by
> industry members and one is appointed by the
> Secretary of the CDFA.[4] The Secretary must
> also concur in any nomination and election
> procedures adopted by the Pistachio
> Commission.  Pistachio Act § 69069.
>
> The Pistachio Commission is directed to
> 'promote the sale of pistachios by
> advertising and other promotional means,' *id.*
> § 69051(i), while the Beef Board is tasked
> with 'carrying out a coordinated program of
> promotion and research designed to strengthen
> the beef industry's position in the
> marketplace and to maintain and expand
> domestic and foreign markets and uses for
> been and beef products.' 7 U.S.C. § 2901(b).

82

The Secretary of the CDFA is authorized to attend and participate in the meetings where promotional activities are planned, Pistachio Act § 69041, just as the Secretary of Agriculture or his designee may attend the meetings where the Beef Board develops marketing plans, *see* 7 C.F.R. § 1260.168(h). As a practical matter, the Secretary of the CDFA or his representative routinely attends Commission meetings.

The Secretary of Agriculture approves the Beef Board's detailed plans for promotional or marketing activities. *See* 7 C.F.R. §§ 1260.150(f)-(g) & 1260.169. Similarly, the Pistachio Commission must submit to the Secretary of the CDFA, for his concurrence, 'an annual statement of contemplated activities authorized [by the Pistachio Act], including advertising, promotion, marketing research, and production research.' Pistachio Act § 69051(q).

Although there is no provision in the Pistachio Act allowing the Secretary of the CDFA to remove members of the Pistachio Commission, *compare Johanns*, 544 U.S. at 563 ..., the Pistachio Act authorizes the Secretary of the CDFA to 'correct or cease any existing activity or function that is determined by the secretary not to be in the public interest or in violation of [the Pistachio Act].' Pistachio Act § 69032. And, the Secretary may suspend or discharge the Commission's president if he has engaged in any conduct that the Secretary determines is not in the public interest. *Id*. § 69051(d).

Other factors also demonstrate the Secretary's control over the Commission. For example, growers dissatisfied with any Commission activity may file a grievance, which can be directly appealed to the Secretary. *Id*. § 69092. The Secretary also must approve the Commission's annual budget before the Commission may disburse funds, *id*. § 69051(p), and he may conduct a separate fiscal compliance audit whenever he deems such an audit is necessary, *id*. § 69051(h). Given the similarities to *Johanns* and the

level of control vested in the Secretary, Paramount has not yet demonstrated that the Pistachio Commission should be classified as a nongovernmental entity.

Paramount argues that *Johanns* should not apply here because, in practice, the Secretary of the CDFA exercises 'no control' over the Pistachio Commission's promotional and marketing activities.  In *Johanns*, the Court held that the speech at issue in that case more than met the requirements for qualifying as government speech.  *See* 544 U.S. at 563 ... (holding that 'the beef advertisements here are subject to political safeguards more than adequate to set them apart from private messages').  However, *Johanns* did not set a floor or define minimum requirements.  *Id*.

At this stage of the proceedings, we cannot say that Paramount is likely to overcome the barrier of *Johanns*.  Paramount has not made a sufficient showing that the Secretary of the CDFA exercises inadequate oversight over the activities of the Commission.  To be sure, the Secretary of the CDFA exercises less control over the Pistachio Commission than the Secretary of Agriculture exercised over the Beef Board.  Nonetheless, the marketing and promotional plans submitted to the CDFA include a significant amount of detail.  For example, they include a general description of the advertisements, detail the themes to be emphasized, the actors to be used, the demographics to be targeted, and the media to be employed.  Last year's budget noted that the 'proposed advertising campaign will feature three generations of [Jane] Seymour's family ... making the connection that heart disease is not a discriminator of age, and that California pistachios can be an important part of lifetime heart health.'  The proposal describes the specific magazines in which the advertisements will run, notes the approximate timing of their publication (in February, to coincide with the Super Bowl, for example), and often includes specific words and imagery to be used.  The overall budget also includes specific line-item budgets for promotional, advertising,

84

marketing, and research activities, a report
from a retained private advertising agency
that discusses the advertisements generally
and each selected publication and promotional
activity specifically, and a 15-page overview
of the entire public relations strategy,
including advertising, marketing, and
promotions.

Although the Secretary has not rejected or
edited proposals, or taken a particularly
active role in meetings, this passivity is
not an indication that the government cannot
exercise authority.  *See Johanns*, 544 U.S. at
560 ... (focusing on effective control).  The
Secretary, through his staff, retains
authority to control both the activities and
the message.  The fact that he has not played
an active role cannot be equated with
abdication of his role.  Just as '[t]he
Secretary of Agriculture does not write [the
copy of the beef advertisements] himself' for
the Beef Board, neither should such oversight
be required for the California scheme to pass
constitutional muster.  *Id.*

We acknowledge that there are differences in
actual oversight between the beef scheme and
the pistachio scheme, but these factual
differences are legally insufficient to
justify the injunction.  To draw a line
between these two approaches to oversight
risks micro-managing legislative and
regulatory schemes, a task federal courts are
ill-equipped to undertake.  'The message set
out in the [pistachio] promotions is from
beginning to end the message established' by
the state government.  *Id.*[5]

...

[4]Paramount makes much of the fact that in
*Johanns*, the entire Beef Board was
'appointed' by the Secretary of Agriculture,
but only one member of the Pistachio
Commission is 'appointed' by the Secretary of
the CDFA.  This distinction, while accurate,
is somewhat exaggerated.  The Beef Board is
appointed by the Secretary of Agriculture
from among a list of candidates nominated by
the trade association.  7 C.F.R. §

85

1260.141(b).  Both boards are dominated by industry appointees, not independent third party board members.

[5]Because we rest our analysis on *Johanns*, we decline to reach the district court's resolution of the compelled speech challenge under *Glickman* and *United Foods*.

491 F.3d at 1010-1012.

3.  <u>Message Mandated by California Legislature</u>.

The California Table Grape Commission was established and is regulated pursuant to Division 22 (Marketing Advisory and Promotional Agency Laws) of the California Food & Agriculture Code.

California Food & Agriculture Code § 63901, as enacted in 1995, is the California Legislature's statement of purpose:

The Legislature hereby finds and declares that the commissions and councils established pursuant to this division advance the interests of the State of California in that they do all of the following:

(a) Reflect a continuing commitment on the part of the State of California to its agricultural and seafood industries.  The state's agricultural and seafood industries are a source of substantial employment for the state's citizens, produce needed tax revenues for the support of state and local government, encourage responsible stewardship of valuable land and marine resources, and produce substantial necessary food and fiber for the state, nation, and world, at reasonable costs.

(b) Represent a policy of support for self-help, public-private partnerships.  These commissions and councils are particularly important for the continued success of California agriculture and seafood because of the unique nature of agricultural and seafood production, which tends to be decentralized

86

with many small entities operating in diverse locations.

(c) Are intended to provide benefit to the entire industry and all of the people of this state.  The commissions and councils are not enacted, and are not intended to produce measurable benefit, on an individual basis, and their successes should be evaluated accordingly by analyzing the extent to which the commissions and councils have improved the overall conditions for the particular commodity subject to the commission's or council's jurisdiction.

(d) Are intended to enhance the image of California agricultural and seafood products to increase the overall demand for these commodities.  In this fashion, the Legislature intends that the commissions and councils operate primarily for the purpose of creating a more receptive environment for the commodity and for the individual efforts of those persons in the industry, and thereby compliment those individual, targeted, and specific activities.

(e) Are now more necessary and valuable than ever before as a result of declining support from the federal government and the increasing competition attributable to the global marketplace.

Section 63901 was amended in 2001.  As amended, Section 63901 sets forth the California Legislature's declaration:

[T]he agricultural and seafood industries are vitally important elements of the state's economy and are supported by state established commissions and councils specified in this division that are mandated to enhance and preserve the economic interests of the State of California and are intended to do all of the following:

(a) Implement public policy through their expressive conduct.  The programs conducted by these commissions and councils are among the broad range of state-mandated regulatory programs that are funded by the public

through user fees assessed in accordance with each person's relationship to a particular program.

(b) Reflect a continuing commitment by the State of California to its agricultural and seafood industries that are integral to its economy.  These industries are a source of substantial employment for the state's citizens, produce needed tax revenues for the support of state and local government, encourage responsible stewardship of valuable land and marine resources, and produce substantial necessary food and fiber for the state, nation, and world.

(c) Represent a policy of support for persons engaged in the agricultural and seafood industries, which are critically important elements of the state's economy.  These commissions and councils are particularly important for the continued success of California's unique agricultural and seafood industries which tend to be decentralized with many small entities operating in diverse locations.

(d) Provide benefit to the entire industry and all of the people of this state.  The commissions and councils are not enacted, and are not intended to produce measurable benefit, on an individual basis, and their successes should be evaluated by analyzing the extent to which they have improved the overall conditions for the particular commodity subject to the commission's or council's jurisdiction with resulting benefit to the overall economy of the state.

(e) Enhance the image of California agricultural and seafood products to increase the overall demand for these commodities.  In this fashion, the Legislature intends that the commissions and councils operate primarily for the purpose of creating a more receptive environment for the commodity and for the individual efforts of those persons in the industry, and thereby compliment individual, targeted, and specific activities.

88

Section 63901.3, enacted in 2001, provides:

>
> The Legislature further finds and declares that the commission and council activities are essential to the goals and interests of the State of California that include, but are not limited to, all of the following:
>
> (a) Research, including, but not limited to, production research, food safety research, marketing research and trends analysis, and research relating to crop protection and production materials.
>
> (b) Elimination of tariff and nontariff trade barriers.
>
> (c) Consumer education relating to the health and other benefits of using and consuming agricultural and seafood products.
>
> (d) Consumer education relating to environmental protection and conservation.
>
> (e) Demand-side regulation that stabilizes the flow of product to market through promotion.
>
> (f) Analysis of the impact of federal, state and foreign regulation.
>
> (g) Cooperative crisis resolution that impacts public health and safety and the continued stability of the industry.
>
> (h) Participation with state and federal agencies in negotiating with other governments relating to market access issues such as phytosanitary issues, shipping protocols, crop protection residues, packaging, labeling, and other issues raised by countries imposing trade barriers on the import of agricultural and seafood products into their markets.
>
> (i) Industry self-regulation to establish and maintain grade, size and maturity standards and to stabilize the flow of product to market.

In Section 63901.4, enacted in 2001, the Legislature:

89

[F]urther finds and declares that mandated cooperative efforts engaged in by the commissions and councils have proven to be effective methods to avoid economic waste and maintain stable agricultural markets.  These cooperative efforts are intended to work subject to, and together with, the constraints placed on the agricultural industry by state and federal statutes and regulations and international restrictions.

Section 63902, amended in 2001, provides:

In addition to any specific provisions regarding grievance procedures, and consistent with the nature of the commissions and councils established pursuant to Part 2 (commencing with Section 64001) and the desire to resolve conflicts in the most timely and cost-effective manner, any person subject to this division shall file a grievance with the appropriate commission or council, and exhaust all administrative remedies prior to the initiation of any litigation based on a claim, express or implied, that the activities undertaken by the commission or council do not directly or materially advance the interests of the State of California as set forth in this part.

Section 63903, enacted in 1997, provides that, "[i]n addition to the authority granted to any commission by Part 2 (commencing with Section 64001), those commissions may commence or participate in administrative and civil actions relative to the activities of the commission."  Pursuant to Section 63904, enacted in 1998, "[t]he Legislature finds and declares that the councils and commissions operating pursuant to this division are duly constituted authorities of this state for purposes of subdivision (i) of Section 610 of Title 7 of the United States Code."  7 U.S.C. § 610(i) provides:

The Secretary of Agriculture upon the request

90

of the duly constituted authorities of any
State is directed, in order to effectuate the
declared policy of this chapter and in order
to obtain uniformity in the formulation,
administration, and enforcement of Federal
and State programs relating to the regulation
of the handling of agricultural commodities
or products thereof, to confer with and hold
joint hearings with the duly constituted
authorities of any State, and is authorized
to cooperate with such authorities; to accept
and utilize, with the consent of the State,
such State and local officers and employees
as may be necessary; to avail himself of the
records and facilities of such authorities;
to issue orders (subject to the provisions of
section 608c of this title) complementary to
orders or other regulations issued by such
authorities; and to make available to such
State authorities the records and facilities
of the Department of Agriculture: *Provided*,
That information furnished to the Secretary
of Agriculture pursuant to section 608d(1) of
this title shall be made available only to
the extent that such information is relevant
to transactions within the regulatory
jurisdiction of such authorities that the
information so furnished shall be kept
confidential by them in a manner similar to
that required of Federal officers and
employees under the provisions of section
608d(2) of this title.

Section 63905, enacted in 2001 and amended in 2006, provides:

(a) Any commission or council may petition
the secretary to adopt or administer any
activity authorized pursuant to the
California Marketing Act of 1937 (Chapter 1
(commencing with Section 58601) of Part 2 of
Division 21) relating to the commodity that
is covered by any commission or council.
Adoption and administration of the activity
by any commission or council shall be in
accordance with the fact.

(b) Any commission or council may petition
the secretary to administer any activity that
the commission or council is authorized to
engage in, and that is authorized pursuant to
the California Marketing Act of 1937 (Chapter

91

1 (commencing with Section 58601) of Part 2
of Division 21), relating to the commodity
that is covered by any commission or council.
If the secretary accepts the petition, the
commission or council shall reimburse the
secretary for his or her actual cost for
administering the activity.  The secretary
may waive referendum under the act, if
following a hearing, the secretary determines
that there is no substantial question of
opposition to doing so among affected
assessment payers.  Administration of the
activity by the secretary shall be in
accordance with the act.

(c) As determined by the secretary, the
governing body of the commission or council
may serve as the advisory board with respect
to any activity recommended and approved
pursuant to this section.

(d) As used in this section, 'substantial
question of opposition' means opposition to
the substance of the petition among currently
affected assessment payers, and is not
intended to mean a particular number of
assessment payers.

The 2001 amendments and enactments were part of AB 1612.
The Report of the California Senate Agriculture and Water
Resources Committee explains the reasons for the 2001 amendments
and enactments:

Existing law ... allows for the establishment
of commissions and councils to advance the
interests of California agriculture and
seafood.  The Legislature declares that these
commissions and councils are established to
reflect a commitment to California
agriculture and seafood industries, represent
a policy of support for self-help and public-
private partnerships, provide a benefit to
the entire industry and all Californians, and
are intended to enhance the image of
California agriculture and seafood products.
Each commission and council is established
and administered according to its own
statutory guidelines.  According to

92

information provided by the California
Department of Food and Agriculture,
California has 51 advisory boards, councils
and commissions.

A series of cases and court rulings have
clouded marketing orders, commissions, and
councils [sic] legal status based on the
First Amendment.  In 1996, The [sic] United
States Supreme Court held that the First
Amendment was not violated when agricultural
marketing orders, as part of a larger
regulatory scheme, required fruit producers
of California tree fruit to pay assessments
for product advertising (Glickman v. Wileman
Brothers and Elliott, 521 U.S. 457).  In
[sic] June 25, 2001, the United States
Supreme Court found that a federal marketing
order covering generic mushroom promotion was
a violation of the First Amendment (United
States etal. [sic] v. United Foods, Inc., No.
00276, Decided June 25, 2001).  The United
Foods court found that no corollary to
Glickmans cooperative marketing structure
existed.  The promotion activities the
opponent was required to support was not
directly associated with other regulatory
activities as required in Glickman.

Many legal analysts believe the result of
these cases is a spectrum.  On one end is
acceptable compelled speech if it is
associated with a regulatory program.  On the
other end of the spectrum are programs that
compel speech that are not associated with a
comprehensive regulatory scheme.  At this
point, there is not a bright line determining
where the appropriate level of regulation or
identifying the necessary activities required
for these programs.

PROPOSED LAW

This measure states that the agriculture and
seafood industries are vitally important
elements of the state's economy and are
supported by state established commissions
and councils mandated to enhance and preserve
the economic interests of California.

This bill contains findings and declarations

93

stating that commissions and councils
implement public policy through their
expressive conduct and these programs are
among the broad range of state mandated
regulatory programs that are funded by the
public generally through user fees assessed
in accordance with each persons [sic]
relationship to a particular program.

The bill amends several existing findings
with clarifying language and further
articulating the importance of these programs
to the state's economy.

The bill states additional findings
concerning these programs importance to
California's interests and that these
programs activities include but are not
limited to the following:

Research
Elimination of tariff and non tariff trade
barriers
Consumer education relating to health and
other benefits of using and consuming these
products
Demand side regulation
Analysis of government regulation
Cooperative crisis resolution
Participation in negotiations with other
governments relating to market access issues
Industry self regulation to establish and
maintain grade, size, and maturity standards
and to stabilize the flow of product.

The final finding declares that mandated
cooperative efforts engaged in by the
commissions and councils are the best methods
to avoid economic waste and maintain stable
markets and work in cooperation with
government regulation.

...

The bill allows commissions and councils to
petition the Secretary to engage in any
activity authorized by the California
Marketing Act of 1937.  This bill would
require a successful referendum according to
the statutory requirements of the Marketing
Act ... and approval by the Secretary ...

94

before the new activity could be implemented
....

...

**COMMENTS**

1.  According to the sponsor, the reason the
additions to the declarations and findings
are included is to strengthen commissions and
councils directives and to clarify their
importance and duties.  By strengthening the
findings and declarations and expressly
stating many of the various important
activities in which these programs
participate, it clarifies these programs
importance to California's economy and
interest and how integral these programs are
to other government regulatory and non-
regulatory activities.

2.  This bill expands the authorized powers
of the various commissions and councils which
have been established to promote California
agriculture and seafood.  Under current law,
each commission or council is allowed to
engage in only those activities authorized by
its specific statutory guidelines.  This
measure would allow each commission and
council to engage in any of the activities
included in the California Marketing Act of
1937.

3.  Although this bill does expand the scope
of activities that can be undertaken by
commissions and councils, the increased
activities can only be initiated after a
successful referendum of affected members
according to the requirements of the act.
Furthermore, the Secretary still retains the
authority to approve marketing programs and
activities recommended by the governing
boards of the commissions and councils.

...

The Commission notes that § 65572(h) empowers the Commission

"[t]o promote the sale of fresh grapes by advertising and other

similar means for the purpose of maintaining and expanding

95

present markets and creating new and larger intrastate,
interstate and foreign markets for fresh grapes; to educate and
instruct the public with respect to fresh grapes; and the uses
and time to use the several varieties, and the healthful
properties and dietetic value of fresh grapes".  Section 65572(i)
empowers the Commission, in its discretion, "to educate and
instruct the wholesale and retail trade with respect to proper
methods of handling and selling fresh grapes; to arrange for the
performance of dealer service work providing display and other
promotional materials; to make market surveys and analyses; and
to present facts to and negotiate with state, federal and foreign
agencies on matters which affect the marketing and distribution
of fresh grapes; and to undertake any other similar activities
which the commission may determine appropriate for the
maintenance and expansion of present markets and the creation of
new and larger markets for fresh grapes".

     The Commission argues that Plaintiffs do not dispute that
the Commission has followed these statutory directives and that
Plaintiffs, having dismissed with prejudice their challenges to
particular activities conducted by the Commission, raise only a
facial challenge to the Ketchum Act as a whole.  The Commission
asserts: "[I]f Plaintiffs challenge only the overall message of
the program - a message that is defined by *statute* - Plaintiffs
cannot plausibly claim that the speech they challenge is not
*government* speech."  Therefore, the Commission contends, the
level of oversight of the Commission's activities by the CDFA is

1    irrelevant.

2         In contending that Plaintiffs raise only a facial challenge

3    to the Ketchum Act, the Commission relies on its Statement of

4    Undisputed Facts:

5         <u>CUF No. 203</u>: Plaintiff Susan Neill Company does not object

6    to the message of the Commission's consumer education, research,

7    or market access activities.  Its only objection is that it does

8    not want to fund these activities.  *See* Neill Dep. 62:1-66:3,,

9    83:24-84:12, 96:5-10, May 17 2004.  To the extent The Susan Neill

10   Company objects to any of the Commission's messages, it is

11   principally an objection to the advertising of all California

12   table grapes as opposed to Lucas Brothers' table grapes.  *See if.*

13   at 33:2-34:12.

14        Plaintiffs' dispute CUF No. 203, asserting in pertinent

15   part:

16              [T]he Susan Neill Company and Lucas Bros.
                believe that the millions of dollars spent by
17              the Commission on generic advertising hurts a
                company like Plaintiffs to urge buyers to buy
18              Plaintiffs' product not 'generic' table
                grapes produced in California and grown by
19              others (response to interrogatory number 13,
                set number two, Exhibit 'I' to Boynton
20              Declaration).  Plaintiff [sic] contends that
                virtually everything that the Commission does
21              is some form of speech-communication, the
                administration of same, as well as the
22              salaries, benefits, travel expenses for
                speech/communication related activities.
23              'That obviously would include bird
                sanctuaries, scholarship funds, dinners,
24              charter planes, lavish parties, limousines,
                payoffs to buyers of table grapes, and when
25              these activities cannot be quantified as
                reducing demand for Plaintiffs' table grapes,
26              when the Commission members are part of this

                                   97

extravagance paid for by Plaintiffs, and the
Commission members, who are Plaintiffs'
competitors are "high-styling" with buyers of
table grapes, that could have an indirect
reduction of demand for Plaintiffs' table
grapes, as well as the fact that since
Plaintiffs are forced to fund such nonsense,
it is less money that Plaintiffs have in
promoting and selling its own table grapes.'
Neill response to interrogatory number 14,
set number 2.  '[Neill and Lucas], stated in
response to the previous interrogatory, does
not seek the Commission's help with respect
to any of Plaintiffs' farming operations,
cultural methods, varieties, sales or
promotion.  Those would be actions on behalf
of Plaintiff that showed that it does not
want to be forced to associate with or
financially support the Commission, its
speech efforts, or its claims that it
represents Plaintiff.  Plaintiff has hired an
attorney to represent it in this lawsuit
against the Table Grape Commission and
expended thousands of dollars for the
attorney to contest the constitutionality and
the legitimacy of the Commission.  If
Plaintiff had agreed with the Commission and
its speech efforts, Plaintiff would not be
pursuing this 8 year effort to have a court
find that the Commission is unconstitutional.
To reiterate, Plaintiff vehemently disagrees
with being forced to associate with and
financial support the Commission [sic], its
speech efforts and its claim that the
Commission represents Plaintiff.'  (Neill's
response to interrogatory number 16, set
number 2).  Neill and Lucas vehemently object
to any and all expenditures and programs of
the Commission.  (Response to interrogatory
number 17.)  Lucas' Bros. objections were the
same as Susan Neill's.  (See Exhibit '2' to
the Declaration of Boynton, Lucas Bros.'
responses to interrogatories, set number two,
numbers 7, 9, 12, 13, 15, and 16. [sic]

Defendant misstates the deposition testimony
of Susan Neill (Exhibit '7' to the
Declaration of Boynton (after explaining all
of the things that the [sic] Susan Neill
Company does to promote and advertise their
product (Depo Transcript pages 19-25) Susan

98

Neill laid into the Commission program, and objects to the Commission engaging in consumer education, objects to it, does not believe it is necessary, believes it is a waste of Neill and Lucas money, the same for research, the same for export activities, and its more than just not wanting to pay the assessments, 'I do not want to be compelled to have to spend money on this when it does nothing for me, and I do not believe that it is useful.'  (Depo transcript at 64) Neill also does not like the Commission message, she does not want to pay for it because it is not useful in selling their grapes, she does not like the scholarship program, the bird sanctuary donations, the chartered planes, the limousines, the 'big dinners and cash payoffs to buyers' (Depo at 65): 'I think that they're [Commission] just wasting money. I object to everything they do. *** I object to them spending my money to do it.  I don't wish to contribute to that cause.'  Depo at page 83, lines 3-16.   When asked if there were any other objections that the [sic] Susan Neill Company had she stated 'I do not like their message.  I don't like the Commission.  I don't want to be associated with it.  They're - I don't like to spend my money on it.  I don't want to be compelled to.'  Page 83, Depo transcript, lines 17-23.

CUF No. 204: Plaintiff Lucas Brothers does not object to the message of the Commission's trade management activities directed to retailers, phytonutrient research, or market access activities.  Its only objection is that it could spend its assessment dollars more profitably.  *See* Lucas Dep. 60:23-61:14; 64:10-16; 65:19-66:5, May 17, 2005.  To the extent Lucas Brothers objects to any of the Commission's messages, it is principally an objection to the advertising of all California table grapes as opposed to his table grapes.  *See id*. at 58:14-22, 59:9-21.

Plaintiffs dispute CUF No. 204 on the same grounds as set

forth in connection with CUF No. 203.  Plaintiffs add that the Commission misstates the deposition testimony of George Lucas:

> Lucas objects to the Commission's advertising, he objects to the Commission's research, he objects to the Commission itself because it is made up of his competitors, Lucas believes that he could use the assessments much more profitably promoting and advertising his table grapes, he feels the same about the Commission's activities with respect to foreign markets, and he does not like the Commission's expenditures for extravagant things.  Lucas Depo pages 60-66; Exhibit '8' to Declaration of Boynton.

CUF No. 206: Even though Delano Farms receives all of the reports and correspondence sent out by the Commission to growers explaining what the Commission is doing ..., Delano Farms has not raised any objection to the substance of any of the Commission's nonadvertising activities.  See Middleton Dep. 35:5-18; 81:8-84:10, 93:25-94:10.  To the extent Delano Farms objects to any of the Commission's messages, it is principally an objection to the advertising of all California table grapes as opposed to Delano Farms's table grapes.  See id. 40:19-25.

Plaintiffs dispute CUF No. 206, referring to Delano Farms responses to the Commission's interrogatories, set no. 2:

> After Delano Farms explained the substantial efforts it goes to in planting the best varieties and growing the best quality, wherein buyers are asking specifically for Delano Farms' grapes (responses to interrogatories 9 and 10), and also explaining the number of branded labels Delano Farms uses for its table grapes (response to interrogatory 2), as well as what its substantial sales force does in the procurement of buyers, sustaining and developing current buyers and for the

promotion of the company and its product, and the expenditure of countless hours, dollars and efforts developing and maintaining a relationship with prospective and current customers, and understanding their needs (answers to interrogatories 5 and 8), as well as planting of the newer varieties and significant quantity of the varieties in order to supply the major buyers (response to interrogatory 10), and the fact that Delano Farms is the industry leader in terms of acreage planted for one variety, and added to its customer list as a result of the superb quality and quantity (response to interrogatory 11), Delano explained at first that one of its objections to the Commission program by stating (response to interrogatory 13) that 'Delano Farms believes that the Commission's advertising efforts, since those efforts are generic only, equating all table grapes produced by one variety to be "generic," fungible, and the same quality is absolutely worthless to Delano Farms in selling its product.   Whether the Commission's advertising reduces demand is totally subjective, but Delano Farms believes that millions of dollars spent on generic advertising hurts a company like Delano which desires to urge buyer to buy Delano's product, not "generic" table grapes produced in California and grown by others.' (Response to interrogatory 13)

In response to interrogatory 16, Delano Farms responded: 'Delano, as stated in response to the previous interrogatories, does not seek the Commission's help with respect to any aspects of Delano Farms' farming operations, cultural methods, varieties, sales or promotion.   Those would be actions on behalf of Delano that showed it does not want to be forced to associate with or financially support the Commission, its speech efforts or its claims that it represents Delano. (Response to interrogatory 16) In response to interrogatory 17 which [sic] they asked the question as to what funding of the Commission's activities Delano Farms contended constituted compelled speech in violation of the First Amendment, Delano Farms responded: 'Delano Farms contends that

virtually all funding activities of the Table
Grape Commission are speech/communication
related activities, so therefore requiring
Delano to fund these speech related
activities constitutes compelled speech, or
compelled funding of speech.  Those
activities would include lobbying, promotion,
consumer education, merchandising,
advertising, promotion, research, salaries,
travel and benefits of the employees to carry
out the same, payments to attorneys, payments
to lobbyists, donations, scholarships, the
Commission's building, the Commission's
meetings, and virtually every activity is
communication, which is speech related
activities.'  (Response to interrogatory 18)

Citing only a selected portion of Jim
Middleton's deposition transcript (Jim
Middleton being the main director and
shareholder of Delano Farms), Mr. Middleton
objected to the Commission's activities far
more that asserted by the Commission.  Those
selected portions of Middleton's deposition
transcript is located as Exhibit '9' to the
declaration of Boynton.  Therein Mr.
Middleton explained a letter that he sent out
to table grape growers in January of 1997
(Exhibit '21' to Middleton deposition
transcript, a copy of which is attached
hereto), explaining Delano Farms' position as
to why the growers should vote out the
Commission in the next referendum, and
explaining all of the reasons ... Middleton
testified that those were Delano Farms'
objections then, and they would be currently
the same objections now (2004 when he was
deposed).  In said letter, Delano Farms
stated fully its position regarding the
objections to the Commission, what it stands
for, and how it is funded.  Middleton was
asked at his deposition whether his
objections 'is simply to the mandatory nature
of the payment to the Commission.' (Page 44
of depo transcript) Middleton's response was:
'We believe in democracy, and what you got
here is a piece of socialism that doesn't
work.  And organizations that we belong to
that are voluntary are always very effective.
If they aren't, the members say, "see ya
later."  When you have to belong to

something, it becomes like the United States
Department of Commerce.  Pretty soon, it is
just a big unwieldy thing.  And that is what
has happened here.'  He later stated that the
biggest objection is the structure of the
Commission and the mandatory nature of it.
(Depo transcript at 44)

Therefore, the Commission's assertion that
Delano Farms' only objection is being
required to pay the assessment is absolutely
false, and while it is certainly one of the
reasons, the main reason is the socialistic
nature of the Commission.

As the Commission contends, Plaintiffs' objections to the

Commissions Statements of Undisputed Fact attack "the general

message promoting all California table grapes, as opposed to

grapes from a particular grower/shipper, that Plaintiffs attack -

to the extent they attack a *message* delivered by the Commission

at all."  Plaintiffs have raised no objection to the particular

messages created by the Commission itself and do not dispute that

the Commission has adhered to the Legislature's instructions.

Plaintiffs further oppose this aspect of the Commission's

motion by asserting that the "Legislature setting the 'overall

message' - forty years ago - is stated only in the loosest,

vaguest and most general of terms that the private board of

competitors that make up the Commission was to promote the sale

of fresh grapes and to educate the public with respect to fresh

grapes."

Plaintiffs cite several Supreme Court cases which they

describe as involving "federal or state regulations dictating

what must be said, written or broadcast" and that "[t]hey were

103

not government speech".

Plaintiffs cite *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), in which the Supreme Court held that the prohibitions in the Food and Drug Administration Modernization Act of 1997 on soliciting prescriptions for, and advertising, compounded drugs amount to unconstitutional restrictions on commercial speech under the *Central Hudson* test; *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), wherein the Supreme Court held that § 5(e)(2) of the Federal Alcohol Administration Act, prohibiting beer labels from displaying alcohol content violates the First Amendment's protection of commercial speech under the *Central Hudson* test; *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), wherein the Supreme Court held that the North Carolina Charitable Solicitations Act, defining reasonable fees that a professional fundraiser may charge, providing that the professional fundraiser must disclose to potential donors the average percentage of gross receipts actually turned over to the charity, and providing that professional fundraisers may not solicit without an approved license, while volunteers may solicit upon submission of a license application, unconstitutionally infringed on freedom of speech; *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986), in which the Supreme Court held that the PUC's ruling that envelope space in its monthly billing statements that PG&E had used to disseminate a newsletter that contained political editorials, feature stories on matters of

public interest, tips on energy conservation and information about utility services and bills was extra space and the ratepayers' property and permitted a group known as Toward Utility Rate Normalization to use the newsletter to raise funds and communicate with ratepayers with no limitation, except to state that its messages were not those of PG&E, impermissibly infringed on PG&E's First Amendment right not to help spread a message with which it disagreed; and *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), where the Supreme Court held that Florida's "right of reply" statute granting a political candidate a right to equal space to answer criticism and attacks on his record by a newspaper and making it a misdemeanor for the newspaper to fail to comply violates the First Amendment's guarantee of a free press.

Plaintiffs only provide the citations and do not discuss the applicability of the holdings of these decisions or how any of these cases involves the issue of "government speech" nor compelled subsidies in the context of government speech. Plaintiffs further argue that the decision in *Johanns* was not that Congress set the overall message "because of the absolute weight the court expressly placed over the amount and degree of the government's officious control over everything that was expressed to the public or concocted by the Beef Board."

It cannot be disputed that the Commission's programs are mandated by California statutes to implement and further the State's economic and consumer protection purposes for the table

grape industry as declared by the California legislature.

**4.   Commission is a Governmental Entity.**

The Commission asserts that, even if it were necessary to show that the manner in which the Commission conveys the Legislature's messages is "effectively controlled" by a governmental entity other than the Legislature, that test is satisfied here because the Commission itself is a "governmental entity" as a matter of California law.  The Commission relies on *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), to define what entities are considered part of the government for purposes of the First Amendment.

In *Lebron*, Lebron created billboard displays that commented on public issues and filed suit claiming that the National Railroad Passenger Corporation (Amtrak) had violated his First Amendment rights by rejecting a display for an Amtrak billboard because of its political nature.  The Supreme Court held:

> [W]here, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.

513 U.S. at 400.

The Commission contends that the Supreme Court's decision in *Keller v. State Bar of California*, 496 U.S. 1 (1990), that the State Bar is not a government entity, is not controlling on this issue because 16 of the 22 members of the Board of Governors are

106

1   directly elected by State Bar members, while, under the Ketchum

2   Act, the Secretary of the CDFA appoints the entire Commission.

3          In *Keller*, the Supreme Court addressed whether the

4   California State Bar is a governmental agency for purposes of the

5   First Amendment under the United States Constitution.   In ruling

6   that it was not, the Supreme Court held:

7                    Of course the Supreme Court of California is
                     the final authority on the 'governmental'
8                    status of the State Bar of California for
                     purposes of state law.   But its determination
9                    that respondent is a 'government agency,' and
                     therefore entitled to the treatment accorded
10                   a governor, a mayor, or a state tax
                     commission, for instance, is not binding on
11                   us when such a determination is essential to
                     the decision of a federal question.   The
12                   State Bar of California is a good deal
                     different from most other entities that would
13                   be regarded in common parlance as
                     'governmental agencies.'   Its principal
14                   funding comes, not from appropriations made
                     to it by the legislature, but from dues
15                   levied on its members by the board of
                     governors.   Only lawyers admitted to practice
16                   in the State of California are members of the
                     State Bar, and all ... lawyers admitted to
17                   practice in the State must be members.
                     Respondent undoubtedly performs important and
18                   valuable services for the States by way of
                     governance of the profession, but those
19                   services are essentially advisory in nature.
                     The State Bar does not admit anyone to the
20                   practice of law, it does not finally disbar
                     or suspend anyone, and it does not ultimately
21                   establish ethical codes of conduct.   All of
                     those functions are reserved by California
22                   law to the State Supreme Court ....

23                   There is, by contrast, a substantial analogy
                     between the relationship of the State Bar and
24                   its members, on the one hand, and the
                     relationship of employee unions and their
25                   members, on the other.   The reason behind the
                     legislative enactment of 'agency-shop' laws
26                   is to prevent 'free riders' - those who

                                      107

receive the benefit of union negotiation with their employers, but who do not choose to join the union and pay their dues - from avoiding their fair share of the cost of a process from which they benefit.  The members of the State Bar concededly do not benefit as directly from its activities as do employees from union negotiations with management, but the position of organized bars has generally been that they prefer a large measure of self-regulation to regulation conducted by a government body which has little or no connection with the profession.  The plan established by California for the regulation of the profession is for recommendations as to admission to practice, the disciplining of lawyers, codes of conduct, and the like to be made to the courts or the legislature by the organized bar.  It is entirely appropriate that all of the lawyers who derive benefit from the unique status of being among those admitted to practice before the courts should be called upon to pay a fair share of the cost of the professional involvement in this effort.

But the very specialized characteristics of the State Bar of California discussed above served to distinguish it from the role of the typical government official or agency. Government officials are expected as part of the democratic process to represent and espouse the views of a majority of their constituents.  With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process.  If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate of issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed. ...

The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the

1
2
3
4
5
6
7

ultimate responsibility of governing the
legal profession.  Its members and officers
are such not because they are citizens or
voters, but because they are lawyers.  We
think that these differences between the
State Bar, on the one hand, and traditional
government agencies and officials, on the
other hand, render unavailing respondent's
argument that it is not subject to the same
constitutional rule with respect to the use
of compulsory dues as are labor unions
representing public and private employees.

496 U.S. at 11-13.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Relying on *Lebron*, the Commission contends that "the Court
need not reach the issue decided in [*Johanns*] - whether the
Commission is a *non*-governmental entity that is nonetheless
'answerable' to a government official - because the State of
California's creation and control over the Commission through the
appointment of its members makes the Commission part of the
government for purposes of the First Amendment."  The Commission
argues that it satisfies the *Lebron* test for a government entity
for purposes of the First Amendment because the Commission was
created as a corporation by the California Legislature, Cal. Food
& Agric. Code §§ 65550-65551, to further governmental objectives,
citing Cal. Food & Agric. Code § 65500(h)("The production and
marketing of grapes produces in California for fresh human
consumption is declared to be affected with a public interest"
and that the Ketchum Act was enacted "in the exercise of the
police power of th[e] state.").

The Commission emphasizes that the Secretary of CFDA
appoints every member of the Commission.  *See* Cal.Food & Agric.

Code §§ 65500, 65556, 65563, 65566, 65575.1.  Commission members are nominated for appointment by table grape producers through an election process and a government official, the Secretary of the CFDA, makes appointments to the Commission from these nominees. The Commission maintains that this appointment process is no different from that in *Lebron* where six of the corporation's eight externally selected members are appointed by the President with the advice and consent of the Senate, with the statute restricting the President's choices to persons suggested by certain organizations or persons with specified qualifications. *Lebron*, *id.* at 397-398.  The Commission observes that members of the Commission may be removed by the Secretary of the CFDA.  The Commission stresses that California Government Code § 11000(a) defines "state agency" to include commissions.  Other California statutes treat commissions as state agencies, *i.e.,* Government Code § 11121(a) defines "state body" for purposes of the Bagley-Keene Open Meeting Act to include commissions created by statute; Government Code § 6252(f) defines "state agency" to include commissions for purposes of public record requirements; Government Code §§ 82048-82049 defines "state agency" to include commissions and "public officials" as "every member, officer, employee or consultant of a state ... agency" for purposes of the Political Reform Act of 1974.  The Commission also refers to California Code of Civil Procedure § 995.220, providing that state agencies and public officials are not required to post a bond in a judicial proceeding.

The Commission argues that "[o]versight by a different government agency is not required for a governmental entity's speech to be considered government speech".  The Commission contends that *Lebron* did not consider whether the government-appointed directors of Amtrak were subject to day-to-day oversight in concluding that Amtrak was a government entity.[3]

Plaintiffs respond that the fact that the Commission is a state agency under California law does not compel the conclusion that the Commission's program is "government speech".  Noting that the Supreme Court in *Keller* was not bound by the state's determination of the governmental status of the State Bar for purposes of the First Amendment, Plaintiffs reiterate the Supreme Court's conclusion that the State Bar was not a governmental entity for First Amendment purposes because it received no financial support from the State and argue that *Johanns*, in finding government speech, distinguished *Keller*: "There the state bar's communicative activities to which the plaintiffs objected were not prescribed by law in their general outline and not developed under official government supervision."  *Johanns, id.,*

_____

[3]**The Commission also cites *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995) and *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000) and asserts that "the [Supreme] Court gave no indication in [those decisions] that speech of a public university would be government speech only if some other government agency exercised oversight over the university."**

**Neither *Rosenberger* nor *Southworth* are helpful as these cases do not involve or discuss the issue of "governmental entity."  Both involve First Amendment protections to students who were compelled to pay fees to the universities to fund various activities.**

544 U.S. at 562.   Plaintiffs argue that the Commission's reliance on *Lebron* for the proposition that the Supreme Court treated Amtrak as part of the government for purposes of the First Amendment" is "extremely misleading":

> The claim in *Lebron* was that the National Railroad Passenger Corp. contended it was not a government entity for purposes of affording free speech protection.  If the court recalls Hornbook First Amendment law, the First Amendment only applies if the government is regulating or compelling speech, not a private party.  The issue in *Lebron* was whether or not the National Railroad Passenger Corp. was a government entity for purposes of providing free speech protection to *Lebron* [sic] who wished to carry out advertising on the respondent's conveyances, and the court held that the National Railroad Passenger Corp. was enough of a government entity in order to provide free speech protection to *Lebron* [sic]: 'government speech' was never addressed and was never an issue in that case.

The Commission rejoins that Plaintiffs have not contested that two of *Lebron*'s key elements are satisfied; that the Commission was created by the California Legislature as a corporation to further governmental objectives and that a governmental official appoints and can remove members of the Commission.   The Commission argues:

> Plaintiffs incorrectly argue that *Lebron*'s holding applies only to situations where finding an entity to be governmental would prevent it from restricting First Amendment rights .... But Plaintiffs' one-sided theory - that government-created and controlled corporations are the government when they restrict private speech but not when they are the speaker - finds no basis in *Lebron*'s reasoning.  In *Lebron*, the plaintiff raised two separate arguments why the First

Amendment applied to Amtrak: (1) that 'Amtrak is not a private entity but Government itself,' and (2) that the First Amendment constrained Amtrak even though it is a private entity because it is 'closely associated with federal entities.'  513 U.S. at 378-379.  The Court, however, expressly declined to address the second, more sweeping rationale for applying the First Amendment – the rationale that Plaintiffs reference – because it found that Amtrak is itself the government for purposes of the First Amendment.  *See id.* at 392, 400.  It may be the case that the speech of a purely private entity – like the restaurant in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) – is not government speech even though the government is sufficiently involved with the private entity to render its conduct 'state action.'  But there is no reason to think that an entity that itself is 'part of the Government for purposes of the First Amendment,' *Lebron*, 513 U.S. at 400, is actually just part of the government when that conclusion benefits the plaintiffs and not when it benefits the government corporation.  Plaintiffs do not even attempt to articulate a rationale that ends-driven result.

In response to Plaintiffs' contention that *Keller* controls the decision that the Commission is not a government entity for purposes of the First Amendment, the Commission argues that *Keller*'s analysis of the funding and membership of the State Bar was necessary only because the structure of the Bar was not determinative, contrary to *Lebron*:

Although the Court in *Keller* did not address the standard it adopted five years *later* in *Lebron*, that is not at all surprising given both the chronology of the cases and the fact that a super-majority of the State Bar's leadership was not appointed by the government.  After *Lebron*, where a government official appoints the *entire board* of an entity, there is no need to reach the

113

analysis conducted in *Keller*.

The Commission maintains that *Johanns* also suggests this result, because *Johanns* distinguished the Operating Committee, only half of whose members were appointed by the government, from the Beef Board, all of whose members were appointed by the Secretary of Agriculture pursuant to law.

The record and state and federal statutory schemes in this action undisputedly establish that the Commission is a governmental entity under California law. Plaintiffs' motion for summary judgment on this issue is DENIED and the Commission's motion for summary adjudication is GRANTED.

Although this decision makes inapplicable the *Johanns* issue of effective control, *arguendo,* the issue of effective control by the State over the Commission is addressed.

### 5. <u>Effective Control</u>.

Plaintiffs contend that the provisions of the Ketchum Act and the California Department of Food and Agriculture's involvement "in the Commission's speech, let alone activities, is not even arguably in the same ball park compared to the control over the make-up and communications of the Beef Board." It follows, Plaintiffs argue, the Commission's program is not "government speech" as that term is defined in *Johanns* and they are entitled to summary adjudication on this issue.

Plaintiffs assert that, in contrast to the *Johanns* facts:

1. Pursuant to § 65551, the Commission was created as a corporate body, with the power to sue and be sued, to contract,

114

1  and to have all of the powers of a corporation.  Plaintiffs

2  contend that the Beef Board was not set up as a corporate body

3  with the power to sue or be sued.

4       This distinction of corporate capacity between the

5  Commission and the Beef Board has no bearing on the issue of

6  "effective control" as *Johanns* discussed.  *Lebron* held that where

7  "the Government creates a corporation by special law, for the

8  furtherance of governmental objectives, and retains for itself

9  permanent authority to appoint a majority of the directors of

10  that corporation, the corporation is part of the Government for

11  purposes of the First Amendment."  513 U.S. at 400.  A

12  "'government corporation' means a corporation owned or controlled

13  by the Government of the United States", 5 U.S.C. § 103(1), and

14  "'executive agency' means ... a Government corporation ...."  5

15  U.S.C. § 105.  The California Pistachio Commission is subject to

16  a virtually identical corporate provisions.  *See* Cal. Food & Ag.

17  Code § 69039.

18       2.  Under § 65552, the Commission may appoint a

19  manager, a treasurer and a secretary, the compensation of each

20  officer shall be fixed by the Commission, and the officers serve

21  at the pleasure of the Commission with such powers and duties as

22  are delegated to them by the Commission.  Plaintiffs note that

23  there is no involvement by the California Secretary of Food and

24  Agriculture in the appointment or compensation of Commission

25  officers.

26       The Commission responds that "it does not appear that the

115

Secretary of Agriculture appoints, removes, or sets the salaries of the staff of the Beef Board, the Beef Board's Operating Committee, or the 'established national nonprofit industry-governed organizations' that actually implement the beef program designed by the Beef Board's Operating Committee." Members of the Beef Board and of the Operating Committee serve without compensation.   7 C.F.R. §§ 1260.148, 1260.165.

The California Pistachio Commission is authorized, "subject to Sections 69032 and 69033":

> (d) To employ a manager to serve at the pleasure of the commission as president and chief executive officer of the commission, and other personnel, including legal counsel, that are necessary to carry out this chapter. The commission may retain a management firm or the staff from any board, commission, or committee of the state to perform the functions prescribed by this subdivision under the control of the commission.  If the manager engages in any conduct that the secretary determines is not in the public interest or that is in violation of this chapter, the secretary shall notify the commission of the conduct and request that corrective and, if appropriate, disciplinary action be taken by the commission.  If the commission fails or refuses to correct the situation or to take disciplinary action satisfactory to the secretary, the secretary may suspend or discharge the manager.

> (e) To fix the compensation for all employees of the commission.

California Food & Agriculture Code § 69032 provides in pertinent part:

> The secretary may require the [pistachio] commission to correct or cease any existing activity or function that is determined by the secretary not to be in the public

116

1        interest or to be in violation of this
         chapter.
2
         If the commission refuses or fails to cease
3        these activities or functions or to make
         corrections as required by the secretary, the
4        secretary may, upon written notice, suspend
         all or a portion of the activities or
5        functions of the commission until the
         cessation or correction of activities or
6        functions as required by the secretary has
         been accomplished by the commission.
7
         Actions of the commission in violation of the
8        written notice are without legal force or
         effect.  The secretary, to the extent
9        feasible, shall issue written notice prior to
         the commission entering into any contractual
10       relationship affecting the existing or
         proposed activities or functions that are the
11       subject of the written notice.

12   Pursuant to Section 69033, "[t]he commission or the secretary may

13   bring an action for judicial relief from the secretary's written

14   notice, or from noncompliance by the commission with the written

15   notice, in a court of competent jurisdiction, which may issue a

16   temporary restraining order, permanent injunction, or other

17   applicable relief."

18       There are no comparable provisions in the statutes

19   regulating the Table Grape Commission.  However, pursuant to

20   Section 65650.5 "[a]ny person aggrieved by any action of the

21   commission may appeal to the director."  Section 65572(f)

22   provides for a State audit of the Commission's books and records.

23       3.   Under § 65570, all assessments collected by

24   Commission are deposited in such banks as the Commission

25   designates and are disbursed by order of the Commission.

26   Plaintiffs refer to 7 U.S.C. § 2904(7), which prescribes through

the Beef Order require the Beef Board and its Operating Committee
to:

> (A) maintain such books and records, which
> shall be available to the Secretary for
> inspection and audit as the Secretary may
> prescribe;

> (B) prepare and submit to the Secretary, from
> time to time, such reports as the Secretary
> may prescribe; and

> (C) account for the receipt and disbursement
> of all funds entrusted to them.

The Commission argues that Plaintiffs' attempt to
distinguish the control by the USDA Secretary over the Beef Board
bank accounts from the purported absence of control over the
Table Grape Commission bank accounts by the CDFA Secretary is
unavailing.  The Commission references 7 U.S.C. § 2904(9), which
specifies that the Beef Order "shall provide that the Board, with
the approval of the Secretary, may invest, pending disbursement,
funds collected through assessments only in obligations of the
United States or any agency thereof, in general obligations of
any State or political subdivision thereof, in any interest-
bearing account or certificate of deposit of a bank that is a
member of the Federal Reserve System, or in obligations fully
guaranteed as to principal and interest by the United States."
The Commission argues that "[a]lthough the Beef Board is required
to obtain the Secretary of Agriculture's approval, there is no
indication that USDA controls the relevant bank accounts."  The
Commission points out that Section 2904(7) merely requires the
Beef Board to "account for the receipt and disbursement of all

funds entrusted to them".  Here, the Commission contends, its funds are appropriated by the Legislature.

Whether the Commission's funds are appropriated by the Legislature or derived from assessments is a contested fact; however, after *Johanns* this is not material.  Plaintiffs focus on the absence of any prior approval or involvement by the CDFA Secretary in the investment and disbursement of Commission funds, as with the USDA Secretary's role over the Beef Board's funds. The statute governing the Pistachio Commission, Section 69043, is virtually identical to Section 65570.  There is no discussion in *Paramount Land Co.*, *supra*, 491 F.3d 1003, that the statutory difference between regulation of investments by the Beef Board and those by the Pistachio Commission was of any importance. Further, Section 65572(f) requires the Commission:

> To keep accurate books, records and accounts of all its dealings, which books, records and accounts shall be open to inspection and audit by the Department of Finance of the State of California or other state officer charged with the audit of operations of departments of the State of California.

4.  Pursuant to § 65571, "[t]he State of California shall not be liable for the acts of the commission or its contracts" and "[p]ayment of all claims arising by reason of the administration of this chapter or acts of the commission shall be limited to the funds collected by the commission."  Plaintiffs assert that the United States Department of Agriculture would be liable for claims against the Beef Board.

The Commission responds that the State generally has

sovereign immunity against damages claims, absent waiver of
sovereign immunity.  *See Country Eggs, Inc. v. Kawamura*, 129
Cal.App.4th 589 (2005).  Further: "Plaintiffs do not explain how
the State's decision to permit suits against a single
governmental entity, but to decline to waive its sovereign
immunity in suits directed against the State as a whole, says
anything about whether the Commission is a governmental entity.
A state is free to define the scope of its own waiver of
sovereign immunity."

Plaintiffs cite *Country Eggs, Inc. v. Kawamura*, *supra*, where
an egg handler paid assessments mandated by the California Egg
Commission, Cal. Food & Ag. Code §§ 75001 – 75176, for
educational and promotional activities, which sought to avoid in
a suit seeking to invalidate the statutory provisions as
violative of federal constitutional rights.  After a counterclaim
to collect delinquent assessments was filed, Plaintiff entered
into a stipulated order for dismissal and judgment against it and
agreed to continue paying the assessments.  Plaintiff then filed
a state court action challenging the assessment scheme on state
constitutional grounds.  Although Plaintiff obtained a judgment
for refund of its assessments, it was unable to collect the
refund because the California Egg Commission had ceased
operations and lacked funds to satisfy the judgment.

Plaintiff then sued the California Department of Agriculture
for declaratory and injunctive relief, alleging that the State
was liable for the debts of the Egg Commission because it allowed

the Egg Commission to go out of business without requiring it to

set aside sufficient funds to pay the judgment, and seeking a

declaration that the state immunity provision in California Food

& Agriculture Code § 75070, violated the due process provisions

of the United States and California Constitutions.  Citing *Cal-*

*Almond, Inc. v. U.S. Dept. of Agriculture*, 67 F.3d 874, 877-880

(9th Cir.1995), the state Court of Appeals held in pertinent

part:

> ... Plaintiff seeks relief not from the
> Commission to whom it paid the assessments,
> but from the State.  Consequently, the remedy
> sought is not a refund, but damages.  But
> section 75070 specifically immunizes the
> State from liability for acts of the
> Commission and limits payment of claims to
> the funds collected by the Commission.  As in
> *Cal-Almond*, plaintiff's claim cannot succeed
> in light of statutory immunity provisions.

129 Cal.App.4th at 597.  The Court of Appeals then addressed

Plaintiff's argument that Section 75070 does not apply because

the Egg Commission was a state-created entity that provided a

direct benefit to the State:

> Under these circumstances, plaintiff
> suggests, the State should be held liable for
> the judgment the Commission owes to plaintiff
> under something akin to a vicarious liability
> or alter ego theory.  Even if these theories
> might be appropriate in certain situations,
> the factual predicate for such a claim is not
> present here.  The Commission was an
> independent entity and did not provide a
> direct benefit to the State sufficient to
> warrant the imposition of liability.
>
> Plaintiff overreaches in asserting that
> because the Commission was created as an
> entity in state government (§ 75051),
> defendants are necessarily liable for the

121

Commission's financial obligations.  The fact that the Commission is a creation of the State does not mean that the State is automatically responsible for the Commission's acts any more than the State is automatically responsible for a county's acts or those of any statutorily-created entity.  As one court noted in determining whether a state agency could invoke the state's Eleventh Amendment immunity, '[l]abeling an entity as a "state agency" in one context does not compel treatment of that entity as a "state agency" in all contexts.'  (*Lynch v. San Francisco Housing Authority* (1997) 55 Cal.App.4th 527, 534 ....)  'It is the relationship between the entity and the state, not the label attached to the entity, that determines whether the Eleventh Amendment would shield that entity from suit in federal court.'  (*Id.* at p.536.)

A review of the statutory scheme governing the Commission demonstrates the Commission's independence from the Department.  Eight of the Commission's nine members are elected by handler members.  (§ 75051.)  The ninth, a public member (*see id.*), is appointed by the Department director from a list of nominees recommended by the Commission.  (§ 75052.)  Handlers also elect three alternative members of the Commission (§ 75058.)  The Commission itself elects representatives to fill any midterm vacancies.  (§ 75059.)

The Commission is a corporate body with the power to sue and be sued, and to enter into contracts.  (§§ 75064, 75092.)  The Commission controls its own finances.  Any funds the Commission receives, including assessments paid by handlers, are to be deposited into a bank account designated by the Commission, and those funds 'shall be disbursed by order of the Commission through the agent or agents that it designated for that purpose.'  (§ 75069.)  The Commission can incur expenses, create liabilities and borrow funds in advance of receipt of assessments.  (§ 75088.)  It can accept contributions for the purpose of carrying out its activities.  (§ 75092.5.)

122

The Commission is empowered to adopt its rules and regulations (§ 75082), and administer and enforce its activities.  (§ 75083.)

The Department plays a narrowly circumscribed role in the Commission's activities.  The Department director sits on the Commission, but only as an ex officio member.  (§ 75053.)  His or her authority over the Commission's activities is limited to the ability to 'require the [C]ommission to correct or cease any existing activity or function which is in violation of this chapter.'  (§ 75054, subd. (a).)  If the Commission does not comply with such a directive, the director may suspend all or a portion of the Commission's activities.  (§ 75054, subd. (b).)

In short, the Commission enjoys broad authority, independent of the Department.  Given this independence, there is no basis to make the State liable for the Commission's activities.  (Cf. *ITSI TV Productions v. Agricultural Associations* (9th Cir. 1993) 3 F.3d 1289, 1292 [outlining factors for determining whether a state agency is an arm of the state for purposes of Eleventh Amend. immunity].)

Plaintiff argues that liability is proper because the State directly benefits from the Commission's activities and, as evidence of the State's interest, it points to several statements included in the statutes creating the Commission.  For example, section 75001 recognizes that the 'maintenance and expansion of the market for eggs is vital to the economy of California.'  Section 75003 declares it to be state policy 'to aid in the handling of eggs and egg products, to develop more efficient and equitable methods in handling, and to maintain job security for workers in the egg industry.'  Similarly, section 75004 provides: 'The production of eggs and egg products in this state and the marketing of eggs and egg products in this state, regardless of their point of origin is hereby declared to be affected with a public interest.  This chapter is enacted in the exercise of the police power of this state

123

1
          for the purpose of protecting the health,
          peace, safety, and general welfare of the

2
          people of this state.'

3
          These general statements do not link
          defendants to the Commission's activities to

4
          such an extent that vicarious liability is
          constitutionally compelled.  The benefits

5
          flowing to the State from the Commission's
          operations are indirect, and do not provide

6
          support for declaring section 75070
          unconstitutional as applied to this case.

7
129 Cal.App.4th at 597-599.

8

9
    Section 69044 governing the Pistachio Commission is

10
virtually identical to Section 65571.  There is no discussion in

11
*Paramount Land Co.*, *supra*, 491 F.3d 1003, that making the

12
Pistachio Commission, as opposed to the State of California,

13
liable for claims against the Pistachio Commission was a relevant

14
factor in determining whether or not *Johanns* applied.

15
    5.  Pursuant to § 65600, an assessment upon all fresh

16
grapes shipped during each marketing season "as fixed by the

17
commission" shall be levied, but, during any marketing season,

18
the assessment shall not exceed the amount specified in § 65600.

19
    Section 69081 governing the Pistachio Commission is

20
virtually identical to Section 65600.

21
    6.  Pursuant to § 65650, the Commission may bring an

22
action in its name to redress violations "of this chapter or any

23
rule or regulation."  Plaintiffs contend that the California

24
Department of Food and Agriculture may not do so.

25
    The Pistachio Commission also is accorded the right "to

26
commence civil actions and utilize all remedies provided in law

124

1  or equity for the collection of assessments and civil penalties,

2  and for the obtaining of injunctive relief or specific

3  performance, respecting this chapter and the rules and

4  regulations adopted under this chapter."

5      7.  Pursuant to § 65650.5, any person aggrieved by any

6  action of the Commission may appeal to the Secretary of Food and

7  Agriculture, who shall review the record of the proceedings

8  before the Commission and either dismiss the appeal or reverse

9  the action of the Commission.  "Any such decision of the director

10 [sic] is subject to judicial review upon petition of the

11 commission or any party aggrieved by the decision."[4]

12     Plaintiffs emphasize that this provision allows the

13 Commission to sue the Secretary.

14     The statutory provisions governing the Pistachio Commission

15 include Section 69062:

16         The commission shall adopt procedures for the
           purpose of according individuals aggrieved by
17         its actions or determinations an informal
           hearing before the commission or before a
18         committee of the commission designated for
           that purpose.  Appeals from decisions of the
19         commission may be made to the secretary.  The
           determination of the secretary shall be
20         subject to judicial review upon petition
           filed with the appropriate court.

21
22 The Pistachio Commission theoretically can sue the Secretary as,

23 theoretically, can the Table Grape Commission.  Nothing in

24 ────────────────

25     [4]The Secretary of Food and Agriculture was formerly known as
   the "director".  Cal.Food & Ag.Code § 50 provides that the term
26 "director" means the Secretary of Food and Agriculture.  *See*
   Cal.Jur.3rd, Agriculture, § 4.

125

*Paramount* indicates that this possibility is of any relevance to "effective control" within the meaning of *Johanns*.  Moreover, no waiver of sovereign immunity can be found, except if the legislature has clearly and unequivocally so provided.

        8.   Plaintiffs assert that there is no provision in the Ketchum Act for the Secretary to oversee, review, or approve/disapprove any of the Commission's activities.

     This is the biggest area of difference from the statutes governing the Pistachio Commission.  Section 69051, which describes the powers and duties of the Pistachio Commission, provides that annual books and records be subject to an annual audit by an auditing firm selected by the Pistachio Commission "with the concurrence of the secretary", that the audit be made part of an annual report to all producers, "copies of which shall also be submitted to the Legislature and the department", and that, as the secretary deems necessary, the secretary may "conduct or cause to be conducted a fiscal and compliance audit of the commission", § 69051(h); that the annual budget "shall be concurred in by the secretary prior to disbursement of funds", except for disbursements made to pay employees of the Pistachio Commission, § 69051(p); and "[t]o submit to the secretary, for his or her concurrence, an annual statement of contemplated activities authorized under this chapter, including advertising, promotion, marketing research, and production research," § 69051(g).  In addition, Section 69041 provides that "[t]he secretary or the secretary's representatives shall be notified

126

and may attend each meeting of the commission, and any committee meeting of the commission."   Sections 69032 and 69033 grant the Secretary authority to correct Pistachio Commission acts deemed by the Secretary not to be in the public interest or in violation of the chapter and to enforce that determination by legal action.

There is nothing in the statutes governing the Table Grape Commission mirroring this type of oversight.  However, Section 65650.5 provides for appeal to and review by the Secretary of any action by the Commission and subsequent judicial review, and Section 65572(f) provides for a State audit of the Commission's books and records.  The Stipulated Undisputed Facts establish that the CDFA reviews any complaint to it about a Commission advertisement and can request that the Commission provide the CDFA with notices of meetings, minutes, contracts and copies of advertisements.

9.  Plaintiffs focus on the following distinction in Table Grape Commission authority:

a.  No one from the Department of Food and Agriculture is notified of Commission meetings, attends Commission meetings, or receives and/or approves minutes of Commission meetings;

b.  No one from the  Department of Food and Agriculture is notified of or approves the Commission's assessment rate, the Commission's budget, staff salaries, contracts, research projects, export marketing and promotions;

c.  The Department of Food and Agriculture does

not review or approve Commission advertising, promotion, research
of marketing plans, advertising copy, does not audit the
Commission and does not approve the Commission's expenditures.

d.   Pursuant to § 65550, members of the Commission
are appointed by the Secretary from nominees selected as provided
by elections set forth in § 65556 and one public member is
appointed pursuant to § 65575.1.  Plaintiffs, however, reference
evidence that the Secretary has always appointed as Commission
members those who received the most votes from the producers who
voted.

Plaintiffs' contention does not undermine the fact that
members of the Commission are appointed by the Secretary and that
the Secretary has the authority to select those members.

e.   Neither the Department of Food and Agriculture
or any other state agency is involved in or reviews Commission
decisions on expenditures and programs.

Plaintiffs' contention is incorrect.  Section 65572(f)
provides for a State audit of the Commission's books and records.

f.   Plaintiffs next cite their request to the
Department of Food and Agriculture to provide all documents in
its possession from January 1, 2000 to December 13, 2005
"relating to CDFA approval, disapproval, comment, criticism or
any other discussion or mention of the California Table Grape
Commission's advertisements, promotions, marketing, public
relations, press releases, lobbying activities, governmental
relation activities or proposed drafts of all of the same, and

any and all documents in CDFA's possession relating to CDFA's approval, disapproval, comment, criticism or any other discussion or mention of the Commission's budget, expense reports, travel authorization or any other Commission expenditures."

The Department of Food and Agriculture responded "by stating that it possessed a document relating to possible legislative action, which CDFA considered exempt from the request, and the department possessed bills submitted to the Commission for payment of services rendered by the Marketing Branch to the Commission."  No other documents responsive to the request were produced.

Relying on these alleged distinctions, Plaintiffs argue that "[f]or the Commission to claim that CDFA provides 'effective control' over the Commission's activities is to distort *Johanns* beyond recognition, and to trivialize the legislature's obvious intent to provide the Commission with virtual unlimited autonomy not subject to CDFA control or review."

The Commission responds that, although *Johanns* discussed the extensive oversight by the USDA of the beef program, nothing in the decision requires such a level of involvement for an agricultural entity's published messages to be "government speech."  Because the Ketchum Act provides that the Secretary of the CDFA appoints and can remove all members of the Commission, because the CDFA can reverse an action of the Commission that it determines to be contrary to law or an abuse of discretion, and because the State audits the Commission's books and records, the

129

CDFA retains "effective control" over the Commission and, under *Johanns*, nothing more is required.  The Commission argues that *Johanns* "as well as the Court's other case law and general constitutional principles ... indicate that where the government has 'set out the overarching message,' and has established a regulatory framework that makes the speaking entity 'answerable' to a politically accountable official, the resulting speech is government speech regardless of whether the government micromanages the dissemination of the message."

The Commission suggests the *Johanns* decision rejected the argument that the beef program did not qualify as government speech because it is funded by assessments rather than the general revenue.  The Supreme Court distinguished those cases, pointing out that government speech is subject to democratic accountablility: "[T]he beef advertisements are subject to political safeguards more than adequate to set them apart from private messages", 544 U.S. at 563.  The Commission asserts that the reference to "more than adequate" safeguards "made clear its decision should not be understood to establish a blueprint that Congress or a state legislature must follow in every case to convey a 'government message."

Citing *Southworth, supra*, 529 U.S. at 235, that "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political processes for its advocacy", the Commission argues that this rationale also applies where the

government uses a private entity to disseminate its message:

> If the government has the power to stop the private entity from promulgating a particular message or to cause the private entity to change its message, the government will ultimately be held accountable for that message if the voters disapprove.  If, for example, the Commission were to run profane or indecent advertising, the Secretary of the CDFA and the Governor would be hardpressed to explain to Californians why they did not stop it ... Plaintiffs themselves acknowledge the political accountability in the California government for the Commission's activities when they note that the level of CDFA oversight depends more on the Administration in power in Sacramento than any other factor.

The Commission also cites *Rust v. Sullivan*, 500 U.S. 173 (1991), and *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) as Supreme Court precedent indicating that the government need not micromanage the dissemination of messages it has crafted. However, these cases do not involve the issue of "government speech" and do not constitute authority for the Commission's position.

Finally, the Commission argues that requiring prior review and approval of the precise wording of all government speech would lead to "absurd results":

> Business-improvement districts funded by mandatory contributions, for example, would have to get express government approval for the precise wording of promotional flyers they post in the downtown business district. If the government were to hire a private consultant to develop and run an ad campaign within certain defined parameters, the advertisements would fail to constitute government speech simply because a government official did not review and approve the precise wording of the ads.  Indeed, an

advertisement prepared by a low-level
government official without any consultation
with his supervisor would constitute
government speech, while the same
advertisement prepared by a consultant
executing instructions from a cabinet
secretary would be private speech if the
secretary chose not to look at the final
wording of the ads.  It is untenable to
conclude that the First Amendment prescribes
a precise and narrowly defined set of
bureaucratic procedures whenever the
government uses private speakers to transmit
government messages.  Imposing such a
requirement of micromanagement is surely not
what the Supreme Court had in mind when it
placed such emphasis in [*Johanns*] on the fact
that the private entity disseminating the
government's message must be 'answerable' to
a politically accountable official and when
it noted that the Beef Board's overall set of
safeguards was 'more than adequate.'

Plaintiffs respond that the Commission's argument that

*Johanns* does not require the same degree of micromanagement

before a finding of government speech may be found is "grasping

at straws":

[A]pparently *Johanns* did not think it would
lead to absurd results because that's what it
required when funding comes from a targeted
designated class (as opposed to general
taxpayer revenue) with respect to the Beef
Board.  It required mandatory micro-managing
of the precise wording for the government to
be able to hang its hat on 'government
speech'.  It would obviously be different if
the State simply dinged all tax paying
citizens to fund whatever message the elected
official of government wanted to carry out,
being responsible for that message when they
come up for reelection.  Neither the
producers nor the citizens get to vote for
the Secretary of Agriculture, nor the Branch
Chief of the Secretary of Agriculture;
general taxpayer funds are not being used but
instead the targeted hit is on table grape
producers.  Obviously, in that situation the

132

U.S. Supreme Court in *Johanns* required such micro-management by a defined government agency, USDA, and the Secretary of USDA. It is simply remarkably disingenuous for the Commission to argue that the U.S. Supreme Court in-depth recitation of the Secretary's control over the Beef Board and the message was simply pontificating *dicta*.

*Johanns* addressed the degree of effective control without defining conditions that constitute the required degree of control before "government speech" in a compelled subsidy case is established. In *Johanns,* the Supreme Court described the facts before it, from which it found that control "more than adequate." The inquiry does focus on the extent of the CDFA's control over the Commission. Plaintiffs seek a rule that unless every procedure/requirement present in *Johanns* is here present, there is no "government speech." In *Paramount Land Co.*, *supra*, 491 F.3d at 1012, the Ninth Circuit cautioned:

We acknowledge that there are differences in actual oversight between the beef scheme and the pistachio scheme, but these factual differences are legally insufficient to justify the injunction. To draw a line between these two approaches to oversight risks micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake. 'The message set out in the [pistachio] promotions is from beginning to end the message established' by the state government.

The statutory provisions governing the Commission, coupled with the Stipulated Undisputed Facts, demonstrate as a matter of law the CDFA has the effective control over the Commission required by *Johanns*.

Plaintiffs' motion for partial summary judgment on the issue

133

of effective control within the meaning of *Johanns* is DENIED; the Commission's motion for summary judgment on this issue is GRANTED.

G. **APPLICABILITY OF *CENTRAL HUDSON* TEST**.

Assuming *arguendo* that *Johanns* does not apply, the Commission's motion for summary judgment on the application of the *Central Hudson* test is addressed.

The Commission moves for summary judgment that the Ketchum Act is constitutional under the test described in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), which the Commission characterizes as "intermediate scrutiny".   Plaintiffs move for summary adjudication that the *Central Hudson* test is not applicable in determining the constitutionality of the Ketchum Act under the First Amendment.

In *Central Hudson*, the Supreme Court discussed First Amendment restrictions on commercial speech, i.e., "expression related solely to the economic interests of the speaker and its audience."   447 U.S. at 561.   Under *Central Hudson*, restrictions on lawful, non-misleading commercial speech are evaluated under a three-part test.   First, the asserted government interest behind the restrictions must be substantial.   Second, the restrictions must directly advance that interest.   Third, the program must not be more extensive than necessary to serve that interest.   *Id.*, at

566.

The Ninth Circuit's *Wileman Bros. & Elliott, Inc. v. Espy*, 58 F.3d 1367 (9th Cir.1995), opinion analyzed the First Amendment challenge to the generic advertising program assessments promulgated the federal Marketing Order under the AMAA for nectarines, peaches and plums under the *Central Hudson* test and concluded that the program violated the First Amendment.  In reversing the Ninth Circuit, the Supreme Court held in *Glickman v. Wileman Brothers & Elliott, supra,* 521 U.S. 457, that it was error for the Ninth Circuit to rely on *Central Hudson* for the purpose of testing the constitutionality of marketing order assessments for promotional advertising:

> The Court of Appeals fails to explain why the *Central Hudson* test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech.  Given the fact that the Court of Appeals relied on *Abood* for the proposition that the program implicates the First Amendment, it is difficult to understand why the Court of Appeals did not apply *Abood*'s 'germaneness' test.'

*Id.*, at 474 n.18.  The Supreme Court held that application of the *Central Hudson* test "is inconsistent with the very nature and purpose of the collective action program at issue here":

> The Court of Appeals concluded that the advertising program does not 'directly advance' the purposes of the marketing orders because the Secretary had failed to prove that generic advertising is any more effective in stimulating consumer demand for the commodities than the advertising that might otherwise be undertaken by producers acting independently.  We find this an odd burden of proof to assign to the

135

administration of marketing orders that
reflect a policy of displacing unrestrained
competition with Government supervised
cooperative marketing programs.  If there
were no marketing orders at all to set
maturity levels, size, quantity, and other
features, competition might well generate
greater production of nectarines, peaches,
and plums.  It may also be true that if there
were no generic advertising, competition
would generate even more advertising and an
even larger consumer demand than does the
cooperative program.  But the potential
benefits of individual advertising do not
bear on the question whether generic
advertising directly advances the statute's
collectivist goals.  Independent advertising
would be primarily motivated by the
individual competitor's interest in
maximizing its own sales, rather than in
increasing the overall consumption of a
particular commodity.  While the First
Amendment unquestionably protects the
individual producer's right to advertise its
own brands, the statute is designed to
further the economic interests of the
producers as a group.  The basic policy
decision that underlies the entire statute
rests on an assumption that in the volatile
markets for agricultural commodities the
public will be best served by compelling
cooperation among producers in making
economic decisions that would be made
independently in a free market.  It is
illogical, therefore, to criticize any
cooperative program authorized by this
statute on the ground that competition would
provide greater benefits than joint action.

*Id*. at 475.

The Commission argues that the Supreme Court in *Glickman*
only reversed the Ninth Circuit because it concluded, under the
circumstances of that case, that the *Central Hudson* analysis was
too demanding because the generic advertising program did not
implicate the First Amendment and, to the extent that it did, it

136

1   was constitutional under the *Abood* germaneness test.  In a case

2   where the First Amendment is implicated, the Commission argues,

3   there is no reason to think that the Ninth Circuit will deviate

4   from its original conclusion in *Wileman Bros.* that a program is

5   constitutional if it passes intermediate scrutiny under *Central*

6   *Hudson*.  The Commission opines that the Supreme Court's *United*

7   *Foods* decision, *supra*, 533 U.S. 405, is not to the contrary

8   because the *Central Hudson* test was not argued by the United

9   States and was not before the Court.  The Commission points to

10  the California Supreme Court's application of the *Central Hudson*

11  test to a First Amendment challenge under the California

12  Constitution to the California Plum Marketing Program issued by

13  the Secretary of Food and Agriculture pursuant to the California

14  Marketing Act of 1937.  *See Gerawan Farming, Inc. v. Kawamura*, 33

15  Cal.4th 1 (2004):

16              *4.   The Proper State Constitutional Test*

17              As noted, the court in *Glickman* held that if
                the First Amendment had been implicated, then
18              the 'test' of *Abood* and *Keller* would 'clearly
                [be] satisfied in this case because ... the
19              generic advertising ... is unquestionably
                germane to the purposes of the marketing
20              order[] ... (*Glickman*, *supra*, 521 U.S. at p.
                473).  As has been recognized, the standard
21              employed by the *Glickman* court was 'plainly
                less exacting' than the intermediate scrutiny
22              test employed in testing the
                constitutionality of commercial speech
23              restrictions.  (*Gerawan I, supra*, 24 Cal.4th
                at pp. 534-535 (dis. opn. of George C., J.)
24              In light of our recognition in *Gerawan I* that
                the generic advertising program does in fact
25              implicate the free speech clause, that is to
                say, a program of compelled subsidization of
26              generic advertising does interfere with the

                              137

right protected under the free speech clause and requires some justification for that interference, we believe it would be incongruous to subject the program to only minimal scrutiny.

On this point, we are partly persuaded by Justice Souter's dissent in *Glickman, supra*, 521 U.S. at page 477, wherein he points out that previous forays into compelled funding of speech have involved areas in which the importance of the government interest at stake and legitimacy of compelled association was already well established.  Commenting on the seminal case of *Abood*, *supra*, 431 U.S. 209, Justice Souter reasoned that the court had concluded some interference with the First Amendment interests was '"constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." [Citation]; see also *Keller*, *supra*, [496 U.S. at pp.] 13-14 ("[T]he State's interest in regulating the legal profession and improving the quality of legal services" justifies "the compelled association [inherent in the] integrated bar").  But this was simply a way of saying that the government's objective of guaranteeing the opportunity for a union shop, the importance and legitimacy of which were already settled, [citations], could not be attained without the incidental infringements of the interests in unfettered speech and association that petitioners there claimed.'  (*Glickman*, *supra*, 521 U.S. at p. 484 (dis. opn. of Souter, J.).)

Justice Souter appears correct that an assumption underlying *Abood* and *Keller*, albeit an implicit one, is that the interest justifying the compelled association must be important, and that there be no effective alternative means of achieving this interest with less intrusion on free speech rights. On the other hand, the conclusion of the *Glickman* majority that the compelled funding of generic advertising requires only minimal scrutiny is at variance with the general rule that intrusion into free speech rights requires substantial justification, even when

138

> the intrusion is incidental to the
> enforcement of a content-neutral law.  (See
> *O'Brien v. United States* (1968) 391 U.S. 367
> ... The requirement of substantial
> justification is further supported by the
> fact that the right of free speech under the
> California Constitution is in some respects
> '"broader" and "greater"' than under the
> First Amendment.  (*Gerawan I, supra*, 24
> Cal.4th at p.491, and cases cited therein.)
>
> Because generic advertising was not self-
> evidently incidental to the functioning of
> some important, legislatively established
> institution, such as a union shop or an
> integrated state bar as in *Abood* and *Keller*,
> Justice Souter argued for treating compelled
> funding of such advertising the same as any
> other regulation implicating the right of
> commercial speech, subjecting it to the test
> articulated in *Central Hudson* ... We believe
> this intermediate standard appropriately
> protects the free speech rights article I was
> designed to safeguard.  Drawing on
> constitutional doctrine summarized above, we
> conclude that the compelled funding of
> commercial speech neither warrants
> application of the strictest scrutiny
> reserved for such matters as the censorship
> or compelled utterance of noncommercial
> speech (see, e.g., *Texas v. Johnson* (1989)
> 491 U.S. 397, 412 ...; *West Virginia Bd. of
> Ed. v. Barnett* (1943) 319 U.S. 624, 642 ...,
> nor can it pass muster simply because it is
> rationally based.

33 Cal.4th at 20-22.

Plaintiffs argue that the Commission is "clearly wrong"

because the Supreme Court has never applied the *Central Hudson*

test for commercial speech restrictions in a case involving

compelled subsidies.  While the Ninth Circuit utilized the

*Central Hudson* test in *Wileman Bros.*, Plaintiffs note that it did

so before *United Foods* was decided by the Supreme Court.  Since

*United Foods*, Plaintiffs contend, the Ninth Circuit followed

1  *United Foods* in *Delano Farms Co. v. California Table Grape*

2  *Com'n.*, *supra*, 318 F.3d 895.  Plaintiffs assert that the Supreme

3  Court "applied the directly relevant line of authority, namely,

4  *Abood/Keller/United Foods* line of cases addressing compelled

5  subsidies of speech."  Plaintiffs further assert that cases since

6  *United Foods* have refused to apply the *Central Hudson* test.

7       Plaintiffs cite *In re Washington State Apple Advertising*

8  *Commission*, 257 F.Supp.2d 1290 (E.D.Wash.2003), where the

9  District Court rejected the argument that the *Central Hudson* test

10 applied:

> While advertising fits the classical
> definition of commercial speech in that it
> does no more than propose a commercial
> transaction, *Central Hudson*, 447 U.S. at 562
> ..., the Commission's mandatory assessments
> are not a restriction upon the commercial
> speech of the Defendants like a restriction
> on their ability to advertise would be.
> Rather, the objecting apple producers are
> compelled to pay for commercial speech.
> Although *United Foods* did not clearly reject
> application of the *Central Hudson* test, it
> did refuse to consider the first prong of
> that test:
>
> > We need not enter into that
> > controversy, for even viewing
> > commercial speech as entitled to
> > lesser protection, we find no basis
> > under either *Glickman* or our other
> > precedents to sustain the compelled
> > assessments sought in this case ...
> > the Government itself does not rely
> > upon Central Hudson to challenge
> > the Court of Appeals' decision ...,
> > and we therefore do not consider
> > whether the Government's interest
> > could be considered substantial for
> > purposes of the *Central Hudson*
> > test.

*United Foods*, 121 S.Ct. at 2337-38.   The Court concludes that *United Foods*, by refraining from deciding the first prong of *Central Hudson*, deemed the commercial speech test inapplicable.   *Central Hudson's* test, which requires that the restriction on speech not be 'more extensive than necessary' to serve the interest, 447 U.S. at 566 ..., presupposes a restriction on speech.   Here, the Defendants' speech is not being restricted, instead it is being compelled. Because the Commission's assessments do not restrict speech, it is inappropriate to apply the *Central Hudson* test for restrictions on speech.   *See also Glickman*, 521 U.S. at 474 n.18 ... (reversing the Ninth Circuit's decision to apply *Central Hudson*).

At argument on these motions, the Commission argued that *United Foods* cited a compelled speech case, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 ... (1985), which applied the *Central Hudson* test, undermining this Court's conclusion not to apply *Central Hudson* at all.   *Zauderer* upheld the requirement that an attorney, who chose to advertise, include certain disclosures in that advertising.   *Id*. at 650-52.   *Zauderer* reasoned that because the government is free to regulate commercial speech to prevent it from being false, deceptive or misleading, *id*. at 638 ..., it can compel speech to ensure those ends as well, *id*. at 652 ... Because the rationale for regulation there, to prevent false and misleading commercial speech, does not apply to the compelled funding of commercial speech here, *Zauderer* is inapplicable to this case. *See also United Foods*, 533 U.S. at 416 ... (holding that *Zauderer* was inapposite because there was no suggestion that the mandatory assessments were necessary to prevent voluntary advertising from being misleading).

257 F.Supp.2d at 1303-1304.

Plaintiffs cite *Michigan Pork Producer's Association, Inc. v. Veneman*, 348 F.3d 157, 163 (6th Cir.2003), *reversed and remanded for further consideration in light of Johanns v.*

141

*Livestock Marketing Association,* 544 U.S. 1058 (2005), *remanded to District Court*:

> [W]e find inapplicable to this case the relaxed scrutiny of commercial speech analysis provided for by *Central Hudson* and relied upon by Appellants.  The Pork Act does not directly limit the ability of pork producers to express a message; it compels them to express a message with which they do not agree.  Even assuming that the advertising funded by the Act is indeed commercial speech, the more lenient standard of review applied to limits on commercial speech has never been applied to speech – commercial or otherwise – that is compelled. *See Glickman*, 521 U.S. at 474 n.18 (questioning whether 'the *Central Hudson* test, which involved restrictions on commercial speech, should govern a case involving the compelled funding of speech'). It is one thing to force someone to close her mouth; it is quite another to force her to become a mouthpiece.

In *Cochran v. Veneman*, 359 F.3d 263, 276-280 (3rd Cir.2004), *judgment reversed and remanded for further consideration in light of Johanns v. Livestock Marketing Association*, 544 U.S. 1058 (2005), also cited by Plaintiffs, the Third Circuit, after discussion of *Central Hudson* and *Abood*, applied the germaneness test of *Abood* rather than the *Central Hudson* test.  In *Pelts & Skins, LLC v. Landreneau*, 365 F.3d 423, 434 n.21 (5th Cir.2004), *judgment reversed and remanded for further consideration in light of Johanns v. Livestock Marketing Association*, 544 U.S. 1058 (2005), *remanded to District Court*, 448 F.3d 743 (5th Cir.2006), the Fifth Circuit doubted that the *Central Hudson* test applied but choose to leave the question open because even if the *Central Hudson* test were applied, Louisiana's alligator marketing program

142

1  would not pass it.

2      These Circuit Court opinions are no longer valid authority;

3  all were reversed and remanded by the Supreme Court based on

4  *Johanns*.  Following the Supreme Court's reversal and remand, the

5  Third Circuit in *Cochran v. Veneman* entered an Order affirming

6  the judgment of the District Court for the Middle District of

7  Pennsylvania, 252 F.Supp.2d 126 (M.D.Pa.2003), which the Third

8  Circuit had previously reversed; upon remand by the Fifth Circuit

9  to the District Court in *Pelts & Skins,* the District Court

10  granted a Consent Motion to Dismiss All Claims Without Prejudice

11  and did not affirmatively consider the impact of *Johanns* on the

12  case; upon remand by the Sixth Circuit in *Michigan Pork*

13  *Producers*, the District Court entered a Stipulation for Dismissal

14  and did not affirmatively consider the impact of *Johanns* on the

15  case.[5]

16      The Commission's assertion that *Glickman* rejected the

17  *Central Hudson* test as "too demanding" finds no support in

18  *Glickman's* majority opinion.  It appears that the Commission

19  bases this interpretation on the California Supreme Court's

20  reliance in *Gerawan, id.*, 33 Cal.4th at 20-22, on Justice

21  Souter's dissenting opinion.  The majority opinion in *Glickman*

22  clearly questioned the application of *Central Hudson* to First

23

24      [5]The Court may take judicial notice of matters of public
   record, including duly recorded documents, and court records
25  available to the public through the PACER system via the internet.
   *See* Fed. R. Evid. Rule 201(b); *United States v. Howard*, 381 F.3d
26  873, 876, fn.1 (9th Cir. 2004).

Amendment challenges in compelled subsidy cases and held that the Ninth Circuit erred in relying on *Central Hudson*.  That the California Supreme Court reached a different conclusion relying on a dissenting opinion does not change the law and is not binding on a federal district court addressing the First Amendment to the United States Constitution.  The Commission's assertion that the Ninth Circuit will continue to apply *Central Hudson* is speculation unsupported by any case authority since *Glickman,* other than the California Supreme Court's *Gerawan* decision.

The Commission contends that *Central Hudson* intermediate scrutiny is appropriate because the Ketchum Act only requires funding of commercial speech and the Ketchum Act satisfies the *Central Hudson* test.  The cases discussed above support the view that *Central Hudson* simply does not apply.

Plaintiffs' motion for summary judgment that the *Central Hudson* test is not applicable in determining the constitutionality of the Ketchum Act as it relates to the Table Grape Commission is GRANTED and the Commission's motion that the Ketchum Act is constitutional under the *Central Hudson* test is DENIED.  The *Central Hudson* test does not apply.

H.  **WHETHER *GLICKMAN* OR *UNITED FOODS* APPLIES**.

If *Johanns* does not apply, Plaintiffs move for summary adjudication that the Supreme Court's ruling in *United States v. United Foods, Inc., supra*,  533 U.S. 405, rather than the ruling in *Glickman v. Wileman Brothers & Elliott, supra*, 521 U.S. 457,

144

governs the Ketchum Act.  Plaintiffs contend that the Ninth Circuit's *Delano Farms v. California Table Grape Commission*, *supra*, 318 F.3d 895 (9th Cir.2003), ruling is "law of the case" and that the undisputed facts in this action demonstrate that *United Foods* controls.

> 1.  *Glickman v. Wileman Brothers & Elliott*.

In *Glickman v. Wileman Brothers & Elliott*, *supra,* 521 U.S. 457 (1997), California tree-fruit growers, handlers and processors initiated administrative proceedings challenging the validity of various regulations contained in marketing orders promulgated by the United States Secretary of Agriculture under the Agricultural Marketing Act of 1937 (AMAA).  The disputed orders assessed respondents for, *inter alia*, the cost of generic advertising of California nectarines, plums and peaches.  After the Department of Agriculture upheld the generic advertising regulations, respondents sought judicial review.  The district court found the orders lawful.  The Ninth Circuit, relying on *Central Hudson, supra,* 447 U.S. 557, held that the Government enforced contributions to pay for generic advertising violated respondents' commercial speech rights.  *See Wileman Bros. & Elliott, Inc. v. Espy*, *supra,* 58 F.3d 1367.  The question presented to the Supreme Court was "whether the requirement that respondents finance such generic advertising is a law 'abridging the freedom of speech' within the meaning of the First Amendment."  521 U.S. at 460-461.  The Supreme Court discussed the Ninth Circuit's conclusion that Government enforced

contributions to pay for generic advertising violated the First

Amendment rights of the handlers:

> Relying on an earlier Ninth Circuit decision that had cited our decision in *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977), see *Cal-Almond, Inc. v. United States Dept. of Agriculture*, 14 F.3d 429 (CA9 1993), the court began by stating that the 'First Amendment right of freedom of speech includes a right not to be compelled to render financial support for others' speech.' 58 F.3d at 1377.  It then reviewed the generic advertising regulations under 'the test for restrictions on commercial speech set out in *Central Hudson Gas & Electric Corp. ... Id.* at 1378.  Although it was satisfied that the Government interest in enhancing returns to peach and nectarine growers was substantial, it was not persuaded that generic advertising passed either the second or third 'prongs' of *Central Hudson*.  With respect to the former, even though the generic advertising 'undoubtedly' has increased peach and nectarine sales, the Government failed to prove that it did so more effectively than individualized advertising.  The court also concluded that the program was not 'narrowly tailored' because it did not give the handlers any credit for their own advertising and because California was the only state in which such programs were in place.

521 U.S. at 465-466.  The Supreme Court left undisturbed

respondents' content-based challenge to the constitutionality of

the generic advertising program, arising from their claimed

disagreement with the content of some of the generic advertising.

The Ninth Circuit did not rely on this claim in invalidating the

advertising program; rather the generic advertising program was

struck down "on the theory that the program could not survive

*Central Hudson* because the Government had failed to prove that

generic advertising was more effective than individual

advertising in increasing consumer demand for California nectarines, plums, and peaches." *Id.* at 467.  The Supreme Court reasoned that the Ninth Circuit's "holding did not depend at all on either the content of the advertising, or on the respondents' claimed disagreement with any particular message" and that respondents' arguments about their disagreement with particular messages, "while perhaps calling into question the administration of portions of the program, have no bearing on the validity of the entire program." *Id.* at 467-468.  The Supreme Court then stated:

> For purposes of our analysis, we neither accept nor reject the factual assumption underlying the Court of Appeals' invalidation of the program – namely, that generic advertising may not be the most effective method of promoting the sale of these commodities.  The legal question that we address is whether being compelled to fund this advertising raises a First Amendment issue for us to resolve, or rather is simply a question of economic policy for Congress and the Executive to resolve.
>
> In answering that question we stress the importance of the statutory context in which it arises.  California nectarines and peaches are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws.  The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme.  It is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, under the standard

147

appropriate for the review of economic
regulation or under a heightened standard
appropriate for the review of First Amendment
issues.

*Id.* at 468-469.  The Supreme Court held that three
characteristics of the generic advertising program mandated by
the marketing orders distinguished it from laws that have been
found to abridge the freedom of speech protected by the First
Amendment: "First, the marketing orders impose no restraint on
the freedom of any producer to communicate any message to any
audience.  Second, they do not compel any person to engage in any
actual or symbolic speech.  Third, they do not compel the
producers to endorse or to finance any political or ideological
views."  *Id.* at 460-470.  The Supreme Court found the fact the
marketing orders imposed no restraint on the freedom of any
producer to communicate any message to any audience,
"distinguishes the limits on commercial speech at issue in
*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980), *Virginia Bd. of Pharmacy v. Virginia
Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), and *44
Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996)."  *Id.* at
469 n.12.

The Supreme Court rejected the argument that the assessments
for generic advertising impinge on First Amendment rights because
they reduce the amount of money the producers have to conduct
their own advertising, holding that "[t]he fact that an economic
regulation may indirectly lead to a reduction in a handler's

148

1   individual advertising budget does not itself amount to a

2   restriction on speech." *Id*. at 470.  The Supreme Court noted

3   that the Ninth Circuit had accepted the argument that the

4   assessments infringe First Amendment rights because they

5   constitute compelled speech, *id.* at 470, but reversed by finding

6   the assessments do not constitute compelled speech in violation

7   of the First Amendment because "[t]he use of the assessments to

8   pay for advertising does not require respondents to repeat an

9   objectionable message out of their own mouths, ... [or] require

10  them to use their own property to convey an antagonistic

11  ideological message ..., [or] force them to respond to a hostile

12  message when they 'would prefer to remain silent,' ... or require

13  them to be publicly identified or associated with another's

14  message ...".  *Id.* at 471.

15       The Supreme Court addressed the Ninth Circuit's reliance on

16  *Abood* that the First Amendment prohibits compelling an individual

17  to contribute financial support for another's speech without

18  sufficient justification by the government:

19              ... However, *Abood*, and the cases that follow
                it, did not announce a broad First Amendment
20              right not to be compelled to provide
                financial support for any organization that
21              conducts expressive activities.  Rather,
                *Abood* merely recognized a First Amendment
22              interest in not being compelled to contribute
                to an organization whose expressive
23              activities conflict with one's 'freedom of
                belief.'  431 U.S. at 235.  We considered, in
24              *Abood*, whether it was constitutional for the
                State of Michigan to require government
25              employees who objected to unions or union
                activities to contribute to an 'agency shop'
26              arrangement requiring all employees to pay

                              149

union dues as a condition of employment.  We held that compelled contributions to support activities related to collective bargaining were 'constitutionally justified by the legislative assessment of the important contribution of the union shop' to labor relations.  *Id.*, at 222.  Relying on our compelled-speech cases, however, the Court found that compelled contributions for political purposes unrelated to collective bargaining implicated First Amendment interests because they interfere with the values lying at the 'heart of the First Amendment[ -] the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State.'  *Id.*, 234-235; see also *id.*, at 235.

Here, however, requiring respondents to pay the assessments cannot be said to engender any crisis of conscience.  None of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit.  Neither the fact that respondents may prefer to foster that message independently in order to promote and distinguish their own products, nor the fact that they think more or less money should be spent fostering it, makes this case comparable to those in which an objection rested on political or ideological disagreement with the content of the message.  The mere fact that objectors believe their money is not being well spent 'does not mean [that] they have a First Amendment complaint.' ....

*Id.* at 471-472.  The Supreme Court recognized cases that permit assessments to fund a lawful collective program "may sometimes be used to pay for speech over the objections of some members of the group":

Thus, in *Lehnert v. Ferris Faculty Assn.*, 500 U.S. 507 (1991), while we held that the cost of certain publications that were not germane to collective-bargaining activities could not

150

be assessed against dissenting union members,
*id.*, at 527-528, we squarely held that it was
permissible to charge them for those portions
of 'the Teachers' Voice that concern teaching
and education generally, professional
development, unemployment, job opportunities,
award programs ..., and other miscellaneous
matters.'  *Id.*, at 529.  That holding was an
application of the rule announced in *Abood*
and further refined in *Keller v. State Bar of
Cal.*, 496 U.S. 1 (1990), a case involving bar
association activities.

As we pointed out in *Keller*, '*Abood* held that
a union could not expend a dissenting
individual's dues for ideological activities
not "germane" to the purpose for which
compelled association was justified:
collective bargaining.  Here, the compelled
association and integrated bar are justified
by the State's interest in regulating the
legal profession and improving the quality of
legal services.  The State Bar may therefore
constitutionally fund activities germane to
those goals out of the mandatory dues of all
members.  It may not, however, in such manner
fund activities of an ideological nature
which fall outside of those areas of
activity.'  *Id.*, at 13-14.  This test is
clearly satisfied in this case because (1)
the generic advertising of California peaches
and nectarines is unquestionably germane to
the purposes of the marketing orders and, (2)
in any event, the assessments are not used to
fund ideological activities.

We are not persuaded that any greater weight
should be given to the fact that some
producers do not wish to foster generic
advertising than to the fact that many of
them may well object to the marketing orders
themselves because they might earn more money
in an unregulated market.  Respondents'
criticisms of generic advertising provide no
basis for concluding that factually accurate
advertising constitutes an abridgement of
anybody's right to speak freely.  Similar
criticisms might be directed at other
features of the regulatory orders that impose
restraints on competition that arguably
disadvantage particular producers for the

151

1    benefit of the entire market.  Although one
     may indeed question the wisdom of such a
2    program, its debatable features are
     insufficient to warrant special First
3    Amendment scrutiny.  It was therefore error
     for the Court of Appeals to rely on *Central*
4    *Hudson* for the purpose of testing the
     constitutionality of market order assessments
5    for promotional advertising.

6  *Id.* at 473-474.  In so holding, the Supreme Court noted:

7         The Court of Appeals fails to explain why the
          *Central Hudson* test, which involved a
8         restriction on commercial speech, should
          govern a case involving the compelled funding
9         of speech.  Given the fact that the Court of
          Appeals relied on *Abood* for the proposition
10        that the program implicates the First
          Amendment, it is difficult to understand why
11        the Court of Appeals did not apply *Abood*'s
          'germaneness' test.'

12
   *Id.*, at 474 n.18.  The Supreme Court held that application of the
13
   *Central Hudson* test "is inconsistent with the very nature and
14
   purpose of the collective action program at issue here":
15
          The Court of Appeals concluded that the
16        advertising program does not 'directly
          advance' the purposes of the marketing orders
17        because the Secretary had failed to prove
          that generic advertising is any more
18        effective in stimulating consumer demand for
          the commodities than the advertising that
19        might otherwise be undertaken by producers
          acting independently.  We find this an odd
20        burden of proof to assign to the
          administration of marketing orders that
21        reflect a policy of displacing unrestrained
          competition with Government supervised
22        cooperative marketing programs.  If there
          were no marketing orders at all to set
23        maturity levels, size, quantity, and other
          features, competition might well generate
24        greater production of nectarines, peaches,
          and plums.  It may also be true that if there
25        were no generic advertising, competition
          would generate even more advertising and an
26        even larger consumer demand than does the

                              152

cooperative program. But the potential benefits of individual advertising do not bear on the question whether generic advertising directly advances the statute's collectivist goals. Independent advertising would be primarily motivated by the individual competitor's interest in maximizing its own sales, rather than in increasing the overall consumption of a particular commodity. While the First Amendment unquestionably protects the individual producer's right to advertise its own brands, the statute is designed to further the economic interests of the producers as a group. The basic policy decision that underlies the entire statute rests on an assumption that in the volatile markets for agricultural commodities the public will be best served by compelling cooperation among producers in making economic decisions that would be made independently in a free market. It is illogical, therefore, to criticize any cooperative program authorized by this statute on the ground that competition would provide greater benefits than joint action.

*Id.* at 475.

2. *United States v. United Foods, Inc.*

In *United States v. United Foods, Inc.,* 533 U.S. 405 (2001), respondent challenged assessments used primarily to fund advertisements promoting mushroom sales pursuant to the Mushroom Promotion, Research, Consumer Information Act, 7 U.S.C. §§ 6101 *et seq.* The Act authorizes the Secretary of Agriculture to establish a Mushroom Council to pursue the statute's goals. Mushroom producers and importers, as defined by the Act, submit nominations from among their group to the Secretary, who then designates Council membership. To fund its programs, the Act allows the Mushroom Council to impose mandatory assessments upon

153

handlers of fresh mushrooms, which assessments can be used for

"projects of mushroom promotion, research, consumer information,

and industry information".  It was undisputed that most of the

assessments were spent on generic advertising to promote mushroom

sales.  The district court granted summary judgment for the

United States based on *Glickman*.  The Sixth Circuit reversed,

holding that *Glickman* did not control because the mandated

payments were not part of a comprehensive statutory agricultural

marketing program.  The Supreme Court affirmed the Sixth

Circuit's decision that *Glickman* is not controlling.  In so

doing, the Supreme Court specified three issues that it was not

addressing:

> We have used standards for determining the
> validity of speech regulations which accord
> less protection to commercial speech than to
> other expressions ... That approach, in turn,
> has been subject to some criticism ... We
> need not enter into the controversy, for even
> viewing commercial speech as entitled to
> lesser protection, we find no basis under
> either *Glickman* or our other precedents to
> sustain the compelled assessments sought in
> this case.  It should be noted, moreover,
> that the Government itself does not rely upon
> *Central Hudson* to challenge the Court of
> Appeals' decision ... and we therefore do not
> consider whether the Government's interest
> could be considered substantial for purposes
> of the *Central Hudson* test.  The question is
> whether the government may underwrite and
> sponsor speech with a certain viewpoint using
> special subsidies exacted from a designated
> class of persons, some of whom object to the
> idea being advanced.

*Id.* at 409-410.  The Supreme Court refused to address the

Government's contention that the advertising is government speech

154

immune from First Amendment scrutiny under *Lebron v. National Passenger Railroad Corporation*, 513 U.S. 374 (1995) because the Government had not raised this argument below.  *Id.* at 416-417.  In affirming the Sixth Circuit, the Supreme Court noted that the First Amendment may prevent the government from compelling individuals to express certain views, that "First Amendment concerns apply here because of the requirement that producers subsidize speech with which they disagree", and that "the compelled funding for the advertising must pass First Amendment scrutiny."  *Id.*, at 410-411.  The Supreme Court distinguished *Glickman* because "[t]he program sustained in *Glickman* differs from the one under review in a most fundamental respect":

> In *Glickman* the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself, far from being ancillary, is the principle object of the regulatory scheme.

*Id.,* at 411-412.  The Supreme Court concluded:

> The features of the marketing scheme found important in *Glickman* are not present in the case before us ... [A]lmost all of the funds collected under the mandatory assessments are for one purpose: generic advertising.  Beyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions.  As the Court of Appeals recognized, there is no 'heavy regulation through marketing orders' in the mushroom market ... Mushroom producers are not forced to associate as a group which makes cooperative decisions.  '[T]he mushroom

> growing business ... is unregulated, except
> for the enforcement of a regional mushroom
> advertising program,' and 'the mushroom
> market has not been collectivized, exempted
> from antitrust laws, subjected to a uniform
> price, or otherwise subsidized through price
> supports or restrictions on supply.' ....

*Id.,* at 412-413.  Although the mushroom generic advertising

assessment only required the individual to support speech by

others, the Supreme Court concluded that "the mandated support is

contrary to First Amendment principles set forth in cases

involving expression by groups which include persons who object

to the speech, but who, nevertheless, must remain members of the

group by law or necessity", citing *Abood v. Detroit Bd. of*

*Education*, 431 U.S. 209 (1977) and *Keller v. State Bar of Cal.*,

496 U.S. 1 (1990).  The Supreme Court rejected the Government's

argument that, despite the lack of cooperative marketing, the

*Abood* rule protecting against compelled speech is inapplicable:

> ... We did say in *Glickman* that *Abood*
> 'recognized a First Amendment interest in not
> being compelled to contribute to an
> organization whose expressive activities
> conflict with one's "freedom of belief."' 521
> U.S., at 471 (quoting *Abood*, 431 U.S., at
> 235).  We take further instruction, however,
> from *Abood*'s statement that speech need not
> be characterized as political before it
> receives First Amendment protection.  *Id.*, at
> 232.  A proper application of the rule in
> *Abood* requires us to invalidate the instant
> statutory scheme.  Before addressing whether
> a conflict with freedom of belief exists, a
> threshold inquiry must be whether there is
> some state imposed obligation which makes
> group membership less than voluntary; for it
> is only the overriding associational purpose
> which allows any compelled subsidy for speech
> in the first place.  In *Abood*, the
> infringement upon First Amendment

associational rights worked by a union shop
arrangement was 'constitutionally justified
by the legislative assessment of the
important contribution of the union shop to
the system of labor relations established by
Congress.'  *Id.*, at 222.  To attain the
desired benefit of collective bargaining,
union members and nonmembers were required to
associate with one another, and the
legitimate purposes of the group were
furthered by the mandated association.

A similar situation obtained in *Keller v.
State Bar of Cal.*, ... A state-mandated,
integrated bar sought to ensure that 'all of
the lawyers who derive benefit from the
unique status of being among those admitted
to practice before the courts [were] called
upon to pay a fair share of the cost.'  *Id.*,
at 12.  Lawyers could be required to pay
moneys in support of activities that were
germane to the reason justifying the
compelled association in the first place, for
example, expenditures (including expenditures
for speech) that related to 'activities
connected with disciplining members of the
Bar or proposing ethical codes for the
profession.'  *Id.*, at 16.  Those who were
required to pay a subsidy for the speech of
the association already were required to
associate for other purposes, making the
compelled contribution of moneys to pay for
expressive activities a necessary incident of
a larger expenditure for an otherwise proper
goal requiring the cooperative activity.  The
central holding in *Keller*, moreover, was that
the objecting members were not required to
give speech subsidies for matters not germane
to the larger regulatory purpose which
justified the required association.

*Id.,* at 413-414.  The Supreme Court held:

The statutory scheme as it relates to
handlers of mushrooms is concededly different
from the scheme in *Glickman;* here the statute
does not require group action, save to
generate the very speech to which some
handlers object.  In contrast to the program
upheld in *Glickman*, where the Government
argued the compelled contributions for

157

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

advertising were 'part of a far broader
regulatory system that does not principally
concern speech,' ... there is no broader
regulatory system in place here.  We have not
upheld compelled subsidies for speech in the
context of a program where the principal
object is speech itself.  Although greater
regulation of the mushroom market might have
been implemented under the [AMAA], the
compelled contributions for advertising are
not part of some broader regulatory scheme.
The only program the Government contends the
compelled contributions serve is the very
advertising scheme in question.  Were it
sufficient to say speech is germane to
itself, the limits observed in *Abood* and
*Keller* would be empty of meaning and
significance.  The cooperative marketing
structure relied upon by the majority of the
Court in *Glickman* to sustain an ancillary
assessment finds no corollary here; the
expression respondent is required to support
is not germane to a purpose related to an
association independent from the speech
itself; and the rationale of *Abood* extends to
the party who objects to the compelled
support for this speech.  For these and other
reasons we have set forth, the assessments
are not permitted under the First Amendment.

16    *Id.*, at 413-416.

17         3.   *Delano Farms Co. v. California Table Grape*

18  *Com'n.*

19        In *Delano Farms Co. v. California Table Grape Com'n.*, *supra,*

20  318 F.3d 895, the Ninth Circuit, ruling on Plaintiffs' appeal

21  from the stipulated dismissal under Rule 12(b)(6) entered in this

22  action, addressed as the only issue, whether the principle

23  distinguishing *Glickman* and *United Foods* makes this case more

24  like *Glickman* or more like *United Foods*.  *Id.,* at 896.  The Ninth

25  Circuit set forth the facts as follows:

26         In 1967, a California statute called the

158

Ketchum Act established the California Table Grape Commission for 'the promotion of the sale of fresh grapes for human consumption by means of advertising, dissemination of information' and other means.  The Commission's Policy Statement says that its purpose is to aid 'producers of California fresh grapes in preventing economic waste in the marketing of their commodity,' and in acting 'in the public interest to protect and enhance the reputation of California fresh grapes for human consumption in intrastate, interstate and foreign markets.'  It promotes the sale of grapes, by advertising the desirability of California grapes and also by negotiating with foreign governments to prevent and eliminate trade barriers against California grapes.  It also lobbies government officials on grape-related matters and contributes to various good works such as science fair scholarships, 4-H Club grants, scholarships to children of grape field workers, and contributions to the Audubon Society.

The Commission has the statutory power to levy assessments 'upon all fresh grapes shipped during each marketing season' to pay for generic advertising, marketing, market research and development, and merchandising.

*Id.*, at 896-897.  In reversing the stipulated dismissal, the Ninth Circuit, after describing the holdings in *Glickman* and *United Foods,* ruled:

Doubtless many cases will arise that are hard to place on one side or the other of the *Glickman-United Foods* distinction, but this isn't one of them.  Just as in the mushroom case, the scheme does not collectivize the industry, about 90% of the assessment money is spent on generic promotional activities, and there is no antitrust exemption.  Delano Farms, Susan Neill, and Lucas Brothers, sell brand name grapes and have an interest in promoting their brands rather than and to some extent at the expense of grapes in general.

**The Table Grape Commission argues that grapes are regulated by various California statutes addressing such matters as testing equipment and standards for fruit maturity, container standards, federal regulation of grading standards (e.g., what does 'extra fancy' mean?), and quality standards for exported grapes. There is a 'marketing order' of the collective sort in one location, though not applicable to the issue in the case at bar. Such consumer protection and information regulations apply to much of the economy, and are far from rising to the level of the collectivization that controlled the result in *Glickman*. Nor does the Commission attempt to show mushrooms are not similarly regulated, and, being food products that can poison people if not properly grown, harvested, labeled and sold, they probably are.**

**...**

**We of course intimate no views on economic policy. The distinction between *Glickman* and *United Foods* does not turn of evaluation of the merits of competing policy concerns. The grape growers do not operate under the 1937 statute [AMAA] that substituted 'collective action' for the 'aggregate of consequences of independent competitive choices' and expressly exempted them from the antitrust laws, as did the ... producers in *Glickman* ... Rather, the business practices by the instant growers are governed by a statute similar to the one at issue in *United Foods*, so they are entitled to First Amendment protections against state compulsion to fund generic advertising.**

*Id.*, at 899-900.

The *Delano Farms* decision accepted as true allegations of the complaint about the table grape industry and Commission that have been amplified or disproved by the evidentiary submissions in this case.

        **4.**  <u>Law of the Case</u>.

160

Plaintiffs contend that the Ninth Circuit's ruling in *Delano Farms v. California Table Grape Commission* controls resolution of this issue as it is "the law of the case," arguing that "the Ninth Circuit - *in this very case* - stated that *United Foods* - NOT *GLICKMAN* - control [sic] the outcome of this case."

"The law of the case doctrine is a judicial invention designed to aid in the efficient operation of court affairs." *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir.1990).  Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court or a higher court in the identical case.  *Id*.  "For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition."  *United States v. Lummi Indians*, 235 F.3d 443, 452 (9th Cir.2000).  Application of the doctrine is discretionary.  *Id.*  A court abuses its discretion in applying the law of the case doctrine only if (1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result.  *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir.1998).

In the Order which denied Plaintiffs' motion for judgment on the pleadings on this very issue, the trial court ruled in pertinent part:

> The Appeals Court, in *Delano Farms*, could

161

decide no more than the issue before it,
whether the amended complaint failed to state
a claim under Rule 12(b)(6).  The Appeals
Court '[took] all of the allegations of
material fact stated in the complaint as true
and construed them in the light most
favorable to the nonmoving party [*i.e.,*
Plaintiffs].'  On a motion attacking the
sufficiency of the complaint, the Circuit
Court could not make evidentiary findings
resolving disputed questions of fact or
credibility.  Rather, it construed the
complaint's factual assertions in the light
most favorable to Plaintiffs, the non-moving
parties.  The Ninth Circuit relied upon the
following facts, which are disputed by
Defendant's answer: that (1) the 1937 [sic]
statute created a grape 'scheme [that] does
not collectivize the industry;' (2) about 90%
of the assessment money is spent on generic
promotional activities;' (3) 'there is no
antitrust exemption' for the Commission
present in the 1937 [sic] statute; and (4)
that the Plaintiffs sell 'brand name grapes
and have an interest in promoting their
brands rather than and to some extent at the
expense of grapes in general.'  *Delano Farms*,
318 F.3d at 899.  Accepting these facts as
true, the Court of Appeal found the complaint
stated a First Amendment claim based on
*United Foods*, distinguished from *Glickman*.
The operative effect of this ruling reverses
the dismissal and reinstate [sic] the amended
complaint.  The Appeals Court did not grant
judgment to Plaintiffs, nor did it remand the
case to the district court with instructions
to do so.  In determining the meaning of an
appellate decision, the trial court must look
to the Appeals Court's dispositive language
and any directions to the lower court.  Here,
the judgment of dismissal was reversed and
the case was remanded for further
proceedings.  No direction is provided to the
trial court.

Plaintiffs' motion for judgment on the
pleadings, assumes the Court of Appeals
finally decided the case and that there are
no disputed issues of fact or law raised by
the amended complaint.  Under Rule 12(c)
standards, for Plaintiffs to prevail, all the

162

allegations of the Defendant's answers must be accepted as true and inferences drawn against the moving party.  The moving party is entitled to judgment as a matter of law only when the facts asserted do not constitute a defense as a matter of law and there are no factual issues to be tried.  The facts upon which the Plaintiff's [sic] motion is based, though assumed to be true for purpose of appellate review, are disputed in the trial court.  There has been no evidentiary resolution by a hearing or trial.  The Appeals Court assumed Plaintiffs' factual allegations to be true, that the Defendant's table grape program is more like the mushroom program in *United Foods* than the tree fruit program in *Glickman*.  However, Defendant's answer alleges, *inter alia*, that the California regulatory scheme has collectivized the table grape industry; that competition has been expressly displaced by the Cartwright Act (state antitrust law) exemption; that less than 70% of the assessments are for generic speech purposes; and that there are industry programs for which assessments on industry members can lawfully be made, such as crop-quality research, and non-speech marketing activities, opening foreign markets.  Plaintiffs dispute all these allegations.  These disputes cannot be resolved without an evidentiary hearing.

...

The extent of California table grape collectivization is the most important factor in determining whether the table grape program more closely resembles the tree fruit program or the mushroom program.  Collectivization exists when 'mandatory assessments that fund[] a broad regulatory apparatus that include[s], as one of its many programs, promotional advertising.  *Mich. Port [sic] Producers Ass'n v. Beneman* [sic]. No. 02-2337/02-2338, 2003 U.S.App. LEXIS 21358, at *13 (6th Cir. Oct. 22, 2003).  Whether the Defendant's activities meet *Glickman*'s 'comprehensive' or 'collectivization' test, or are ancillary to the advertising and are governed by *United*

163

*Foods*, present unresolved factual disputes.
Plaintiffs assert, but have not yet proven,
that they sell their grapes under a 'brand
name' or 'under the high end labels' and do
not benefit from generic advertising.
Defendant denies this allegation and alleges
Plaintiffs do 'benefit' from the Commission's
programs ... This dispute cannot be resolved
as a matter of law without evidence.  If the
Commission can show that its 'generic
advertising assessments were "ancillary to a
more comprehensive program restricting
marketing autonomy"' that benefitted the
Plaintiffs, the table grape program may be
lawful under *Glickman*.  *Delano*, 318 F.3d at
898.

The parties must be allowed to develop a full
factual record to permit fair and orderly
resolution of this dispute over the
regulation of California table grapes by the
Commission.  The Supreme Court's decision in
*United Foods* leaves open two questions of
law, (1) collectivization and displacement of
competition, and (2) whether non-speech
program activities benefit Plaintiffs.

Plaintiffs' argument that the "law of the case" doctrine
makes *United Foods* binding, irrespective of the facts, is without
merit and has been previously rejected in the ruling on the
motion for judgment on the pleadings.

    5.   <u>Plaintiffs' Factual Position that *United Foods*</u>
<u>Applies</u>.

Plaintiffs emphasize the following undisputed facts in
contending that *United Foods* applies:

<u>PUF No. 38</u>: The Table Grape Commission has no authority to
set the minimum prices nor the maximum prices that shippers pay
to producers.  A shipper can sell its grapes for whatever price
it wants and there are no state or federal regulations that

164

control or regulate price.

Although the Commission contends that whether it has the authority to set minimum prices is a legal conclusion to which it need not respond, the Commission admits this fact with the clarification "that state and federal regulations do not impose any *direct* price controls on table grapes.  This fact is undisputed.

PUF No. 39: The state does not set any federal or state quantity restrictions on grapes to be produced or shipped in the San Joaquin Valley.  There is no pro-rate for California table grapes.  There are no federal marketing orders for table grapes produced in the San Joaquin Valley.  The Ketchum Act has no quality, maturity or packaging requirements.

The Commission admits "with the clarification that there are no *direct* quantity restrictions on grape production and shipment", but denies this fact "insofar as State maturity and quality regulations and federal export standards have the effect of limiting the quantity of table grapes produced and shipped in the United States."  The Commission's denial relies on paragraphs 3-5 and 7 of the Declaration of James Pandol, a California table grape grower and marketer based in Delano, who avers in pertinent part:

> 2.  I am a third-generation California table grape grower.  I have spent most of my career as vice president of marketing for my family's table grape business.  I was previously the president and majority shareholder of a fresh mushroom growing and shipping business based in California.

3.   Table grapes shipped in California are subject to a number of state regulations, including regulations imposing minimum maturity requirements, minimum quality standards, and packaging and labeling requirements.  California table grapes exported abroad are also subject to federal quality, maturity, and labeling regulations. All of these regulations impact the way I and other California table grape grower/shippers do business.  The regulations limit what we can and cannot do by imposing standards and other requirements that we all have to meet if we want to ship our fruit.  The regulations require all California table grape growers and shippers to follow the same rules in order to maintain demand for California table grapes.  Almost all of these regulations, in fact, were developed with input from the table grape industry.

4.   The California maturity regulations require growers to leave grapes on the vine long enough to make sure that the sugar content of the grapes reaches a required minimum level.  The regulations prevent growers from attempting to take advantage of high early market prices by selling immature, sour grapes, which would turn off customers and weaken demand for all California grapes. By prohibiting growers from picking and selling grapes too early, the regulations help the entire industry maintain demand for California grapes.  In the absence of a mandatory rule requiring all growers to market only mature fruit, there would likely be a small group of growers that would try to ship their fruit early (when prices are high) even though doing so hurts all of the growers who ship their grapes later, after the grapes have matured.

5.   The California quality regulations also have the effect of limiting sales of California grapes for the collective benefit of all California growers.  The regulations prohibit the shipment of table grapes that are damaged due to insects, mold, decay, freezing, sunburn, and other conditions.  By keeping low-quality grapes off the market, the California regulations ensure that

166

overall consumer demand for California table grapes is not adversely affected by the self-interested decisions of individual grower/shippers to try to sell poor quality fruit.

...

7. Finally, federal regulations governing exports of California table grapes limit the quantity and quality of California grapes exported.  Depending upon the country to which a shipment is destined, federal regulations require the grapes shipped to meet certain USDA grade quality standards. The industry pushed for development of these standards because without them some California table grape growers would likely export lower quality fruit, and it does not take much poor quality fruit to decrease demand in a market.  By limiting the export of California table grapes to only those grapes that meet certain requirements, federal regulations benefit the entire industry by preventing shippers from taking actions that might be profitable to them in the short-run but that would hurt the entire industry in the long-run.

Plaintiffs object to Mr. Pandol's declaration, contending it "lacks foundation, is speculative, it is hearsay and conclusory as to what 'other grower/shippers' their business [sic]" and because it is irrelevant.

Plaintiffs' objections are sustained to the extent that the rules (state and federal) are the best evidence of their content. Mr. Padol may explain his understanding of how the rules apply to grape growers.  The objections are sustained to how the rules and regulations are interpreted by others, but Mr. Pandol's opinions are admissible to describe the effect the rules have on his growing, harvesting, shipping and marketing practices.

167

1    **PUF No. 40**: There is no federal or state legislation, nor

2    none in the Ketchum Act, that restricts the quantity of table

3    grapes that can be sold.  There is no law that forbids a shipper

4    from dumping table grapes at a cheap price on the market.  There

5    are no federal or state regulations regarding price limitations

6    for which a shipper can sell table grapes.  The Table Grape

7    Commission does not take title to grapes nor does the Table Grape

8    Commission act as a cooperative in selling table grapes.

9         The Commission admits "with the clarification that antitrust

10   and other laws may 'forbid[] a shipper from dumping table grapes

11   at a cheap price on the market' and the further clarification

12   that there are no *direct* quantity restrictions on grape sales or

13   *direct* price controls for table grapes."  Again relying on Mr.

14   Pandol's declaration, the Commission denies the facts "insofar as

15   "state maturity and quality regulations and federal export

16   standards have the effect of limiting the quantity of table

17   grapes sold."

18   **PUF No. 41**: The only regulation that the Ketchum Act has

19   over the shipper is that the shipper is required to file reports

20   regarding the sales of table grapes and to pay the assessments.

21        The Commission admits that the shippers are required to file

22   reports and to pay assessments pursuant to the Ketchum Act, but

23   denies "that they are the only regulations that could be imposed

24   pursuant to the Ketchum Act."  This fact is disputed. [OWW ???]

25   **PUF No. 42**: The Commission has no authority to impose volume

26   control on the production or shipment of table grapes.  There is

168

no authority to set minimum prices for what table grapes can be sold.

The Commission asserts that "[t]his is a legal contention to which the Commission need not respond."  The Commission's opposition asserts that it has not moved for summary judgment on the "collectivization" issue, that there are issues of fact that preclude summary adjudication for Plaintiffs that *United Foods* rather than *Glickman* applies.

The Commission refers to state and federal regulations imposing restrictions on the growing and shipping of table grapes.  The state regulations call for table grapes to be free from serious damage due to insects, mold, decay, freezing, and sunburn, Cal.Code.Regs. tit. 3 §§ 1436.18, 1436.24, define what constitutes "serious damage" in table grapes, *id.*, § 1436.19, and require a specific percentage of grapes in a container or bulk lot to be free from serious damage, *id.*, § 1436.20.  Additional regulations impose minimum maturity requirements, *id.,* §§ 1436.12, 1436.17, 1436.18, specifying the sampling and testing methods for maturity, *id.*, §§ 1370.16, 1436.3, 1436.5, and set testing equipment standards, *id.*, §§ 1436.6, 1437.7.  Other regulations prohibit mislabeling of varieties, proscribe the use of particular variety designations, *id.*, §§ 1436.30, 1436.31, 1436.42, and provide detailed specifications of what containers may be used, how they must be packed, how they must be closed, *id.*, §§ 1436.37, 1436.38, 1380.19, and further requirements for grapes being shipped out of state, *id.*, § 1436.

Federal regulations define grades for table grapes, 7 C.F.R. §§ 51.1880-51.913, set the minimum standards for each grade, including requirements for berry size, maturity and firmness, bunch and stem characteristics, prohibited defects, and tolerances.  Additional regulations impose quality, maturity and labeling requirements for grapes exported to foreign countries and require the shipper to obtain a certificate from the USDA that the grapes meet quality and labeling requirements imposed by the regulations.  7 C.F.R. §§ 35.11, 591.  Federal statutory provisions and regulations govern fees for inspection and certification services, 7 U.S.C. § 595, when inspections must occur, 7 C.F.R. § 35.12, and the process for obtaining inspections and certifications, 7 C.F.R. §§ 51.-4-51.61.  Moreover, a federal marketing order governs grapes grown in southeastern California.

The Commission maintains that these state and federal laws and regulations have the "practical effect" of collectivizing the California table grape industry, contending that, in a number of respects, independent business activity has been displaced by collective action.  The Commission asserts that, to understand this "practical effect", the market for table grapes and the structure of the California table grape industry must be understood.

The Commission refers to the Undisputed Stipulated Facts that table grapes are not "branded" in the retail market and that consumers view table grapes as a commodity; that retailers do not

170

typically indicate the name of the grower/shipper on store
signage displaying grapes; and that, most of the time, grapes'
packaging does not reveal the grower/shippers' name.  The
Commission also submits evidence that the majority of consumers
do not know the names of the grower/shippers; nor the labels
under which the grower/shippers sell their grapes to wholesalers
and retailers;  and do not shop for grapes in the retail market
with brand names in mind.  Further evidence shows Plaintiffs'
grapes are not branded at the consumer level and expert testimony
based on a survey of primary grocery shoppers indicates that
consumers do not know the Plaintiffs' "brand" names.

    All of this evidence is said to demonstrate that consumers
do not know the brands or labels of individual grape growers,
"the fortunes of California table grape producers are
inextricably bound together":

> Where consumers do not differentiate between
> table grapes from different producers, each
> California table grape grower is dependent
> upon other growers not to sell poor quality
> grapes that will weaken demand across the
> board.  In this environment, the maturity and
> quality regulations that govern the table
> grape industry are not mere 'consumer
> protection' regulations but are, more
> fundamentally, restrictions that table grape
> growers have urged the state and federal
> government to adopt in order to protect the
> industry and that serve to collectivize the
> industry.

This position is based primarily on the Pandol declaration.

    Further evidence that the Ketchum Act collectivizes the
table grape industry is found in the breadth of the Commission's

171

work, which reaches well beyond advertising and displaces
individual firm activities in favor of collective activities.
This includes the Commission's work to develop and patent better
varieties of table grapes; to discover and publicize the health
benefits of table grapes; to initiate better cultural practices;
to open new markets; and to improve grape storage and handling.
The Commission undertakes these actions on behalf of all
California table grape growers for their collective benefit.  The
Commission describes its patenting activities of new grape
varieties, which are made available to growers on certain terms.
The Commission develops protocols for shipping table grapes to
various foreign countries, has a constraining effect on the table
grape industry, which further serves to collectivize the table
grape industry.

From the totality of the circumstances:  "[t]he practical
effect of the regulatory regime governing the table grape
industry stands in stark contrast to the regime governing the
mushroom industry at issue in *United Foods*."  The Commission
relies on Mr. Pandol's declaration:

> 8.  In contrast to California table grapes,
> shipments of fresh mushrooms are subject to
> exceedingly little government regulation.
> There are no federal or California quality
> restrictions, maturity standards, size
> standards, grade standards, or packaging
> requirements applicable specifically to
> mushrooms.  The principal regulation
> affecting the marketing of mushrooms is the
> assessment paid to support the Mushroom
> Council.  Because there are no maturity,
> size, or packaging regulations applicable to
> mushrooms, individual mushroom shippers

<blockquote>
attempt to differentiate their mushrooms by
varying maturity, size, or packaging.  The
absence of these regulations have made fresh
mushrooms less of a 'commodity' product than
other regulated products, like table grapes.
</blockquote>

The Commission notes that the Supreme Court observed in *United Foods* that "[b]eyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions."  No federal regulations for mushroom grade standards have been issued.  In *United Foods,* the government was only able to refer to the federal statute establishing the Mushroom Council, which authorized the Mushroom Council to develop voluntary standards, and to the AMAA, pursuant to which a marketing order governing mushrooms could have been, but was not promulgated.  Almost all of the Mushroom Council's activities were devoted to generic advertising; therefore, the Mushroom Council could not have displaced any significant aspect of independent business activity, comparable to the Commission's non-advertising activities in the table grape industry.

Plaintiffs' argument that the California table grape industry is not collectivized, rests largely on the fact that state and federal regulations do not directly regulate the price and volume of sales.  The Commission counters that the absence of direct price and quantity regulation is not determinative, as the marketing order found constitutional in *Glickman* did not contain direct price or quantity restrictions and that, nonetheless, the

Supreme Court concluded that California tree fruit was marketed "pursuant to detailed marketing orders that have displaced many aspects of independent business activity."  From this, the Commission argues, Plaintiffs' motion for summary adjudication that *United Foods* controls, rather than *Glickman*, should be denied.

Plaintiffs respond that the regulations and statutes now relied on by the Commission were presented to the Ninth Circuit in *Delano Farms*, and the Ninth Circuit ruled that "[s]uch consumer protection and information regulations apply to much of the economy, and are far from rising to the level of the collectivization that controlled the result in *Glickman*." Plaintiffs object to Mr. Pandol's averments as uninformed and irrelevant.  Plaintiffs point to the Supreme Court's note in *Johanns*, *supra*, 544 U.S. at 558 n.3:

> In *United Foods*, the Court distinguished (and the dissent relied on) *Glickman* ..., which upheld the use of mandatory assessments to fund generic advertising promoting California tree fruit.  In *Glickman*, as in *United Foods*, the Government did not argue that the advertising was permissible government speech ... Rather, the Government contended, and we agreed, that compelled support for generic advertising was legitimately part of the Government's 'collectivist' centralization of the market for tree fruit ... Here, as in *United Foods,* 'there is no broader regulatory system in place' that collectivizes aspects of the beef market unrelated to speech, so *Glickman* is not controlling.

Plaintiffs emphasize that Ketchum Act has no maturity, quality, or packaging requirements and that producers of table grapes are

not regulated by state or federal law concerning price, quantity, volume, or shipping quotas.  Plaintiffs contend that as with the mushroom growers in *United Foods*, table grape producers "are not forced to associate as a group which makes cooperative decisions."  533 U.S. at 413.

Plaintiffs discount the Commission's position that table grapes are not branded at the consumer level:

> It is not even the beginning of [the] turning point as to whether or not the consumers observe the brand of table grapes.  The consumers cannot buy any table grapes unless the retailers buy the branded grapes from the shippers like Plaintiffs.  But in any event, it is not a collectivization of the industry, whether the consumers see the brand or not.

With regard to the Commission's evidence and argument that its programs and activities reach well beyond advertising, Plaintiffs rejoin that all of those "demand-enhancing" activities, i.e., research, trade management, issues management, education and outreach, domestic marketing, are "<u>all speech related programs</u>, they are not the regulatory programs that have collectivized the industry or required the compelled association for non-speech related regulatory programs that *United Foods* ... would countenance."  Plaintiffs rely on a district court decision, *In re Washington State Apple Advertising Com'n, supra*, 257 F.Supp.2d at 1302:[6]

Like *United Foods*, the Apple Commission's

---

[6]Plaintiffs cite *Pork Producers Ass'n., Inc. v. Veneman, supra*, 348 F.3d at 163.  For the reasons stated above, this case no longer constitutes valid authority.

essential purpose is the advertisements and other marketing which it produces.  In the years 1998-99 through 2001-02, the Commission spent between 62.5% of 85% of its budget expenditures were spent on 'marketing' activities ... Those same spreadsheets reflect that while not all of that budget is allocated to 'consumer advertising,' the vast majority of 'marketing' expenditures fits within four categories: (1) publications; (2) trade advertising; (3) consumer advertising (4) promotions.  The Court finds that these constitute 'speech' for the purposes of analysis.  Plaintiffs cite *Pelts & Skins, LLC v. Landreneau*, *supra*, 365 F.3d at 434:
We recognize that, unlike the assessments at issue in *United Foods, Cochran,* and *Delano Farms,* a majority of the alligator-related assessments fund programs other than generic marketing ... In each of the past several years, the Council has spent approximately 15% of the Resource Fund on generic marketing and the remainder on research and law enforcement.  This distinction in the percentage of fees that go to generic marketing does not support applying *Glickman* to this case.  The key element in *Glickman* - a highly collectivized marketing association - is still absent.  The common thread uniting *Abood, Keller, Glickman*, and *United Foods* is that compelled subsidization of speech is permissible when individuals have been bound into a collective association ... The fees imposed here, though used for more than generic marketing, represent a collective association only in the loosest sense of that term.

Facially admissible evidence establishes greater industry collectivization than Plaintiffs' acknowledge.  Plaintiffs point to every minute fact describing the Commission's activities and characterize each as speech.  The undisputed facts show that more than 60% of the Commission's activities do not involve speech or expressive activity.

Plaintiffs' motion for partial summary judgment that *United*

176

*Foods* rather than *Glickman* applies to the Commission's statutory program is DENIED.

    I.   *ABOOD*'S "GERMANENESS" TEST.

    If *Johanns* does not apply, the Commission moves for summary judgment that the Ketchum Act is constitutional under the "germaneness" test articulated in *Abood v. Detroit Board of Education*, *supra*, 431 U.S. 209.  The Commission asserts that, even if the Ketchum Act is found to implicate the First Amendment, the Ketchum Act is constitutional under the "germaneness" test because the Commission's "advertising is germane to a broader program that serves important governmental interests and that is not related solely to speech."

        1.  Applicability of Test.

    The Commission argues that *Glickman* and *United Foods* "make clear that compelled funding of generic advertising undertaken by a commodity research and promotion program is constitutional under the *Abood* germaneness test if the advertising is germane to a broader program that serves an important governmental interest and that is broader than the advertising itself."  Plaintiffs respond that the Commission "erroneously conflates the *Abood* 'germaneness' test with *Glickman*, when the analysis must be under *United Foods*."  Plaintiffs contend:

                The Commission substantially errs in claiming that its advertising program is germane to a 'broader program that serves important governmental interests and that is not solely related to speech.'  First of all, '*solely*' is not to be found in *United Foods* nor in *Delano Farms*; instead those two cases held

> when the program is not a collectivized
> regulatory program, and when the principle
> object of the program is speech the program
> is unconstitutional.

The Commission rejoins that Plaintiffs misread *Glickman*.
First, the Supreme Court concluded that the generic advertising
program at issue in *Glickman* did not implicate the First
Amendment, 521 U.S. at 469-470, 474-476, but that, even if the
marketing orders did implicate the First Amendment, they were
constitutional under *Abood*'s "germaneness" test, 521 U.S at 473.
Second, *United Foods* held that the First Amendment was implicated
because the mushroom industry was not "collectivized" as the tree
fruit industry was in *Glickman*.  The Supreme Court then
considered the mushroom program under the *Abood* test, and
concluded that "[t]he cooperative marketing structure relied upon
by the majority of the Court in *Glickman* to sustain an ancillary
assessment finds no corollary here; the expression respondent is
required to support is not germane to a purpose related to an
association independent from the speech itself; and the rationale
of *Abood* extends to the party who objects to the compelled
support for this speech."  533 U.S. at 415.  The Commission
replies:

> Plaintiffs' contention that the challenged
> speech must be germane to a regulatory
> scheme, not just a broader program of
> activity, is flatly inconsistent with *Abood*
> itself.  In *Abood*, the Court did not consider
> whether the challenged speech was germane to
> *regulations* of the sort at issue in
> [*Glickman*] - regulations that constrain the
> entities being required to fund the
> challenged speech.  Rather, the Court

considered whether the challenged speech was germane to another union *activity*, collective bargaining. *See* 431 U.S. at 235-236. Similarly, in *United Foods*, the Court held that *Abood*'s germaneness test could not be satisfied because the test requires 'an associational purpose' distinct from the challenged speech of a program – the challenged speech cannot be 'germane to itself.' 533 U.S. at 413, 415. Nothing about this rationale requires the broader program to which the challenged speech must be germane to price, quantity, quality, or packaging regulations [sic].

The Commission's interpretation of the *Abood* test is correct as the Commission's purpose is economic enhancement of the table grape industry, consumer protection from enhanced research and development of new varieties of grapes, and facilitating the entry into and expansion of domestic and international markets for table grapes.

2.  <u>Satisfaction of Germaneness Test</u>.

The Commission argues that the Ketchum Act is constitutional under the germaneness test because: (1) it created a broad industry program, of which advertising is just one part, that serves California's important legislatively declared economic interest in expanding demand for California table grapes; and (2) the Commission's advertising is germane to that broader program and interest.

a.  <u>Broad Program</u>.

The Commission suggests that the Ketchum Act serves primarily an economic purpose of expanding demand for California table grapes worldwide, thereby strengthening California's

179

economy and improving the health and welfare of its citizens.
The Commission contends that the Ketchum Act's purpose is related
principally to economic public welfare, not speech, and that
California's interests in strengthening its economy and improving
the welfare and health of its citizens are indisputably
important.

To support its contention that the program enacted by the
Ketchum Act is much broader than advertising, the Commission
references Cal.Food & Agric. Code § 65572, which empowers the
Commission in pertinent part:

> (h) To promote the sale of fresh grapes by
> advertising and other similar means for the
> purpose of maintaining and expanding present
> markets and creating new and larger
> intrastate, interstate and foreign markets
> for fresh grapes; to educate and instruct the
> public with respect to fresh grapes; and the
> uses and times to use the several varieties,
> and the healthful properties and dietetic
> value of fresh grapes.
>
> (i) In the discretion of the commission, to
> educate and instruct the wholesale and retail
> trade with respect to proper methods of
> handling and selling fresh grapes; to arrange
> for the performance of dealer service work
> providing display and other promotional
> materials; to make market surveys and
> analyses; and to present facts to and
> negotiate with state, federal and foreign
> agencies on matters which affect the
> marketing and distribution of fresh grapes;
> and to undertake any other similar activities
> which the commission may determine
> appropriate for the maintenance and expansion
> of present markets and the creation of new
> and larger markets for fresh grapes.
>
> (j) In the discretion of the commission, to
> make in the name of the commission contracts
> to render service in formulating and

conducting plans and programs, and such other
contracts or agreements as the commission may
deem necessary for the promotion and sale of
fresh grapes.

(k) In the discretion of the commission, to
conduct, and contract with others to conduct,
scientific research, including the study,
analysis, dissemination and accumulation of
information obtained from such research or
elsewhere respecting the marketing and
distribution of fresh grapes, the production,
storage, refrigeration, inspection and
transportation thereof, to develop and
discover the dietetic value of fresh grapes
and to develop and expand markets, and to
improve cultural practices and product
handling so that the various varieties may be
placed in the hands of the ultimate consumer
in the best possible condition.   In
connection with such research, the commission
shall have the power to accept contributions
of, or to match, private, state or federal
funds that may be available for these
purposes, and to employ or make contributions
of funds to other persons or state or federal
agencies conducting such research.

...

(m) In the discretion of the commission, to
publish and distribute without charge a
bulletin or other communication for
dissemination of information relating to the
fresh grape industry to producers and
shippers.

Referring to evidence submitted in support of its motion for

summary judgment, the Commission describes the various programs

it has effectuated, *i.e.,* research, trade management, issues

management, and education and outreach.

As to research, the Commission cites the Undisputed

Stipulated Facts that it directs and oversees the funding, and

provides direction in the implementation of viticulture research

181

performed by scientists from research institutions such as the University of California, California State University, and the USDA, designed to increase grower efficiency and improve grape production and fruit quality, and resulting in creation of new varieties that account for approximately 45% of the California table grapes shipped to market.  Evidence demonstrates additional research is conducted related to category management and consumer preference, which provides retailers with information about the value of selling California table grapes and how to increase sales, and with consumer research and data showing how an individual retailer's sales of table grapes compare to sales by comparable retailers.  The Commission also conducts research  on international topics, such as production studies of foreign countries, transhipments, and consumer research.  The Commission conducts a phytonutrient research program that analyzes the health benefits of table grapes, and has discovered links between the compounds in table grapes and the fighting or prevention of cancer, heart disease and degenerative nerve damage.

Plaintiffs respond that the research conducted by the Commission is less than 10% of its total budget based on the Commission's budgets for crop years 1994-1995 to the present. Referring to Section 65572(k), Plaintiffs assert that the Commission is required to disseminate its research results and does so.  Plaintiffs argue that research "is akin to gathering the news and gathering the news is only relevant if the information is disseminated and all is in the process of 'speech'

or the press likewise protected by the First Amendment."  In so arguing, Plaintiffs cite *Keyishian v. Board of Regents of University of State of N.Y.*, 385 U.S. 589, 603 (1967)("[Academic] freedom is ... a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957)("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die"); *CBS, Inc. v. Smith,*, 681 F.Supp. 794, 802-803 (S.D.Fla.1988)("The gathering of news of political consequence is a necessary corollary to the freedom to report about politics and government ... Simply put, newsgathering is a basic right protected by the First Amendment; 'without some protection for seeking out the news, freedom of the press could be eviscerated.'").  Plaintiffs argue that research is "worthless" without dissemination.  Further, the Commission's research activities dealing with category management, consumer preference, and the health benefits of table grapes all "involve essential elements of speech because the information is provided to producers, shippers and ... retailers."

The Commission responds that its 2004-2005 research activities accounted for 22% of its total expenditures and that Plaintiffs unsupported conclusion that research is always less than 10% of the Commission's budget is wrong in the face of the undisputed evidence submitted by the Commission.  The Commission asserts that its research activities are not "speech", citing

*United States v. Frame*, 885 F.2d 1119, 1131 (3d Cir.), *cert. denied*, 493 U.S. 1094 (1989)("[T]he aspect of the Beef Promotion Act which imposes assessments for research purposes qualifies as neither 'expressive' nor 'intimate' association, and therefore does not implicate Frame's first amendment rights").  The Commission argues that "[e]ven if Plaintiffs were right that the dissemination of research results implicates the First Amendment - which is not the case - the research itself nevertheless would not implicate the 'compelled subsidy' doctrine.

For trade management, the Commission points to evidence of its efforts to increase sales of table grapes to domestic and international wholesalers.  Domestically, the Commission works with retailers to increase the quantity of table grapes sold during the season; to increase the square footage of table grape display space and the number of varieties displayed; to improve the effectiveness of these displays; and to increase the number and effectiveness of table grape advertisements run by the retailers, including providing training to retailers' produce staff for handling, storing and displaying table grapes.  The Commission enters into promotional incentive agreements with wholesalers and retailers by which the Commission agrees to provide goods and services to a retailer if the retailer meets a target for total grape sales volume.  The Commission encourages foodservice providers to increase their purchases of table grapes by developing recipes that it sends to foodservice providers; by contacting editors and writers of foodservice publications; and

by retaining a registered dietician as a consultant.

In international trade management activities, the Commission has  fifteen overseas representatives, who work directly with overseas retailers, importers and wholesalers, to provide grape storage, handling, and display information and monitor local markets in order to provide information that is sent twice a month during the California season to California table grape grower/shippers.  The overseas' representatives also organize activities such as in-store grape tastings and cooking demonstrations, and provide financial awards to retailers for grape promotional activities.

Plaintiffs argue that all the Commission's trade management are "all speech":

> The way to discern whether this is speech, is
> to look at it from the standpoint of
> Plaintiffs or any shippers or any service
> providers or any retailer engaging in the
> same conduct; that is what the Commission
> does, if done by a private person, would
> absolutely be protected by the First
> Amendment.  Since it would be protected by
> the First Amendment if private persons (such
> as Plaintiffs) engaged in that conduct, the
> First Amendment bars Plaintiffs being
> compelled to fund others doing it.

The Commission replies that its trade management activities "may involve people speaking, but none of it consists of public dissemination of messages to which Plaintiffs object."  The Commission is correct as the purpose of trade management is to assure enhanced and effective world-wide distribution, compliance with regulatory requirements of world-wide markets to assure

access and participation, and remedial actions to address

quarantine, embargos, and other governmental impediments to

continued access into and participation in new and existing

markets.

The Commission refers issues management, which entails the

Commission's work with interested parties and decisionmakers to

keep trade flowing in the United States and internationally and

to respond to issues that could impair the distribution of

California table grapes and the economic strength of the

industry.  The Commission asserts that a significant portion of

this work is related to gaining and maintaining access to

international markets.  The Commission's evidence shows that it

sponsored research and worked with the USDA and the Office of the

U.S. Trade Representative (USTR) to negotiate and implement a

shipping protocol with Australia that called for grapes to be

inspected and fumigated; that it has helped to open markets for

California table grapes in China and India; that it helped to

keep the market in the United Kingdom open when U.K. retailers

threatened to stop importation of California table grapes in 2002

following the discovery of a black widow spider in a shipment;

and that it helped reverse a 2004 announcement by Thailand

effectively banning three chemical by setting a zero tolerance on

them, preventing the importation of California table grapes.  The

Commission also refers to evidence that it works with USDA and

USTR to lower tariff and non-tariff barriers that impede the

importation of California table grapes and that it has opened or

improved access to California table grapes in a number of countries or regions.

The Commission describes its issue management work related to pesticides, pest exclusion, production, packaging, distribution and quarantine, such as monitoring chemical Maximum Residue Level restrictions to determine whether the MRL affects California table grapes, whether the proposed MRL is lower than U.S. or international standards, and whether the proposed MRL will disrupt shipments of California table grapes to the country in question.  The Commission explains its patenting and licensing program pursuant to which the Commission has developed new varieties jointly with the USDA and licensed newly patented varieties, applied for intellectual property protection abroad, set the terms on which new varieties are available abroad, and enforced foreign intellectual property rights obtained.

Plaintiffs argue that all of the categories of activities identified as issues management, if done by a private person, would be fully protected by the First Amendment and "all fall within the category of 'speech' subject to *United Foods* and the *Delano Farms* Ninth Circuit decision."  This characterization is overbroad and unfair.  The activities described may require communication, but not to advertise or promote, rather to address scientific and regulatory concerns.

On the subject of education and outreach, the Commission's evidence shows that it provides education, training, analysis, and general information relating to California table grapes to

187

retailers, wholesales, foodservice providers, grower/shippers, researchers, consumers, teachers, editors, authors, doctors and nutritionists.

Plaintiffs interpose the same argument, "that since neither the State nor Congress could prohibit Plaintiff [sic] from doing the same activity because it involves speech, it falls within the umbrella of *United Foods* ... that precludes compelled funding of the same activities."

The Commission responds that its evidence establishes that of its broad range of activities, only one is advertising, and the others enhance demand for California table grapes, strengthen California's economy, and improve the health and welfare of its citizens.  For the 2004-2005 fiscal year, the four categories, i.e., research, trade management, issues management, and education and outreach, accounted for the following percentages of the Commission's expenditures of assessments: 22% on research, 24% on trade management, 18% on issues management, and 10% on education and outreach.  From this evidence it is evident that advertising has never been "almost all" of the Commission's program, in contrast to *United Foods*, *supra*, 533 U.S. at 412, where "almost all of the funds collected under the mandatory assessments are for one purpose: generic advertising".  The Commission contends that it is "just the sort of broad economic program to which *Abood's* germaneness analysis applies."

Plaintiffs cite *Pelts & Skins, LLC v. Landreneau*, *supra*, 365 F.3d at 434 and *Michigan Pork Producers Ass'n., Inc. v. Veneman*,

188

*supra*, 348 F.3d at 163 to argue that the Commission's research, trade management, issues management and education and outreach activities are "all speech related programs, not the regulatory programs that have collectivized the industry or required the compelled association for non-speech related regulatory programs that *United Foods* ... would countenance." As stated above, these Circuit Court opinions no longer constitute valid authority, but more importantly Plaintiffs' characterization of every Commission activity as speech is nothing mor than argumentative legal conclusions, not supported by the facts.

Plaintiff also cite *In re Washington State Apple Advertising Com'n, supra*, 257 F.Supp.2d at 1302:

> Like *United Foods*, the Apple Commission's essential purpose is the advertisements and other marketing which it produces. In the years 1998-99 through 2001-02, the Commission spent between 62.5% of 85% of its budget expenditures were spent on 'marketing' activities ... Those same spreadsheets reflect that while not all of that budget is allocated to 'consumer advertising,' the vast majority of 'marketing' expenditures fits within four categories: (1) publications; (2) trade advertising; (3) consumer advertising (4) promotions. The Court finds that these constitute 'speech' for the purposes of analysis.

The Commission argues the District Court opinion is unsupported by analysis and strays "from the proposition that a 'compelled subsidy' claims looks only to any publically disseminated message with which the plaintiffs disagree." The Commission cites *Johanns*, 544 U.S. at 557 ("[t]he reasoning of these compelled-speech cases has been carried over to certain

instances in which individuals are compelled not to speak, but to subsidize a private message with which they disagree"), and interprets the Supreme Court holding that the First Amendment applies only in this context if the plaintiff actually objects to a message he is compelled to fund and it is not enough that a party object to funding an organization on the ground that free competition is preferable to socialism or that the organization does not use the funds effectively.  The Commission argues that Plaintiffs do not object to any message conveyed by the overwhelming majority of the Commission's work nor do many of the Commission's activities convey any particular message to which Plaintiffs might possibly object.  The Commission refers to *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), that upheld a federal statute which required the Department of Defense to deny federal funding of colleges and universities that prohibited military representatives access to and assistance for recruiting purposes.  A portion of the opinion addressed the argument that the statute constituted "compelled speech" because recruiting assistants provided by the schools often sent e-mails or posted notices on bulletin boards: "Compelling a law school that sends scheduling e-mails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected by *Barnette* and *Wooley* to suggest that it is."  547 U.S. at 62.

1      The Commission also offers *Lehnert v. Ferris Faculty Ass'n*,

2  500 U.S. 507, 529 (1991)("[P]ublic speech in support of the

3  teaching profession generally is not sufficiently related to the

4  union's collective bargaining functions to justify compelling

5  dissenting employees to support it), as establishing that

6  compelled funding of speech implicates the First Amendment only

7  if it involves dissemination of a message.   The Commission

8  argues:

9           Drawing a distinction between speech that is
            publicly disseminated and conveys a
10          particular message to which a party might
            possibly object - like generic advertising -
11          and non-public speech or speech with no
            particular message to which a party might
12          possibly object makes perfect sense.
            Plaintiffs' theory - that they cannot be
13          compelled to fund any activity that involves
            the spoken (or written) word - cannot be the
14          law.  As the Supreme Court has noted in
            rejecting a freedom of association challenge
15          to a law restricting access to dance halls,
            '[i]t is possible to find some kernel of
16          expression in almost every activity a person
            undertakes - for example, walking down the
17          street or meeting one's friends at a shopping
            mall - but such a kernel is not sufficient to
18          bring the activity within the protection of
            the First Amendment.'  *City of Dallas v.*
19          *Stanglin*, 490 U.S. 19, 25 (1989).  Every
            activity a union or agricultural commission
20          might engage in likely involves some person
            uttering some word - like a grape breeder
21          giving instructions to her assistant - yet
            the Supreme Court in *Abood,* [*Glickman*], and
22          *United Foods* did not hold that the funding of
            *every* activity potentially implicates the
23          First Amendment.  Under Plaintiffs' view, a
            law imposing a toll for crossing the Golden
24          Gate Bridge would violate the First Amendment
            if a portion of the toll proceeds paid toll
25          collectors who must speak to motorists.

26  The Commission concludes that its "non-advertising activities

191

form the broader, constitutionally permissible, program to which
the Commission's advertising can be germane."  The evidence
establishes that advertising was only 25% of the Commission's
expenditures in 2004-2005 and has never been more that 50% of the
assessment expenditures during the relevant time period.

The totality of the circumstances of the Commission's
industry activities are germane within the meaning of *Abood* to
achieving the legislatively adopted economic objectives.

b. Germane to Commission's Broad Program.

The Commission asserts it is entitled to summary judgment
that its generic advertising is germane to the Commission's
broader demand-enhancement program under the *Abood* test, because
all of its advertisements are designed to motivate consumers to
buy more fresh California table grapes; that its advertisements
have not promoted products other than California table grapes;
that the Commission has not run political or ideological
advertisements; that its advertisements have been in good taste
and are not false or misleading; and that its advertisement have
increased demand for California table grapes, which benefits the
table grape industry, the California economy, and the health and
welfare of its citizens.  Finally, this advertising works in
conjunction with its other non-speech activities, including the
current advertising campaign that emphasizes grapes as a healthy
snack alternative.

The totality to the circumstances of the Commission's
industry program are germane within the meaning of *Abood* to

achieving the legislatively adopted economic objectives to advance, enhance, and protect the table grape industry and the greater economic well-being of California.

The Commission's motion for summary judgment that the Ketchum Act is constitutional under the "germaneness" test articulated in *Abood* is GRANTED.

J.   <u>CONCLUSION</u>.

For the reasons stated above:

1.   Plaintiffs' motion for partial summary judgment is DENIED and the Commission's motion for summary judgment is GRANTED that the Table Grape Commission is a governmental entity that engages in government speech within the meaning of *Johanns v. Livestock Marketing Ass'n.*, 544 U.S. 550 (2005);

2.   Plaintiffs' motion for partial summary judgment is DENIED that the Table Grape Commission is governed by *United Foods, Inc. v. United States*, 533 U.S. 405 (2001);

3.   Plaintiffs' motion for partial summary judgment is GRANTED that the *Central Hudson* test, *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), has no application to the resolution of Plaintiffs' First Amendment challenge to the Ketchum Act, and the Commission's motion for summary judgment is DENIED;

4.   The Commission's motion for summary judgment is GRANTED that its activities are germane to valid legislative objectives within the meaning of    *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977);

**5.   The Commission's motion for partial summary judgment on the grounds that The Susan Neill Company lacks standing to obtain relief and the Lucas Brothers Partnership lacks standing to obtain prospective as opposed to past relief is GRANTED and Defendant's motion for summary judgment on this issue is DENIED.**

**6.   Counsel for the Commission shall prepare and lodge a form of order setting consistent with this Memorandum Decision within five (5) days following the date of service of this decision.**

IT IS SO ORDERED.

**Dated:    March 28, 2008           /s/ Oliver W. Wanger**
                                    UNITED STATES DISTRICT JUDGE